**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MARINER HEALTH CENTRAL, INC., *et al.*,[1] | Case No. 22- 10877 (      ) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR INTERIM AND FINAL**
**ORDERS AUTHORIZING DEBTORS TO CONTINUE USE OF**
**EXISTING BANK ACCOUNTS, CASH MANAGEMENT SYSTEM**
**AND BUSINESS FORMS, AND GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"),

hereby move (the "Motion") for the entry of interim and final orders, substantially in the forms

attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order,"

and together the "Proposed Orders"), (i) authorizing the Debtors to (a) continue to maintain

existing bank accounts, (b) continue use of their existing cash management system, (c) continue

use of their existing business forms, and (d) honor certain prepetition obligations related thereto,

and (ii) granting related relief.  In support of this Motion, the Debtors rely on the *Declaration of*

*Lawrence Perkins in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day

Declaration") filed contemporaneously herewith, and respectfully submit as follows:

**JURISDICTION, VENUE, AND PREDICATES FOR RELIEF**

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of*

*Reference from the United States District Court for the District of Delaware,* dated February 29,

---

[1]     The Debtors, along with the last four digits of each Debtor's tax identification number, are Mariner
        Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating
        Company, LP (7273).  The Debtors' headquarters are located at 3060 Mercer University Drive, Suite
        200, Atlanta, GA 30341.

2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and may be determined by the Court.

2.	The predicates for the relief requested herein are sections 105(a), 345(b), 363(c)(1), 364(a), 503(b)(1), and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

3.	The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Motion if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

4.	On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").  The Debtors are operating as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

5.	The three Debtors, Mariner Health Central, Inc. ("Mariner Central"), Parkview Holding Company GP, LLC ("Parkview Holdco"), and Parkview Operating Company, LP ("Parkview"), are part of the Mariner Health Care group of healthcare services providers, consultants and holding companies (collectively, the "Mariner Companies"), all of which are direct

2

or indirect subsidiaries of non-Debtor Mariner Health Care, Inc. Certain of the Mariner Companies operate 20 skilled nursing facilities (the "Mariner Facilities"), with nearly 2,200 licensed beds and approximately 3,100 employees, that provide short-term rehabilitation, comprehensive post-acute skilled care, long-term care, therapy, and other services. For more than 30 years, the Mariner Facilities have delivered quality, affordable care to historically underserved persons and communities. Additional information regarding the Debtors' operations, structure, liabilities, and the events leading up to the commencement of these cases is set forth in the First Day Declaration, which is incorporated herein by reference.[2]

A.    **The Debtors' Bank Accounts and Cash Management System**

   ***i.    Overview***

   6.    The Debtors maintain a cash collections and disbursement system that allows for efficient monitoring and control of collections and disbursements, fulfillment of reporting requirements, and satisfaction of financial obligations in the ordinary course (the "Cash Management System"). As is common in the skilled nursing industry, the Mariner Companies seek to achieve operating efficiencies and economies of scale by consolidating certain key functions necessary for operating the Mariner Facilities, including cash management functions. Each Mariner Facility operator, including Parkview, is party to an agreement for such services with Mariner Central, pursuant to which Mariner Central provides among other things (a) administration of payroll and personnel services, (b) bookkeeping, accounting and related administrative support, budgeting, financial analysis and reporting, (c) billing and collection services, and (d) orderly and timely payments of all accounts payable of the respective Mariner Facility, including taxes, insurance premiums, and vendor payables. In order to lessen the

---

[2]    Capitalized terms used but not defined herein have the meanings given in the First Day Declaration.

disruption caused by the bankruptcy filing and maximize the value of their estates in these chapter 11 proceedings, it is vital that the Debtors maintain the Cash Management System.

7. In addition to the bank accounts maintained and used by the Debtors for collections and disbursements in the ordinary course, Parkview also maintains a patient trust account at Citibank, N.A. (the "Trust Account").[3] The Debtors' bank accounts that are part of the Cash Management System and the Trust Account are identified on **Exhibit C** annexed hereto (collectively, the "Bank Accounts"). Other than the Trust Account, the Bank Accounts are maintained at Capital One, N.A. ("Capital One") or Bank of America, N.A. ("BoA" and together with Capital One, the "Banks"). All of the Debtors' accounts maintained with the Banks are insured by the Federal Deposit Insurance Corporation ("FDIC"), and each of the Banks is designated by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") as an authorized depository, pursuant to the U.S. Trustee's Operating Guidelines and Financial Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines"). The Debtors have instructed the Banks that the Debtors' prepetition checks should be dishonored absent specific confirmation from the Debtors pursuant to order of this Court authorizing honoring of certain prepetition checks.

8. As of the Petition Date, none of the Debtors' Bank Accounts are subject to any security interests or liens. As set forth in the First Day Declaration, prior to the Petition Date, the Debtors were obligors on two revolving credit facilities with Capital One, N.A. secured by, among other things, liens on substantially all assets of Parkview. In advance of the Petition Date, because of continuing defaults under those facilities and the lack of availability thereunder to meet the

---

[3] The Trust Account is held in the name of a third-party unaffiliated entity National Datacare, who administers the patient Trust Account through a trust administration agreement with Parkview.

needs of these cases, the Debtors negotiated amendments to those facilities releasing their respective obligations thereunder and the termination of all related security interests.

    *ii.*      ***Collections and Disbursements****.*

    9.      Parkview receives cash payments from various sources, including governmental deposits, resident payments, and payments from other private payors.  Government program payments, primarily Medicare and Medi-Cal reimbursements, account for approximately 85% of Parkview's cash receipts.  Typically, the Debtors bill Medi-Cal on a weekly basis and Medi-Cal, private-insurance and other payors on a monthly basis, and receive most of the reimbursement payments on the same intervals.  All of Parkview's governmental receipts (whether by ACH or check) and its private payor receipts (whether by ACH or check) are deposited into a consolidated collections account.  Reconciliations of receipts, including comparing receipts to invoices billed to patients, is done on a monthly basis.

    10.      Mariner Central receives funds from the Mariner Facility operators pursuant to the terms of the applicable Support Agreement.  In general, such fees are paid on a monthly basis with periodic adjustments to account for services actually rendered and costs incurred.

    11.      The Debtors make substantially all disbursements to meet their ordinary course obligations, such as vendor payments and operational expenses, from designated disbursement accounts, other than payments made by wire transfers that are made directly from each Debtor's respective Concentration Account.  Disbursements are paid through both physical checks and electronic fund transfers ("EFTs") which are initiated, approved and tracked through the Banks and tracked by Mariner Central.  Checks are issued generally on a bi-weekly basis for accounts payable and bi-monthly for payroll.  Accounts payable payments are made in accordance with the terms of the relevant invoice, with each of the Debtor's checks issued in its own name.  Reports

are generated for each check run, containing the vendor/employee names, invoices, amounts, and check numbers, and reports are verified for accuracy before checks are mailed. The disbursement accounts are "zero-balance" accounts that are funded on an as-needed daily basis from funds in the respective Debtor's Concentration Account, and maintain no cash balance at the end of each day.

12.     The Debtor's collections and disbursements are effectuated with the Bank Accounts, which are comprised of the following:

a.     <u>Depository Account</u>: Parkview maintains one account for the collection and payment of receivables from private customers and government payors (the "<u>Depository Account</u>"), which comprise substantially all of Parkview's cash receipts. Deposits made into this account include checks, wire transfers, automated clearinghouse transfers, credit card payments (VISA, MasterCard, Discover and American Express as well as other debit cards), and cash receipts. The Depository Account is a zero-balance account and only carries a cash balance in the event a payment was received following the daily sweep.

b.     <u>Concentration Accounts</u>: Each of Parkview and Mariner Central maintains a bank account in its own name to pool funds before disbursement to satisfy incurred obligations and operating expenses (the "<u>Concentration Accounts</u>"). The Depository Account is swept into Parkview's Concentration Account daily. The Mariner Central Concentration Account is funded with amounts owing from the Mariner Facility operators under the applicable support agreements.

c.     <u>The Disbursement Accounts</u>. Each Debtor has its own disbursement accounts ("<u>Disbursement Accounts</u>"):

  i.     <u>Payroll</u>. Each Debtor has an account for payroll related expenses, which is funded on an as-needed basis from its respective Concentration Account.

  ii.     <u>Utility Account</u>. Each Debtor has established an account to satisfy recurring charges incurred for general utility services, which is funded on an as-needed basis from its respective Concentration Account and carries a balance only for any outstanding checks. The Debtors anticipate utilizing such accounts to hold adequate assurance deposits for utilities, as described in the related motion filed contemporaneously herewith.

  iii.     <u>Accounts Payable</u>. Each Debtor has an account for general accounts payable, which is funded on an as-needed basis from its respective Concentration Account

**B.      The Patient Trust Accounts**

13.      Each Mariner Facility operator, including Parkview, maintains a trust account for the benefit of their patients at the respective facility (the "Patient Trust Accounts").  The Patient Trust Accounts are escrow accounts maintained at Citibank, N.A. and the funds belong to the respective patients.  Parkview's patients, or a third party on behalf of the patient, deposit funds into the Parkview Patient Trust Account, which Parkview holds in trust for benefit of such patient. The patients have access to and use those funds for incidental expenses incurred in the Parkview Facility and, in some cases, to pay Parkview for the patient's share of cost responsibilities for services received.  The Patient Trust Funds are for all purposes property of the patients, not of the Debtors or their estates.

**C.      Intercompany Transactions**

14.      The Debtors historically have engaged, in the ordinary course of business, in certain routine transactions with each other and with certain other Mariner Companies that are non-debtors ("Non-Debtor Affiliates") resulting in intercompany receivables and payables (collectively, the "Intercompany Obligations").

15.      The Intercompany Obligations arise in various capacities.   In particular, Intercompany Obligations may arise when Mariner Central pays third-party vendors for services provided to Debtor Parkview and various Non-Debtor Affiliates.  The cost for such expenses is allocated among various Mariner Companies or to the specific entity on whose behalf Mariner Central made the payment.  For example, the Mariner Facilities carry general liability insurance under a single policy and worker compensation insurance under a single policy, with costs allocated across facilities based on beds or wage costs as applicable, and such amounts may result in Intercompany Obligations.  In addition, an employee of a Debtor or Non-Debtor Affiliate may provide services to another Debtor or Non-Debtor Affiliate resulting in an Intercompany

Obligation. For example, Parkview has contracted with Bio-Pacific, LLC, a Non-Debtor Affiliate, to provide physical therapy and rehabilitation services at the Parkview Facility. Finally, on occasion the Mariner Companies may transfer excess physical equipment or inventory (for example, beds) among each other to satisfy open needs. Such transactions do not occur on a regular basis but may also result in Intercompany Obligations.

16. Similarly, Mariner Central is compensated on a monthly basis, in arrears, for the administrative and support services that it provides to the SNF Operators, including Parkview. On average for the last six (6) months, Parkview has paid Mariner Central an average of approximately $170,000 per month in Support Fees.

17. Accordingly, in connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and/or their Non-Debtor Affiliates, at any given time there may be balances owing from one Debtor to the other, or to or from a Non-Debtor Affiliate. The Mariner Companies historically have reflected Intercompany Obligations as journal entry receivables and payables in the respective Debtor or Non-Debtor Affiliate's accounting ledger. All fund transfers are tracked in the respective entities accounting ledger and inter-company cash movement is reconciled on a monthly basis and, therefore, the Debtors can ascertain, trace, and account for such intercompany transfers. The Debtors intend to account for all postpetition transactions in accordance with past historical practice.

18. The Intercompany Transactions are an essential component of the Company's complex multi-site operations and funding needs. Any interruption of the Intercompany Transactions would severely disrupt the Company's operations and result in great harm to the Debtors' estates and their stakeholders. Accordingly, the Debtors seek authority to continue

intercompany transactions and to honor the Intercompany Obligations in the ordinary course of business on a postpetition basis, in a manner substantially consistent with past practice. The Debtors are *not* at this time requesting authority to pay or satisfy any amounts owed on account of prepetition Intercompany Obligations.

**D.     The Debtors' Existing Business Forms**

19.     In the ordinary course of business, the Debtors use certain business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms"). Because of the nature and scope of the Debtors' business operations and the number of suppliers of goods and services with whom the Debtors transact business on a regular basis, including on behalf of Non-Debtor Affiliates, it is important that the Debtors be permitted to continue to use the Business Forms. Business Forms were used prepetition and thus, do not reference a given Debtors' current status as debtor in possession. However, most parties doing business with the Debtors will doubtless be aware of the Debtors' status as debtors in possession as a result of receiving the official notice of the commencement of these Chapter 11 Cases that has been or will be provided to parties in interest and a press release being issued by the Debtors. As with the existing Cash Management System, requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their efforts to restructure their businesses and impose needless expenses on the Debtors' estates.

20.     Notably, the Debtors do not maintain pre-printed check stock; rather, at the time checks are issued, the name of the payor entity is written when the check is printed. The Debtors will make reasonable best efforts to ensure that after the Petition Date, subsequently written checks bear the designation "Debtor in Possession" and their joint case number in accordance with Local Rule 2015-2.

**E.**    **Investments**

21.    The Debtors periodically have amounts over the FDIC insured limits on a particular day in a given Bank Account.  Other than the Concentration Accounts, the Debtors have no overnight or other investments.  The Debtors do not participate in any financial derivative investments or transactions.

## RELIEF REQUESTED

22.    By this Motion, the Debtors request entry of the Proposed Orders authorizing (a) the continued use of existing Bank Accounts, (b) the continued use of the Debtors' existing Cash Management System, and (c) the continued use of existing Business Forms, and granting related relief.

23.    The relief requested herein will help ensure the Debtors' smooth transition into chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtor's attention from more pressing matters during the initial days of this case.

## BASIS FOR RELIEF REQUESTED

24.    The Office of the United States Trustee (the "U.S. Trustee") has established operating guidelines for debtors-in-possession to facilitate the administration of chapter 11 cases. The guidelines provide that chapter 11 debtors must: (i) close all existing bank accounts and open new debtor-in-possession bank accounts; (ii) establish a single debtor-in-possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain a separate debtor-in-possession account for cash collateral; and (iv) acquire new checks for all debtor-in-possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number, and the type of account.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against

the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date. For the reasons set forth herein, the Debtors submit that it is appropriate for the Court to grant the relief requested by this Motion.

25. Continuation of the Cash Management System (including the related relief sought herein), is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1); *see Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447 (10th Cir. 1996) (debtor's ability to continue the "routine transactions" necessitated by debtor's cash management system is within the purview of section 363(c); *Charter Co. v Prudential Ins. Co. of Am. (In re Charter Co.)*, 778 F.2d 617, 620-21 (11th Cir. 1985) (affirming district court's dismissal of attempted appeal of bankruptcy court order authorizing debtor to "continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors herein") (citation omitted).

26. Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin -United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987). Additionally, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see*

*also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that maintaining an existing cash management system allows debtors "to administer more efficiently and effectively its financial operations and assets").

27.     Moreover, Courts in this district and others routinely allow debtors in chapter 11 cases to maintain their existing cash management systems. *See, e.g., In re First Guaranty Mortgage Corporation*, No. 22-10584 (CTG) (Bankr. D. Del. July 1, 2022) (authorizing debtors to continue using cash management system maintained by debtors prepetition); *In re CMC II, LLC,* Case No. 21-10461 (JTD) (Bankr. D. Del. Mar. 3, 2021) (same)*; In re AAC Holdings, Inc.,* Case No. 20-11648 (JTD) (Bankr. D. Del. July 15, 2020) (same)*; In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 21, 2020) (same); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 3, 2019) (same); *In re Destination Maternity Corporation, et al.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (same); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019) (same); *In re Blackhawk Mining LLC, et al*., No. 19-11595 (LSS) (Bankr. D. Del. Aug. 8, 2019) (same).[4]

A.      **Maintaining the Debtors' Existing Cash Management System is Essential to Maximize Values for the Estates and Should be Approved.**

28.     The Debtors' Cash Management System constitutes a customary and essential business practice that was created and implemented by the Debtors in the exercise of their business judgment. It is a practical mechanism that allows the Debtors to transfer revenues to the payment of obligations that decreases the burdens on the Debtors, and that provides several important benefits, including the ability to: (a) control and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds and the

---

[4] Because of their lack of novelty, and the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

development of timely and accurate balance and presentment information.  All of these benefits will assist the Debtors in maintaining operations pending the confirmation of a chapter 11 plan or other disposition of these cases.  In order to use the property of their estates and to ensure an orderly transition into chapter 11, the Debtors seek authority to continue to use their existing Cash Management System in the ordinary course of business.

29.     Requiring the Debtors to adopt a new, segmented cash management system at this early and critical stage of these cases would be costly, would likely create unnecessary administrative and other problems, and would be much more disruptive than productive.  Such disruptions could adversely affect Parkview's ability to operate and deliver critical end-of-life care to its patients.  Consequently, maintenance of the existing Cash Management System, including the Debtors' continued ability to transfer funds among the identified Bank Accounts, and engaging in the ordinary course intercompany transactions, is both essential and in the best interest of all creditors and other parties in interest.

30.     The Debtors' Cash Management System includes the necessary accounting controls to enable the Debtors, as well as other interested parties in these cases, to trace funds through the system and ensure that all transactions are adequately documented and readily ascertainable.  The Debtors will continue to maintain detailed records reflecting all fund transfers.

31.     In connection with their Cash Management System, the Debtors also seek authorization to maintain and operate their Bank Accounts in the ordinary course of their business. Closing all existing bank accounts and opening new and separate debtor in possession accounts pursuant to the U.S. Trustee Guidelines would needlessly interrupt the Debtors' operations and impair the Debtors' efforts to preserve the value of their estates.  In particular, as a healthcare business that receives payments and reimbursements from government payors, the Debtors are

required to maintain deposit accounts that are linked with specific healthcare provider identification. Modifying the Bank Accounts in any way would hinder and cause delays in the Debtors' receipt of receivables, which would be detrimental to the Debtors' estates and creditors.

32. Similarly, the Debtors request that the Court grant further relief from the U.S. Trustee Operating Guidelines to the extent they require the Debtors to make all disbursements by check in contravention of the Debtors' Cash Management System. In particular, the U.S. Trustee Operating Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement. As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH transactions, EFT transactions and other similar methods. If the Debtors' ability to conduct transactions by these methods is impaired, the Debtors may be unable to perform under certain contracts, and payments to vendors could be delayed, resulting in unnecessary disruption to their business operations and the incurrence of additional costs to their estates.

33. As set forth above, the relief requested herein is fully appropriate and supported by ample authority in this and other courts. The purpose of section 363(c)(1) is to provide flexibility to a debtor-in-possession to engage in the ordinary transactions necessary to operate its business without unneeded oversight by its creditors or the Court. *See, e.g., In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("[t]he framework of section 363 is designed to allow a trustee (or debtor-in-possession) the flexibility to engage in ordinary transactions without unnecessary creditor and bankruptcy court oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary"); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007). The requirement to maintain all accounts separately would decentralize the Debtors' Cash Management System and, therefore, would impede the efficient utilization of cash

resources and would be impractical, and a huge administrative burden, to maintain separate accounts. *See Columbia Gas*, 997 F.2d at 1061; *In re Columbia Gas Sys., Inc.,* 136 B.R. at 934; *see, e.g., In re Malibu Lighting Corp.,* Case No. 15-12080 (KG) (Bankr. D. Del. Nov. 4, 2015); *In re FCC Holdings, Inc.,* Case No. 14-11987 (CSS) (Bankr. D. Del. Sept. 22, 2014).

34.     Based on the foregoing, the Debtors submit that maintenance of their existing Cash Management Systems (and the related relief requested herein) is in the best interest of their estates and all parties in interest and is permitted under section 363(c)(1) of the Bankruptcy Code.

**B.     Authorizing the Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course Is Warranted.**

35.     The Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course.

36.     The Debtors have made arrangements to readily identify checks, wire transfer requests, or automated clearing house transfers with respect to authorized payments related to this motion, as applicable. Accordingly, the Debtors believe that checks, wire transfer requests, or automated clearing house transfers that are not related to authorized payments will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, including the Banks, when requested by the Debtors, to receive, process, honor, and pay any and all checks, wire transfer requests, or automated clearing house transfers in respect of the relief requested in this motion.

37.     In this regard, all applicable financial institutions, including the Banks, should be authorized to receive, process, honor, and pay any and all checks, wire transfers requests, ACH or other ETF transfers, and other instructions and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue

instructions with respect thereto; provided that any check, draft, or other notification that the Debtors advise the Banks to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the banks only to the extent authorized by order of the Court.

38.     The Debtors further request that the Court authorize all applicable financial institutions, including the Banks, to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or subsequent to the Petition Date. The Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any account either (a) at the direction of the Debtors, (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as a result of a mistake made despite implementation of customary item handling procedures, such Bank will not be deemed to be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item honored postpetition. The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

39.     Moreover, the Debtors request that the Court authorize the Debtors to pay any Bank fees on account of prepetition transactions that are charged postpetition, and authorize the Banks to continue to charge fees to the Debtors, and charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course.

**C.     The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.**

40.     As described above, in the ordinary course of business, the Debtors use various Business Forms. Because parties doing business with the Debtors undoubtedly will be aware of

the Debtors' status as debtors-in-possession, changing their Business Forms would be unnecessary and unduly burdensome. The Debtors, therefore, request authority to use their existing Business Forms pursuant to Local Rule 2015-2(a); however, the Debtors expect to be able to designate "Debtor in Possession" and their joint case number on the Debtors' checks issued shortly after the Petition Date and will make reasonable best efforts to ensure that any new business forms of the Debtors purchased after the Petition Date will bear the designation "Debtor in Possession" and their joint case number.

**D.** **The Debtors are in Compliance with the Requirements of Section 345(b) of the Bankruptcy Code.**

41. The Debtors believe all of the Bank Accounts comply with section 345(b) of the Bankruptcy Code because such Bank Accounts are maintained at banks that are insured by the Federal Deposit Insurance Corporation (the "FDIC"). *See* 11 U.S.C. § 345(b). As of the Petition Date, the Debtors maintain all of their Bank Accounts at Capital One, BoA or Citibank, which are each insured by the FDIC and designated as an authorized depository by the Office of the United States Trustee for the District of Delaware pursuant to the U.S. Trustee Guidelines. As such, the Debtors submit that the Cash Management System and the Bank Accounts comply with the requirements of section 345 of the Bankruptcy Code and the U.S. Trustee Operating Guidelines. Nevertheless, to the extent the U.S. Trustee would like a period of time to review the Bank Accounts, the Debtors hereby request a 30-day extension of the time by which they must comply with the requirements of section 345(b) of the Bankruptcy Code.

42. Courts in this district and elsewhere have allowed debtors to maintain their existing depository accounts in complex chapter 11 cases, despite a failure to strictly comply with section 345 of the Bankruptcy Code. *See, e.g.*, *In re Clover Techs. Grp., LLC*, No. 19-12680 (KBO) (Bankr. D. Del. Jan. 21, 2020) (order suspending debtors' obligation to comply with section 345

and authorizing maintenance of existing bank accounts); *In re Anna Holdings, Inc.*, No. 19-12551 (CSS) (Bankr. D. Del. Dec. 3, 2019) (same); *In re Destination Maternity Corporation, et al.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 12, 2019) (same); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Oct. 28, 2019) (same); *In re Maxcom USA Telecom, Inc.*, Case No. 19-23489 (RDD) (Bankr. S.D.N.Y. Sep. 27, 2019) (same); *In re Blackhawk Mining, LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 9, 2019) (same); *In re Avaya Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Mar. 31, 2017) (same); *In re SunEdison, Inc.*, No. 16-10992 (SMB) (July 8, 2016) (same).[5]

**E.** **The Debtors Have Satisfied The Requirements Of Bankruptcy Rule 6003 and Are Entitled To A Waiver Of Bankruptcy Rule 6004.**

43.     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant. . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose prior to the filing of the petition . . . ." Fed. R. Bankr. P. 6003(b).  As detailed above and as set forth in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.   If the relief requested herein is not obtained during the first twenty-one days of these chapter 11 cases it would cause substantial disruption to the Debtors' operations to the detriment of their estates and creditors.   Accordingly, the Debtors submit that Bankruptcy Rule 6003 is satisfied.

44.     Similarly, unless the Court orders otherwise, Bankruptcy Rule 6004(a) requires the Debtors to provide 21 days' notice to all creditors and certain other parties in interest of the use of

---

[5]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.  Copies of these orders are available upon request to the Debtors' proposed counsel.

property outside of the ordinary course of business. *See* Fed. R. Bankr. P. 6004(a). Moreover, unless the Court orders otherwise, Bankruptcy Rule 6004(h) automatically stays for 14 days any order granting such relief. *See* Fed. R. Bankr. P. 6004(h). To the extent applicable, the Debtors submit that, as described above and in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors that would otherwise be caused by a delay in the granting of the relief requested herein. Therefore, to implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) or such notice requirement is waived, and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

45.     The Debtors hereby reserve any and all rights they may have with respect to the Cash Management System, the Bank Accounts, the Business Forms, and the relief requested herein. Without limiting the foregoing, the Debtors reserve the right to close or otherwise modify the terms of certain of the Bank Accounts and open new debtor-in-possession accounts as may be necessary to facilitate these chapter 11 cases and operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing order entered in this case. Moreover, nothing contained herein is intended or shall be construed as: (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy or lease under section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute

such claim subsequently. Finally, the relief requested herein shall not oblige the Debtors to accept any services.

## NOTICE

46.     Notice of this Motion is being provided to: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the United States Attorney for the District of Delaware; (iv) the Centers for Medicare & Medicaid Services; (v) the Attorney General for the State of California; (vi) the Banks; (vii) all parties on the Debtors' consolidated list of 30 largest unsecured creditors; and (viii) all parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m). As the Motion is seeking "first day" relief, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

47.     No prior motion for the relief requested herein has been made to this or any other court.

*[remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and the Final Order, substantially in the forms attached hereto as Exhibit A and Exhibit B, granting the relief requested herein and such other and further relief as is just and proper.

Dated: September 19, 2022
      Wilmington, Delaware

/s/ Laura Davis Jones
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
        tcairns@pszjlaw.com
        mcalloway@pszjlaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice* pending)
Carollynn H.G. Callari (*pro hac vice* pending)
David S. Forsh (*pro hac vice* pending)
**RAINES FELDMAN LLP**
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019-4801
Telephone:    (917) 790-7100
Email:    hrafatjoo@raineslaw.com
        ccallari@raineslaw.com
        dforsh@raineslaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*