IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MARINER HEALTH CENTRAL, INC., *et al.*,[1] | Case No. 22- 10877 (     ) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO MAINTAIN, ADMINISTER, AND MODIFY RESIDENT REFUND PROGRAMS AND PRACTICES, AND HONOR OBLIGATIONS RELATED THERETO, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move (the "Motion") for the entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order," and together the "Proposed Orders"), authorizing the Debtors to maintain, administer, and modify the Refund Program (as defined herein) and make payments to residents and third-party payors or to otherwise honor accrued obligations owed under their Refund Program, regardless of whether the obligations occurred prepetition or postpetition, and granting certain related relief. In support of this Motion, the Debtors rely on the *Declaration of Lawrence Perkins in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed contemporaneously herewith and respectfully submit as follows:

**JURISDICTION, VENUE, AND PREDICATES FOR RELIEF**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29,

---

[1] The Debtors, along with the last four digits of each Debtors' tax identification number, are Mariner Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating Company, LP (7273). The Debtors' headquarters are located at 3060 Mercer University Drive, Suite 200, Atlanta, GA 30341.

2012. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and may be determined by the Court.

2.The statutory predicates for the relief requested herein are sections 105(a), 363, 507(a), and 541(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(m) of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

3.The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Court in connection with this Motion if later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

4.On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 cases. The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

5.The three Debtors, Mariner Health Central, Inc. ("Mariner Central"), Parkview Holding Company GP, LLC ("Parkview Holdco") and Parkview Operating Company, LP ("Parkview"), are part of the Mariner Health Care group of healthcare services providers, consultants and holding companies (collectively, the "Mariner Companies"), all of which are direct or indirect subsidiaries of non-Debtor Mariner Health Care, Inc. Certain of the Mariner Companies operate 20 skilled nursing facilities (the "Mariner Facilities"), with nearly 2,200 licensed beds and approximately 3,100 employees, that provide short-term rehabilitation, comprehensive post-acute skilled care, long-term care, therapy, and other services. For more than 30 years, the Mariner

Facilities have delivered quality, affordable care to historically underserved persons and communities. Additional information regarding the Debtors' operations, structure, liabilities, and the events leading up to the commencement of these cases is set forth in the First Day Declaration, which is incorporated herein by reference.[2]

### A. The Refund Program

6. Parkview receives payments for its services from various sources, including residents of its skilled nursing facility ("Residents,") and third-party payors such as (but not limited to) healthcare insurers, private pay sources, and governmental agencies ("Third-Party Payors"). Due to, among other things, the way healthcare payments are billed, processed, and reconciled, Parkview routinely receives overpayments from Residents and Third-Party Payors. Accordingly, in the ordinary course of its business, Parkview issues refunds or credits ("Refunds") to Residents and Third-Party Payors (the "Refund Program").

7. For instance, Parkview may have a Refund obligation when a Resident whose insurance policy has both co-pay and deductible components might be presented with a bill containing an estimate of the portion of the bill that is the Resident's responsibility. That estimate may include, among other things, an over- or underestimation of the remaining deductible or copay. If the estimated copay turns out to be lower than the actual copay after the Resident paid for the services, the Resident is entitled to a credit. Often the Resident's final obligation amount for specific services rendered are not reconciled until after a Third-Party Payor (sometimes more than one) informs Parkview of the applicable portion of shared costs. Parkview's Refund obligations also may arise when services are improperly coded or billed against Resident accounts. Additionally, when Residents prepay for services to be rendered based on a projected length and course for treatment, but then there is a change in treatment, a Refund obligation may arise. Nonetheless, as overpayments are identified, Parkview is required under certain state and federal laws to reimburse the applicable Residents and Third-Party Payors the Refund amount, or risk

---

[2] Capitalized terms used but not defined herein have the meanings given in the First Day Declaration.

possible penalties and damages. Accordingly, in the ordinary course of business, Parkview either remits funds to Residents and Third-Party Payors to address these overpayment amounts, or the Third-Party Payor (or, less often, Residents) will offset future payments in the amount of the overpayment.

8.  The case-by-case nature of Parkview's services provided to Residents makes the process of determining each Resident's payment obligations from the outset particularly complex. As part of the Refund Program, Parkview (through Mariner Central) maintains a balance account for each Resident and tracks the accounts in Parkview's patient ledger, including any refunds due back to such Resident upon discharge, after all charges and payments have been reconciled. Historically, there has been a lag between when the Resident is treated, and when the overpayment is recognized or determined, and entered into the Debtors' billing system. In connection with the Support Services provided by Mariner Central to Parkview, Mariner Central is responsible for reviewing refund requests and works with Medicaid, Medi-Cal, and insurance specialists to ensure accuracy, reconcile offsets, finalize outstanding issues, and complete refund processing. As appropriate, instructions for Refunds are then sent to accounts payable for issuance as a check or credit to Residents or Third-Party Payors, as applicable. In addition to such regular Resident account reviews, when a Resident is discharged from the Parkview Facility, an audit of the Resident's account is conducted. Mariner Central will complete a full review of the Resident's account to determine that all debit or credit balances by all payor sources are valid or if an adjustment to the account is necessary. After the audit is completed, if a credit balance remains on the Resident's account, a Refund will be issued to the Resident (or to such other appropriate Third-Party Payor).

9.  Due to the nature of Parkview's business, the involvement of Third-Party Payors outside of the Debtors' control, and the continuous reconciliation process, it is difficult to determine the amount of outstanding overpayments at any point in time, as such overpayments may not yet have been identified or may have been identified but for which a refund check has not yet been issued. Moreover, some refund checks issued to Residents or Third-Party Payors

prepetition may not have been presented for payment or may not have cleared the Debtors' banking system and, accordingly, have not been honored and paid as of the Petition Date.

10. As of the Petition Date, Parkview's records reflect a credit on accounts receivable that indicates approximately $350,000 may be payable under the Refund Programs. However, historically Parkview's annual payment of refund liabilities has not exceeded $90,000. The Debtors expect that Refunds in 2022 will continue to be a relatively small percentage of revenues. The Debtors estimate that less than $90,000 may be owing under the Refund Program as of the Petition Date, of which approximately $69,000 may become due within the first 30 days of these Chapter 11 cases.

## RELIEF REQUESTED

11. By this Motion, the Debtors request entry of the Proposed Orders: (i) authorizing the Debtors to maintain, administer, and modify the Refund Program consistent with the ordinary course of business and make payments to Residents and Third-Party Payors or to otherwise honor prepetition or postpetition obligations accrued pursuant to the Refund Program; and (ii) granting certain related relief. In particular, the Debtors request authority to pay and allow offsets up to $10,000 in Parkview's Refund Program obligations, in the ordinary course of business on an interim basis, pending entry of the Final Order granting the relief requested herein, and authority to continue to issue (and reissue, if needed), pay and allow offsets for the Refund Program obligations to patients and Third-Party Payors, including refunds for overpayments made prepetition or resulting from prepetition services in the ordinary course of business, on a postpetition basis.

## BASIS FOR RELIEF REQUESTED

### A. Payment of the Refund Program Obligations Is a Sound Exercise of the Debtors' Business Judgment, and Should be Approved.

12. In furtherance of their duty to protect and preserve their estates, the Debtors submit that payment of Refund Program obligations (whether incurred prepetition or postpetition) is necessary to preserve Parkview's going-concern value and would inure to the benefit of the

Debtors' estates and creditors, and therefore the Motion should be approved. The Court may authorize the Debtors' payment of the prepetition Refund Program obligations pursuant to section 363(b) of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." *See* 11 U.S.C. § 363(b)(1);[3] *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (affirming lower court order authorizing payment of prepetition claims pursuant to section 363(b) of the Bankruptcy Code). To do so, courts require that the debtor "show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (citations omitted); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task"). Thus, if a transaction satisfies the business judgment rule, it should be approved under section 363(b) of the Bankruptcy Code. As set forth herein, the Debtors have demonstrated a sound business purpose that justifies the relief requested herein.

13. Furthermore, "[t]he Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during Chapter 11." *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999). Specifically, section 105(a) of the Bankruptcy Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" [the Bankruptcy Code]," pursuant to the "doctrine of necessity." *See* 11 U.S.C. § 105(a). The

---

[3] To the extent the Refund Program obligations relate to the postpetition period, the Debtors submit they are ordinary course payments that may be paid pursuant to section 363(c) of the Bankruptcy Code, which provides, in relevant part, that a debtor in possession may enter into transactions, including the use, sale, or lease of property of the estate, in the ordinary course of business, without notice or a hearing. *See* 11 U.S.C. § 363(c)(1).

"doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, a court may authorize debtors to pay prepetition claims that are essential to the continued operation of the business).

14.     A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175-76 (*citing Miltenberger v. Logansport, C. & S. W. Ry. Co.*, 106 U.S. 286 (1882)). Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 3 91, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Corp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits). This standard is satisfied here.

15. Indeed, similar relief has been routinely granted in this jurisdiction. *See, e.g., In re Hospital Acquisition LLC, et al.,* Case No. 19-10998 (BLS) (Bankr. D. Del. May 8, 2019) [D.I. 44] (authorizing continuance of patient and third-party payor refund program); *In re Promise Healthcare Grp.*, LLC, Case No. 18-12491 (CSS) (Bankr. D. Del. Dec. 3, 2018) [D.I. 200] (same); *In re Welded Constr., L.P.*, Case No. 18-12378 (KG) (Bankr. D. Del. Oct. 23, 2018) [D.I. 42] (authorizing the continuance of customer programs*); In re ONE Aviation Corp.*, Case No. 18-12309 (CSS) (Bankr. D. Del. Oct. 11, 2018) [D.I. 46] (same); *In re ATD Corp.*, Case No. 18-12221 (KJC) (Bankr. D. Del. Oct. 5, 2018) [D.I. 107] (same); *In re J & M Sales, Inc.*, Case No. 18-11801 (LSS) (Bankr. D. Del. Aug. 7, 2018) [D.I. 84] (same); *In re Brookstone Holdings Corp.*, Case No. 18-11780 (BLS) (Bankr. D. Del. Aug. 3, 2018) [D.I. 71] (same).[4]

16. Here, under certain state and federal laws, Parkview is required in certain circumstances to timely reimburse Residents and Third-Party Payors as overpayments are identified, or risk possible penalties and damages. For instance, pursuant to the Patient Protection and Affordable Care Act ("ACA") a person has "60 days after the date on which the overpayment was identified" to report and return such overpayment. 42 U.S.C. § 18001. Under the ACA, any overpayment retained after the 60-day deadline is an "obligation" subject to liability under the False Claims Act ("FCA"). Id. The FCA states in relevant part that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government . . . is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which Government sustains because of the act of that person." 31 U.S.C. § 3729 (a)(1)(G); see also 31 U.S.C. § 3279(b)(3) (the term "obligation" means an "established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment").

---

[4] Because of their lack of novelty, and the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Accordingly, if Parkview fails to obtain the relief sought by the Motion, and are unable to "report and return" any overpayments by the 60-day deadline set forth by the ACA, Parkview may be subject to penalties and treble damages under the FCA.

17. Second, the failure to honor the Refunds will erode loyalty from Residents and will severely and adversely impact Parkview's reputation and business with prospective residents and in this highly competitive industry. Current and potential Residents may be concerned about Parkview's future performance once they learn that the Debtors have commenced the Chapter 11 cases. Any ambiguity concerning Parkview's ability to honor its Refund Program obligations would put Parkview in a substantial competitive disadvantage in the marketplace, amplifying the negative effect of Resident uncertainty that may arise from these cases. Also, the Residents and the Third-Party Payors with whom the Debtors regularly interact depend on the timely disbursement of Refunds as they are due as part of the ongoing healthcare system. If for any reason Residents or Third-Party Payors do not believe they will be reimbursed for the amounts they are due, the Debtors' goodwill may be irreparably harmed and Residents will stop seeking care at the Parkview Facility, and insurance providers may be reluctant to do business with the Debtors. It is therefore imperative that the Debtors alleviate Residents' and Third-Party Payors' concerns respecting Parkview's performance, including assuring that any overpayments by a Resident will be refunded (or an offset will be allowed) in the ordinary course of business to preserve Parkview's going concern value. Third, the administrative distraction, undue accounting reconciliations and transactional costs of dealing with a disrupted insurance collections system could be significant and is not justified. Therefore, granting the relief requested herein is in the best interests of the Debtors' estates and creditors.

18. Accordingly, not promptly obtaining Court authorization to honor and perform the Refund obligations would threaten the Debtors' ability to operate seamlessly and successfully during bankruptcy, undermining their chances at a successful reorganization to the detriment of their creditors and other stakeholders. Under these circumstances, the benefits of continuing to

honor the Refund Program outweighs the costs associated therewith, and the Debtors submit that the relief requested herein is justified and warranted.

        **B.**      **Cause Exists to Authorize and Direct the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers as Set Forth Herein.**

        19.      The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment, and to honor all electronic payment requests made by the Debtors, related to the obligations described herein, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date; provided, that sufficient funds are available in the applicable accounts to cover the checks and fund transfers. The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion. The Debtors respectfully submit that such relief is reasonable and appropriate because the banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise. The Debtors represent that Parkview has sufficient availability of funds to pay any amounts described herein.

        20.      Also, the Debtors submit that their cash management system and Resident account reconciliation processes enable them to readily identify checks or wire transfer requests as relating to an authorized payment made with respect to the Refund Program. Accordingly, the Debtors believe that unauthorized checks or wire transfer requests will not be honored inadvertently and that all applicable financial institutions should be authorized and directed, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests with respect to the Refund Program.

        **C.**      **The Debtors Have Satisfied the Requirements of Bankruptcy Rule 6003 and Are Entitled to A Waiver of Bankruptcy Rule 6004.**

        21.      Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant. . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property

of the estate, including a motion to pay all or part of a claim that arose prior to the filing of the petition . . . ." Fed. R. Bankr. P. 6003(b).  As detailed above and as set forth in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  An Operator's refusal or inability to pay a refund obligation is simply bad for business.  If the relief requested herein is not obtained during the first twenty-one days of these cases it could cause substantial disruption to the Debtors' operations to the detriment of their estates and creditors.  Accordingly, the Debtors submit that Bankruptcy Rule 6003 is satisfied.

22. Similarly, unless the Court orders otherwise, Bankruptcy Rule 6004(a) requires the Debtors to provide 21 days' notice to all creditors and certain other parties in interest of the use of property outside of the ordinary course of business.  *See* Fed. R. Bankr. P. 6004(a).  Moreover, unless the Court orders otherwise, Bankruptcy Rule 6004(h) automatically stays for 14 days any order granting such relief.  *See* Fed. R. Bankr. P. 6004(h).  Based on the nature of the relief requested herein, to the extent applicable, the Debtors submit that, as described above and in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors that would result from delay in the relief requested herein. Therefore, the Debtors request that the Court enter an order providing that the notice given of the relief requested herein is sufficient and satisfies all applicable requirements, and that such relief shall be immediately effective.

**RESERVATION OF RIGHTS**

23. Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval, assumption, or rejection of any agreement, contract, or lease under Bankruptcy Code section 365.  The Debtors expressly reserve their rights to contest any invoice or claim under applicable law and to assume or reject any agreements with Residents or Third-Party Payors in accordance with the applicable provisions of the Bankruptcy Code.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should

not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE

24. Notice of this Motion is being provided to: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the United States Attorney for the District of Delaware; (iv) the Centers for Medicare & Medicaid Services; (v) the Attorney General for the State of California; (vi) all parties on the Debtors' consolidated list of 30 largest unsecured creditors; and (vii) all parties entitled to notice pursuant to Local Rules 2002-1(b) and 9013-1(m). As this Motion is seeking "first day" relief, within two business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any order entered in respect to this Motion as required by Local Rule 9013-l(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

25. No prior motion for the relief requested herein has been made to this or any other court.

*[remainder of page intentionally left blank]*

**CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that this Court enter the Interim Order and Final Order granting the relief requested herein, and such other and further relief as the Court may deem just and proper under the circumstances.

Dated: September 19, 2022
       Wilmington, Delaware

/s/ Laura Davis Jones
Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Mary F. Caloway (DE Bar No. 3059)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:   (302) 652-4100
Facsimile:   (302) 652-4400
Email:       ljones@pszjlaw.com
             tcairns@pszjlaw.com
             mcalloway@pszjlaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice* pending)
Carollynn H.G. Callari (*pro hac vice* pending)
David S. Forsh (*pro hac vice* pending)
**RAINES FELDMAN LLP**
1350 Avenue of the Americas, 22nd Floor
New York, NY 10019-4801
Telephone:   (917) 790-7100
Email:       hrafatjoo@raineslaw.com
             ccallari@raineslaw.com
             dforsh@raineslaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*