**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MARINER HEALTH CENTRAL, INC., *et al*.,[1] | Case No. 22- 10877 (     ) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF LAWRENCE PERKINS IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Lawrence Perkins, hereby declare under penalty of perjury as follows:

1.      I am the Chief Executive Officer and Founder of SierraConstellation Partners LLC ("**SCP**"), a national interim management and advisory firm, and restructuring advisors to the above-captioned debtors and debtors in possession.  I also am the Chief Restructuring Officer ("CRO") of Mariner Health Central, Inc. ("Mariner Central"), Parkview Holding Company GP, LLC ("Parkview Holdco"), and Parkview Operating Company, LP ("Parkview"), the debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases" or "Cases").

2.      I am over the age of eighteen and authorized to submit this declaration (the "Declaration"), and if called on to testify, I could and would testify competently to the facts set forth in this Declaration.

3.      In my capacity as Chief Restructuring Officer for the Debtors, I submit this Declaration in support of the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and the relief

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are Mariner Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating Company, LP (7273).  The Debtors' headquarters are located at 3060 Mercer University Drive, Suite 200, Atlanta, GA 30341.

requested pursuant to the Debtors' applications and motions filed contemporaneously herewith (collectively, the "First Day Motions").

4.       I am familiar with the Debtors' operations, business affairs, books and records, and circumstances leading to these Chapter 11 Cases.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on (a) my personal knowledge of the Debtors' operations and finances, and/or my review of the Debtors' books and records, or relevant documents, (b) information I received from the SCP team working under my supervision or direction, or the Debtors' management team and their advisors, and/or (c) my opinion based upon my experience as a restructuring professional.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

## PROFESSIONAL BACKGROUND

5.       I have over 20 years of experience in the turnaround industry that has included interim management and turnaround consulting for middle market companies across the United States. Among other things, I have served as a chief restructuring officer, interim CEO, turnaround advisor, strategic consultant, and crisis manager in many industries, including healthcare companies.

6.       In July 2021, SCP was engaged by Mariner Central to evaluate its financial affairs and provide it with business financial advice and support the company in its evaluation of strategic alternatives.   In connection with that engagement, I was designated the principal of that engagement with overall responsibility for the engagement on behalf of SCP.  For over a year, I, together with the SCP team working under my supervision or direction, have been working with the Debtors to analyze their financial condition and provide advice concerning their liquidity and business strategies.  As explained further below, in connection with the Debtors' desire to pursue restructuring alternatives through these Chapter 11 Cases, I was appointed Chief Restructuring Officer for the Debtors.

## SUMMARY

7.     Debtor Parkview operates a skilled nursing facility with 121 beds and Debtor Mariner Central provides administrative, clinical and operational support services to Parkview and to other skilled nursing facilities.  Parkview Holdco is the general partner of Parkview (which is its sole asset), and has no other operations.  While the Debtors[2] have faced significant challenges since the beginning of the pandemic, and are party to over 35 lawsuits, the Debtors' present need for bankruptcy relief was precipitated by the recent entry of the Ledesma Judgment (defined below), which is against the Debtors in an amount that far exceeds the Debtors financial capacity to satisfy the judgment.  While the Debtors pursue an appeal from this judgment on various grounds, the Debtors cannot risk an interruption in care to the residents of the Parkview skilled nursing facility, or to the residents of the other skilled nursing facilities that rely on services provided by Mariner Central, that may result from judgment enforcement efforts.  Therefore, the Debtors were compelled to file these Chapter 11 Cases to protect their residents and their medical care, and to preserve value for their estates and creditors, while addressing the Ledesma Judgment and the Debtors' other obligations in an orderly manner.

8.     The Debtors intend to engage their creditors, in particular the holders of the Ledesma Judgment, to explore a consensual resolution of disputes within the circumstances of these Chapter 11 Cases.  However, the Debtors' efforts are focused on continuing to provide uninterrupted service to residents at the Parkview and other Mariner Facilities while pursuing a plan to reorganize in these Cases.  If necessary, the Debtors will pursue other strategic alternatives

---

[2] Parkview Holdco is not a named defendant in these actions (and is not named in the Ledesma Judgment) but faces potential liability as the general partner of Parkview.

to ensure uninterrupted care for Parkview's residents and to serve the best interests of their estates, creditors, residents, and other stakeholders.

## BACKGROUND

### A. *Overview*

9.      The three Debtors, Mariner Central, Parkview Holdco and Parkview, are part of the Mariner Health Care group of healthcare services providers, consultants and holding companies (collectively, the "Mariner Companies"), all of which are direct or indirect subsidiaries of Mariner Corp.[3] Each of the Debtor entities was formed in Delaware. Currently, the Mariner Companies' operations primarily relate to 20 skilled nursing facilities (each, a "Facility" and collectively, the "Mariner Facilities"), located in southern and northern California with approximately 2,190 licensed beds.  The Mariner Facilities generally range in size from 100 to 200 licensed resident beds, with an average of 109 beds, and serve residents with shorter-term rehabilitation needs and with longer-term nursing care needs. The Mariner Companies and their predecessors have been operating for over 30 years, and the Mariner Facilities have consistently provided quality accessible healthcare to the public, including to the underserved homeless community, during that time.

10.      As of the Petition Date, the Mariner Companies employ approximately 3,100 employees, of which approximately 2,062 are full-time employees with others on a part-time or per diem (as needed) basis.  Most work in, and are employed by, a particular Facility, and are highly skilled nurses, nursing aides and allied health professionals such as physical therapists, occupational therapists, speech therapists, and dieticians, and deliver a diverse array of services

---

[3] The Mariner Companies are comprised of over 50 related entities, only three of which are debtors.  A chart reflecting the Debtors' organizational structure is attached hereto as **Exhibit A**.

for residents.  Each Facility operator (an "Operator") also provides related services to patients, including, among other things, meals, local transportation, housekeeping, 24-hour monitoring, laundry, and daily living assistance.  As of the Petition Date, the Debtors employ 202 persons, and contract with various independent contractors or staffing agencies to provide certain medical and rehabilitation care and related services, such as utilization reviews and quality assurance. Parkview's employees are located in California, while Mariner Central's employees are located in Georgia, Maryland, California and Texas.

11.    Mariner Central, Parkview Holdco and Parkview are the only Mariner Companies seeking bankruptcy protection.  The Debtors' headquarters are located in Atlanta, Georgia. Parkview operates a skilled nursing facility with 121 beds located in Hayward, California (the "Parkview Facility"), while Mariner Central provides administrative, clinical and operational support services to Parkview and the other Operators.  During the COVID-19 pandemic, the Parkview Facility served as a COVID facility supporting its community and local hospitals by accepting and caring for COVID patients, and Mariner Central was appointed by the California Department of Public Health as a temporary manager for a non-affiliated nursing facility that had suffered a substantial increase in COVID cases.

### B.  *Operations*

12.    The Mariner Facilities' operations are heavily regulated by various state and federal agencies, and their resident services and financial operations are subject to rigorous rules and regulations.  As described below, certain lawsuits relating to such issues are pending against various Mariner Companies, in particular with respect to the Debtors' staffing.  As of the Petition Date, and at all relevant times, the Debtors believe they are in substantial compliance with such rules and regulations in all material respects

13.     The Operators realize revenues from: (i) Medicare reimbursements; (ii) Medi-Cal reimbursements; and (iii) managed care and other third-party insurance and private payors.[4]  The Operators generally use the revenue received to repay debt, fund their daily operations, make rent payments, and make capital improvements to the Facilities.  Approximately 85% of the Parkview's receipts are from Medicare or Medi-Cal.

14.     As is common in the skilled nursing care industry, the Mariner Companies seek to achieve operating efficiencies and economies of scale by consolidating certain key functions necessary for operating the Facilities.  Each Operator is party to an Administrative, Clinical and Operational Support Agreement (each, a "Support Agreement") with the Debtor Mariner Central. Under the Support Agreements, Mariner Central provides each counter-party Operator with the following services, among others: (a) administration of payroll and personnel services: (b) bookkeeping, accounting and related administrative support, budgeting, financial analysis and reporting; (c) billing and collection services; (d) orderly and timely payments of all accounts payable related to the operations of the applicable Facility, including taxes, insurance premiums, and vendor payables; (d) assistance in securing insurance; (e) handling Medicaid, Medi-Cal, and other reimbursement programs; (f) preparation and filing of tax returns; (g) negotiating and managing national contracts and other purchasing services; (h) insurance procurement; and (i) miscellaneous other services.  In exchange for such services, Mariner Central receives a monthly fee of 5% of the monthly net operating revenues of the subject Facility (the "Support Services Fee").  Mariner Central provides the Support Agreement services directly or subcontracts with a

---

[4] Parkview, and the other Operators, are no longer providing Veterans Administration services, however, payments for certain prior Veterans Administration services may be received by Parkview for an additional period of time.

third party, Fundamental Administrative Services, LLC, to provide certain services.  The Support Agreements may be terminated by the Operators on thirty (30) days' notice.

15.     Parkview has historically experienced material variability in its operating results but has generally operated on a positive cash flow basis, as has Mariner Central.  Parkview generated approximately $1.4 million of net income on revenues of $17.03 million, and a net loss of approximately $4.826 million on revenues of $14.92 million for the years ending December 31, 2020, and December 31, 2021, respectively.[5]  Over the same periods, Mariner Central generated approximately $77,278 in net income on $25.3 million of revenues and a net loss of approximately $3.37 million on $31 million of revenues.  The Debtors' decline in revenues in 2021 may be attributed to a significant census decline for that year relating to the pandemic and Parkview's service as a COVID center supporting the local community.  As of July 31, 2022, Parkview had approximately $5.97 million in total assets and $10.96 million in total liabilities, and Mariner Central had approximately $7.3 million in total assets and $104.7 million in total liabilities.  The Debtors' consolidated top thirty (30) creditors are located in various states including Maryland, New York, California, Georgia, Texas, Pennsylvania, among other states.

### C.    *Prepetition Liabilities*

16.     As discussed below, the Debtors' prepetition liabilities generally consist of: (i) outstanding borrowings, (ii) Medicare overpayment liability, (iii) trade debt to vendors and other counterparties incurred in the ordinary course of operations, (iv) general litigation claims (including those currently in litigation or subject to settlements), and (v) intercompany obligations, each of which is discussed below.

---

[5]  Parkview Holdco has no separate operations or liabilities, and its sole asset is its partnership interest in Parkview.

i. *Borrowings*

17.     Previously, the Debtors were obligors with other Mariner Companies on two revolving credit facilities (the "Capital One Facilities") with Capital One, N.A. ("Capital One"), as agent and lender, which facilities were used to fund working capital needs for the Mariner Companies, with monthly draws repaid through revenue receipts over the course of the month. Mariner Central and Parkview Holdco were each a guarantor on both facilities, while Parkview was a borrower under one facility, with availability of up to $6 million, and a guarantor on the other facility, with availability of up to $5 million.  For each of the Capital One Facilities, Parkview's and Parkview Holdco's obligations were each secured by liens on all or substantially all its assets, while Mariner Central's obligations were not secured.

18.     In advance of the Petition Date, the Debtors, in consultation with their advisors, determined that the Capital One Facilities lacked adequate availability for the Debtors' needs that could arise in these Chapter 11 Cases and were subject to a continuing event of default on account of the Ledesma Judgment.  The Debtors engaged in extensive negotiations with Capital One regarding the Capital One Facilities and/or a potential new debtor-in-possession financing facility. Ultimately, Capital One was unwilling to provide postpetition financing, through the Capital One Facilities or a new facility, but the Debtors successfully negotiated amendments to the Capital One Facilities releasing their respective obligations thereunder and terminating any liens by Capital One on their assets.

19.     The Debtors do not have any bank debt as of the Petition Date.  In 2020, Parkview obtained approximately $1.4 million under the Paycheck Protection Program (the "PPP Loan") and $850,000 from the Provider Relief Fund ("PRF") and other stimulus relief provided pursuant to the Coronavirus Aid, Relief, and Economic Security (CARES) Act.  The Debtors satisfied the requirements to obtain forgiveness of the PPP Loan, and the loan was forgiven in 2021.  While

approximately $690,000 of the PRF funds remain on the Debtors' balance sheet as a liability, the Debtors have satisfied the requirements for treatment of those funds as a grant and its financial will be updated accordingly this month.

ii.  *Overpayment Liabilities*

20.     The nature of Parkview's operations and the reimbursement process from Medicare involves post-payments audits that may identify and require the return of overpayments.  At this time, Parkview is subject to an extended repayment schedule agreement, administered by Noridian Healthcare Solutions, for Medicare overpayments related to the year ending December 31, 2021, in the amount of $1,798,928.18.  This agreement calls for monthly payments of $308,072.77 continuing through February 2023, with such amounts generally applied to offset monthly remittances otherwise payable to Parkview.

iii.  *Trade Debt*

21.     The Debtors have various unsecured liabilities incurred in the ordinary course of operations, consisting primarily of vendor claims and real property lease obligations.  Such claims include those of staffing agencies, independent physicians, medical directors, or other professionals relied on by the Debtors to provide care and services to residents as well as for medical supplies and equipment and for pharmacy, laboratory and food services.  Many of these service providers are critical to the Debtors' operations.

22.     The Operators, including Debtor Parkview, do not own the underlying real property at the Facilities but rather lease or sublease each of the premises where a Facility is located. Parkview leases the premises for the Facility from a third-party landlord, Tampa Avenue Property, LLC, under a lease with a term expiring on December 31, 2027, and monthly payments that are currently approximately $59,000.  Similarly, Mariner Central leases or subleases premises for the Debtors' headquarters in Atlanta, Georgia and for offices in Hayward, California and in Montrose,

California, which leases have terms ranging through 2026 and provide for monthly payments that are currently approximately $13,500 in the aggregate.

    *iv.*   *Litigation*

    23.    Lawsuits related to resident care and treatment against healthcare facilities are not uncommon in the industry.  In addition, the Debtors from time to time are subject to claims from employees on various grounds.  Accordingly, the Debtors have unsecured liquidated indebtedness relating to litigation awards or settlements, as well as contingent and/or unliquidated liabilities in connection with pending litigation.  As of the Petition Date, the Debtors were subject to approximately 35 pending lawsuits or structured settlements.

    24.    As noted above, the Debtors have been compelled to commence these Chapter 11 Cases because of adverse litigation outcomes in *Ledesma et al. v. Mariner Health Care, Inc., et al.*, Case No. RG19-025110, Superior Court of State of California, County of Alameda (the "Ledesma Action").  This is an action brought by 10 disparate plaintiffs and consolidated into a single case against the Debtors based on widely-varying allegations pertaining to their various residencies at the Parkview Facility and seeking a range of compensatory damages, attorney fees, statutory remedies and punitive damages based on widely-varying factual circumstances and liability theories that do not apply equally for all plaintiffs.[6]  On December 30, 2021, judgment was entered in favor of the Ledesma Action plaintiffs against the Debtors[7] in the aggregate amounts of approximately $4.5 million in compensatory damages plus more than $9 million in punitive damages (the "Ledesma Judgment").

---

[6] The initial complaints included (a) six additional plaintiffs, whose claims were consensually removed from the litigation to submit to arbitration, and (b) various additional Mariner Companies as defendants, against whom the litigation was dismissed for lack of personal jurisdiction.

[7] As noted above, Parkview Holdco is not a named defendant in the Ledesma Action or Ledesma Judgment but faces potential liability as the general partner of Parkview.

25. Since entry of the Ledesma Judgment, the plaintiffs have been subject to a stay on enforcement while the parties have engaged in post-trial motion practice. On March 21, 2022, the trial court granted in part and denied in part the Debtors' motion for judgment notwithstanding the verdict and seeking a new trial.[8]  As a result, the trial court reduced the Ledesma Judgment to $8,072.860.08.  Plaintiffs' counsel also filed a motion seeking fees and costs in the amount of $13.9 million dollars.  Plaintiffs subsequently were awarded $6.6 million dollars for attorneys' fees and costs.  According to the reduced judgment, in the aggregate, Parkview is liable for approximately $6.02 million and Mariner Central is liable for approximately $8.7 million of the judgment.  The stay of enforcement on the Ledesma Judgment is to expire on September 22, 2022. Further, the claims of the six additional plaintiffs are scheduled to be arbitrated in mid-2023.

26. The Debtors have already commenced, and intend to pursue during these Chapter 11 Cases, appeals of the Ledesma Judgment on various grounds, including but not limited to the grounds that (a) the joinder of such disparate plaintiffs and claims in one action before a single jury was erroneous and highly prejudicial to the Debtors, and (b) the introduction of consolidated financial information for all Mariner Companies was an abuse of discretion and a deprivation of the Debtors' due process rights.  Contemporaneously with the filing of this Declaration, the Debtors have filed a motion for relief from the automatic stay to continue such appeals.  The Debtors also intend to engage the Ledesma Action plaintiffs to explore a consensual resolution of claims within these Chapter 11 Cases.

27. In addition to the Ledesma Judgment, on December 30, 2021, an injunction (the "Ledesma Injunction") was entered in the Ledesma Action requiring Parkview to comply with

---

[8] The Ledesma Action court granted a new trial on the issue of the amount of wrongful death damages awarded to the heirs of two residents finding that Plaintiffs' counsel engaged in misconduct.  The combined award at issue is $700,000.00 and plaintiffs are appealing that ruling.

applicable staffing and specified health and safety statutes or regulations, imposing periodic reporting requirements, and providing for the appointment of a monitor to ensure such compliance. On February 8, 2022, the Ledesma Action court entered an order appointing Kathryn Jean Page as the monitor.  The Debtors believe they are and have been in compliance with such statutes and regulations in all material respects at all relevant times.

28.    In addition to the Ledesma Action, Parkview and/or Mariner Central are presently subject to two actions of particular note: (a) *United States of America ex rel. Integra Med Analytics LLC v. Mariner Health Care, Inc. et al.*, Case No. 3:18-CV-00653-EMC (N.D. Cal.) (the "Integra Action"), a *qui tam* action bringing claims under the FCA against Parkview and other Mariner Companies relating to therapy services provided to residents; and (b) *People of the State of California v. Mariner Health Care, Inc. et al.,* Case No. RG21-095881 (the "PSC Action"), Superior Court of the State of California, County of Alameda (Apr. 4, 2021), an action against the Debtors and other Mariner Companies alleging violations of state law relating to resident care. Parkview is a defendant in both actions, while Mariner Central is a defendant only in the PSC Action.[9]  Both of these actions are in the initial discovery stage.  The Debtors, as applicable, and other defendants dispute the allegations in, and will continue to defend, each of these actions. Contemporaneously with the filing of this Declaration, the Debtors are commencing adversary proceedings seeking temporary injunctive relief from the Court enjoining the continuation of the Integra Action, the PSC Action, and certain other actions pending against the Debtors or non-Debtor affiliates.

---

[9] Parkview Holdco is not a named defendant in these actions but faces potential liability as the general partner of Parkview.

*v. Intercompany Obligations*

29.     As Mariner Central provides services to and receives fees from the Operators in accordance with the applicable Support Agreement, at any time there may be amounts owing to Mariner Central from its Operator counterparty or from Mariner Central to its counterparty.  These amounts vary considerably in the ordinary course of operations.

30.     Generally, Mariner Central's sole source of revenue is from the Support Services Fee it receives from the Operators pursuant to the Support Agreements.  As of the Petition Date, Mariner Central is obligated to its Operator counterparties in the aggregate amount of approximately $87.6 million, of which approximately $3.9 million is owed to Parkview. These amounts reflect a history of advances made by the Operator counterparties to Mariner Central to enable Mariner Central to pay amounts payable to third-parties for goods or services that generally benefited the Operators but which exceeded the fees payable by the Operators to Mariner Central under the Support Agreements, resulting in an accrual of amounts owing from Mariner Central to the applicable Operators.

31.     The Operators may also contract with other Mariner Companies from time to time for certain services.  In particular, Parkview has contracted with its affiliate Bio-Pacific, LLC to provide physical therapy and rehabilitation services at the Parkview Facility.  As of the Petition Date, Parkview is obligated to Bio-Pacific for such services in the aggregate amount of approximately $32,200.

32.     The Debtors intend to continue performing under the Support Agreements or otherwise transacting from time to time with non-Debtor Mariner Companies on a postpetition basis consistent with past practices in the ordinary course of business.  The Debtors are *not* seeking authority at this time to pay or satisfy any such prepetition intercompany obligations.

## EVENTS LEADING UP TO THESE CASES

33.    Parkview has experienced significant decreases in resident occupancy and revenues during the pandemic, and has had substantial increases in operating expenses, particularly for labor costs, personal protective equipment, and facility improvements or modifications.    These developments have strained Parkview's liquidity, and efforts in recent months to improve occupancy levels, realize staffing efficiencies and otherwise reduce operational costs have not been sufficient to offset the adverse operational environment.

34.    While significant, these headwinds have been manageable and did not precipitate the commencement of these Chapter 11 Cases.  Rather, the Debtors have been forced to commence these cases because they lack the assets or the liquidity to satisfy the Ledesma Judgment, which in my opinion exceeds the value of the Debtors' assets and operations multiple times over.  The Debtors believe that the Ledesma Judgment should be overturned and will pursue an appeal therefrom, on grounds including but not limited to that the trial court's joinder of the widely-varying claims, factual circumstances and liability theories of the 10 plaintiffs in one action before a single jury was erroneous and highly prejudicial to the Debtors.  However, the Debtors cannot expose their residents and ongoing medical care requirements to the vagaries of the Ledesma plaintiffs' enforcement efforts during any such appeal.  The appeals bond for the Ledesma Judgment would be at least 150% of the judgment (*i.e.*, in excess of $22 million).  The Debtors require the protections of the Bankruptcy Code to ensure uninterrupted operations and care by the Debtors for their residents and to preserve value for the benefit of the Debtors' estates, residents, creditors and other stakeholders.

35.    Since the verdict in the Ledesma Action, the Debtors have worked with their advisors to explore strategic alternatives.  To oversee this process and facilitate strategies for the Debtors, Mr. Craig Barbarosh was appointed as independent director and independent manager of

Mariner Central and Parkview, respectively (the "<u>Independent Director</u>"), with sole authority to review, approve and implement strategic alternative transactions, including strategic restructuring alternatives, negotiations of resolutions of disputes, negotiations with counter-parties to contracts and leases, and with decision-making authority over any other matter to which the Debtors' management has a conflict, including matters concerning the non-Debtor Mariner Companies. The Independent Director appointed me as Chief Restructuring Officer of the Debtors. To ensure the continued delivery of safe and reliable services to the Debtors' residents, as well as to the residents of the other Mariner Facilities to which Mariner Central provides support services, the Debtors' senior management team remains in the day-to-day management of the Debtors' operational affairs.

36.     The Debtors have explored a potential sale of assets as well as potential financing. However, the Debtors' options have been constrained by, among other things, their balance sheet, operational issues such as the lack of a long term lease for the Parkview Facility and the ability of Operator counterparties to exit their Support Agreements with Mariner Central on limited notice, litigation overhang, and the broader economic and regulatory climate with respect to reimbursements and enforcement actions that may weigh against the industry overall. The Debtors sought an initial valuation from a real estate broker that specializes in residential care facilities and was familiar with the Parkview Facility from his involvement with similar facilities in the area. That initial valuation of the Debtors was less than $1 million (presuming the seller keeps cash on hand). Based on this initial valuation, the Debtors did not proceed with exploring marketing the assets further at this time, but it remains an option.

37.     The Debtors, through SCP, also solicited twenty-five (25) different third-party lenders to procure postpetition financing in order to assure sufficient availability for operations

and administration during these Chapter 11 Cases.   After some potential lenders signed confidentiality agreements and submitted proposals, the Debtors ultimately selected the best available proposal and began negotiations with a potential lender.  As of the date hereof, such negotiations remain ongoing.  The Debtors intend to continue such negotiations, and to pursue other available alternatives for postpetition financing as consistent with their duties and as may be in the best interests of their estates, and may seek authorization to enter into arrangements for postpetition financing as these Chapter 11 Cases progress and as the Debtors pursue a reorganization, sale or other value-maximizing course of action.  As set forth in the projected budget attached as **Exhibit B**, the Debtors' liquidity is tightly constrained but is expected to be sufficient for critical needs in the immediate future.

38.    The Debtors believe that a negotiated resolution with their creditors, including but not limited to the Ledesma Judgment plaintiffs, may be in the best interests of their estates, creditors, residents and other stakeholders and may yield the highest distributable value for allowed creditor claims.  The Debtors intend to file a plan within thirty (30) days.  If necessary, the Debtors will pursue other strategic alternatives to ensure uninterrupted care for the residents at Parkview and the other Mariner Facilities, and to further the interests of the Debtors' estates, creditors, residents and other stakeholders.

## THE FIRST DAY MOTIONS

39.    Contemporaneously with the filing of this Declaration, the Debtors have filed or will file the First Day Motions to minimize the disruption and adverse effects of the commencement of the Chapter 11 Cases on the Debtors' operations and their residents, and to preserve value for their estates and all stakeholders.

40.    The First Day Motions are:

a. **Joint Administration Motion**. *Motion of Debtors Seeking Entry Of An Order (I) Directing Joint Administration Of Their Related Chapter 11 Cases For Procedural Purposes Only And (II) Granting Related Relief*;

b. **Creditor Matrix Motion.** *Motion of Debtors For Authorization To (I) File A Consolidated List Of Creditors In Lieu Of Submitting A Separate Mailing Matrix For Each Debtor, (II) File A Consolidated List Of The Debtors' Thirty Largest Unsecured Creditors, (III) Redact Certain Personal Identification Information For Debtors' Employees And Individual Creditors, And (IV) Granting Related Relief*;

c. **Cash Management Motion.** *Motion of Debtors For Interim And Final Orders Authorizing Debtors To Continue Use Of Existing Bank Accounts, Cash Management System And Business Forms, And Granting Related Relief;*

d. **Utilities Motion.** *Motion of Debtors For Entry Of Interim And Final Orders (I) Determining Adequate Assurance Of Payment For Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, Or Discontinuing Utility Services, (III) Establishing Procedures For Determining Adequate Assurance Of Payment, (IV) Requiring Utility Providers To Return Deposits For Utility Services No Longer In Use, And (V) Granting Related Relief*;

e. **Wages Motion.** *Motion of Debtors For Entry Of Interim And Final Orders Authorizing Payment Of Certain Prepetition Employee-Related Claims And Granting Related Relief*;

f. **Insurance Motion.** *Motion of Debtors For Entry Of Interim And Final Orders Authorizing Continuation Of Insurance Coverage And Granting Related Relief*;

g. **Taxes Motion.** *Motion of Debtors For Entry Of Interim And Final Orders Authorizing Debtors To Pay Certain Prepetition Taxes And Granting Related Relief*;

h. **Patient Refund Programs Motion.** *Motion of Debtors For Entry Of Interim And Final Orders (I) Authorizing Debtors To Maintain, Administer, And Modify Resident Refund Programs And Practices, And Honor Obligations Related Thereto, And (II) Granting Related Relief*;

i. **Confidentiality Motion.** *Motion of Debtors For Entry Of An Order Authorizing Certain Procedures To Maintain Confidentiality Of Patient Information As Required By Applicable Privacy Rules*; and

j. **Claims & Notice Agent Application.** *Application of Debtors For Retention And Appointment Of Kurtzman Carson Consultants LLC As Claims And Noticing Agent.*

41.    I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) listed above, and the facts set forth in the First Day Motions are incorporated herein by reference.  To the best of my knowledge, the facts set forth in the First Day Motions are

true and correct.  If called upon to testify, I could and would testify competently to the facts set forth in each First Day Motion.

42.    As described in the First Day Motions, I believe that the Debtors' requests for interim relief are narrowly tailored, or where the requested payments would otherwise be entitled to priority over general unsecured claims, under the Bankruptcy Code.  It is my opinion that the relief sought in the First Day Motions is essential to avoid uncertainty and to allow the Debtors to operate without disruptions and protect residents, as well as to preserve the value of the Debtors' estates, and is in the best interests of the Debtors' estates, residents, creditors and other stakeholders.

## **CONCLUSION**

43.    For the reasons described herein and in the First Day Motions, I believe that the relief requested in the First Day Motions should be granted by the Court, with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: September 19, 2022

By: _____
Lawrence R Perkins (Sep 18, 2022 08:06 GMT+2)

Lawrence Perkins,
Chief Restructuring Officer of the Debtors

# EXHIBIT A

# ENTITY ORGANIZATION CHART

Note: Mariner Health Care, Inc. directly and indirectly owns other entities that are not shown on this chart.



# EXHIBIT B

**Subject to Further Revision**

**Parkview Healthcare Center and Mariner Health Central Consolidated 13 Week Cash Flow Projection**

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | 13 Week |
| --- | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: | ---: |
| Week Ending: | 9/23/2022 | 9/30/2022 | 10/7/2022 | 10/14/2022 | 10/21/2022 | 10/28/2022 | 11/4/2022 | 11/11/2022 | 11/18/2022 | 11/25/2022 | 12/2/2022 | 12/9/2022 | 12/16/2022 | Total |
| **CASH FLOW** | | | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | | | |
| **Total Receipts** | 795,380 | 795,380 | 816,099 | 816,099 | 816,099 | 816,099 | 796,283 | 796,283 | 796,283 | 796,283 | 815,245 | 815,245 | 815,245 | 10,486,025 |
| | | | | | | | | | | | | | | |
| **Disbursements** | | | | | | | | | | | | | | |
| Salary and Wage Expense | - | 387,801 | - | 388,077 | - | 387,418 | - | 386,108 | - | 386,866 | - | 387,254 | - | 2,323,525 |
| Benefits Expense | 267,673 | 28,065 | 174,476 | 27,796 | 250,519 | 43,553 | 171,042 | 27,427 | 170,326 | 121,016 | 169,876 | 27,691 | 171,901 | 1,651,360 |
| Supplies & General Operating Costs | 90,433 | 75,927 | 60,370 | 66,367 | 51,810 | 102,205 | 64,230 | 67,802 | 62,777 | 96,154 | 71,818 | 70,740 | 60,733 | 941,367 |
| Utilities | 24,783 | 882 | 3,927 | 1,216 | 5,200 | 24,793 | 3,991 | 1,505 | 5,629 | 24,288 | 4,125 | 1,715 | 4,869 | 106,922 |
| Taxes | 53,566 | - | - | - | - | 53,498 | - | - | - | 53,432 | - | - | - | 160,496 |
| Operating Legal | 21,089 | 2,494 | 28,180 | 509,334 | 14,449 | 19,894 | 34,512 | 509,334 | 10,520 | 15,993 | 45,265 | 663,876 | 13,139 | 1,888,079 |
| Other Operating Expense | 63,854 | 22,281 | 22,876 | 46,565 | 26,779 | 65,173 | 24,031 | 47,746 | 28,642 | 67,603 | 25,959 | 50,442 | 29,495 | 521,445 |
| Management / Admin Fee | 1,031,517 | - | - | - | - | 1,036,315 | - | - | - | 1,031,315 | - | - | - | 3,099,147 |
| Rent | - | - | 74,756 | - | - | - | 74,756 | - | - | - | 74,756 | - | - | 224,267 |
| Interest Expense | 178,889 | - | 3,574 | - | - | 180,185 | 3,574 | - | - | 179,969 | - | - | - | 546,191 |
| Other | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 845,000 |
| **Total Operating Disbursements** | **1,796,805** | **582,451** | **433,158** | **1,104,355** | **413,757** | **1,978,033** | **441,136** | **1,104,921** | **342,894** | **2,041,636** | **456,799** | **1,266,717** | **345,136** | **12,307,799** |
| | | | | | | | | | | | | | | |
| **Operating Cash Flow** | **(1,001,425)** | **212,929** | **382,941** | **(288,256)** | **402,343** | **(1,161,934)** | **355,148** | **(308,638)** | **453,389** | **(1,245,353)** | **358,446** | **(451,473)** | **470,108** | **(1,821,775)** |
| | | | | | | | | | | | | | | |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Professional & UST Fees | - | - | 370,261 | - | - | 19,354 | - | - | 640,522 | - | - | 571,422 | 525,889 | 2,127,447 |
| Other | 40,000 | - | - | 40,000 | - | 40,000 | - | 40,000 | - | 40,000 | - | 40,000 | - | 240,000 |
| **Total Non-Operating Disbursements** | **40,000** | **-** | **370,261** | **40,000** | **-** | **59,354** | **-** | **40,000** | **640,522** | **40,000** | **-** | **611,422** | **525,889** | **2,367,447** |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | **(1,041,425)** | **212,929** | **12,681** | **(328,256)** | **402,343** | **(1,221,288)** | **355,148** | **(348,638)** | **(187,133)** | **(1,285,353)** | **358,446** | **(1,062,894)** | **(55,781)** | **(4,189,222)** |
| | | | | | | | | | | | | | | |
| **LIQUIDITY** | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| Beginning Balance | 4,949,800 | 3,908,376 | 4,121,305 | 4,133,986 | 3,805,730 | 4,208,073 | 2,986,784 | 3,341,932 | 2,993,294 | 2,806,161 | 1,520,808 | 1,879,254 | 816,359 | 4,949,800 |
| (+) Net Cash Flow | (1,041,425) | 212,929 | 12,681 | (328,256) | 402,343 | (1,221,288) | 355,148 | (348,638) | (187,133) | (1,285,353) | 358,446 | (1,062,894) | (55,781) | (4,189,222) |
| **Ending Cash** | **3,908,376** | **4,121,305** | **4,133,986** | **3,805,730** | **4,208,073** | **2,986,784** | **3,341,932** | **2,993,294** | **2,806,161** | **1,520,808** | **1,879,254** | **816,359** | **760,578** | **760,578** |