## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MARINER HEALTH CENTRAL, INC., *et al.*,[1] | Case No. 22-10877 |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: October 25, 2022 at 11:00 a.m. (ET)**<br>**Obj. Deadline: October 18, 2022 at 4:00 p.m. (ET)** |

### DEBTORS' APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS TO EMPLOY AND RETAIN SIERRACONSTELLATION PARTNERS, LLC TO PROVIDE THE DEBTORS WITH A CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL AND (II) DESIGNATING LAWRENCE R. PERKINS AS THE DEBTORS' CHIEF RESTRUCTURING OFFICER, EFFECTIVE AS OF THE PETITION DATE

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this application (the "Application") to the Court for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) authorizing the Debtors to retain and employ SierraConstellation Partners, LLC ("Sierra") to provide the Debtors with a Chief Restructuring Officer ("CRO") and additional personnel and (ii) designating Lawrence R. Perkins ("Mr. Perkins") as the Debtors' CRO, effective as of the Petition Date (as defined herein), pursuant to the terms and conditions set forth in the Engagement Letter (as defined herein).  In support of this Application, the Debtors rely on the *Declaration of Lawrence R. Perkins in Support of Debtors' Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain SierraConstellation Partners, LLC to Provide the Debtors with a Chief Restructuring Officer and Additional Personnel and (II) Designating Lawrence R. Perkins as the Debtors' Chief*

---

[1]    The Debtors, along with the last four digits of each Debtors' tax identification number, are: Mariner Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating Company, LP (7273).  The Debtors' headquarters are located at 3060 Mercer University Drive, Suite 200, Atlanta, GA 30341.

*Restructuring Officer, Effective as of the Petition Date* (the "Perkins Declaration"), which is attached hereto at **Exhibit B**.  In further support of this Application, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Application under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Application in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105 and 363 of the Bankruptcy Code, and Bankruptcy Rules 2014(a), 2016(b), 6003 and 6004.

3.      Pursuant to Local Rule 9013-1(f), the Debtors confirm their consent to the entry of a final order by the Court in connection with this Application if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

4.      On September 19, 2022 (the "Petition Date"), the Debtors commenced their cases by filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these cases.

5.      A detailed description of the Debtors, including their business operations, their corporate and capital structures, the events leading to the commencement of the Chapter 11 Cases, and the facts and circumstances supporting this Application, are set forth in greater detail in the *Declaration of Lawrence R. Perkins in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 12] (the "First Day Declaration") and incorporated by reference herein.

## RELIEF REQUESTED

6.      Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Rules 2014(a), 2016(b), 6003 and 6004 of the Bankruptcy Rules, the Debtors seek entry of an order, substantially in the form of the Proposed Order, authorizing (i) the employment and retention of Sierra on the terms and conditions set forth in Sierra's prepetition engagement letter with the Debtors entered into on September 18, 2022 (the "Engagement Letter"),[2] a copy of which is attached to the Perkins Declaration and incorporated herein by reference, (ii) the designation of Mr. Perkins as CRO, effective as of the Petition Date, pursuant to the terms of the Engagement Letter, and (iii) such other and further relief as the Court deems just, proper and necessary.  The Debtors seek to retain Sierra in order to prepare, guide and assist the Debtors as an officer through the Chapter 11 Cases as outlined below.

## RETENTION OF SIERRA

### A.      Sierra's Qualifications

7.      Sierra is an interim management and advisory firm providing services to companies navigating their way through business challenges, including bankruptcy.  Sierra's diversified consulting experience assisting companies in transition has made it capable of solving strategic,

---

[2] The Engagement Letter is dated September 16, 2022 on the first page, but was approved by the Debtors and entered into on September 18, 2022.

3

operational, and financial issues faced by businesses.  Specifically, Sierra provides services in areas including performance improvement, financial restructuring, and interim management.

8.      Sierra is well qualified to provide its services and a CRO to the Debtors.  Sierra is recognized for its experience in providing advisory services to financially distressed companies, including advising debtors, creditors, and other constituents in chapter 11 proceedings in numerous cases.  Among numerous other cases across the United States, Sierra has provided advisory and restructuring services to entities in a broad range of industry sectors, including healthcare, manufacturing, pharmaceuticals, specialty chemicals, and technology, among others.  Some of the chapter 11 cases in which Sierra has provided restructuring and advisory services, include:  *In re Zosano Pharma Corp.*, Case No. 22-10506 (Bankr. D. Del. 2022); *In re Proteus Digital Health, Inc.,* Case No. 20-11580 (Bankr. D. Del. 2020); *In re NORPAC Foods, Inc.*, Case No. 19-62584 (Bankr. D. Or. 2019); *In re CFO Mgmt. Holdings, LLC*, Case No. 19-40426 (Bankr. E.D. Tex. 2019); *In re J & M Sales Inc.*, Case No. 18-11801 (Bankr. D. Del. 2018); *In re Katy Indus., Inc.*, Case No. 17-11101 (Bankr. D. Del. 2017); *In re Cranberry Growers Coop.*, Case No. 17-13318 (Bankr. W.D. Wis. 2017); *In re Liberty Asset Mgmt. Corp.*, Case No. 16-13575 (Bankr. C.D. Cal. 2016); *In re Bethel Healthcare, Inc. & Corinthian Sub-Acute & Rehab. Ctr., Inc.*, Case No. 13-12220 (Bankr. C.D. Cal. 2013).

9.      In July 2021, Debtor Mariner Health Central, Inc. engaged Sierra for the purpose of providing business advice and consultation regarding the company's challenges, pursuant to an engagement letter dated July 7, 2021.  On September 18, 2022, the Debtors and Sierra entered into the new Engagement Letter, which superseded the prior engagement letter and terminated the financial advisory services.

10.     The Debtors have determined that the services of an experienced CRO will substantially enhance their efforts to maximize value of the estates.  The Debtors are familiar with the professional standing and reputation of Sierra and Mr. Perkins.  As set forth in the Engagement Letter, the Debtors retained Sierra for purposes of providing Mr. Perkins, the founder and Chief Executive Officer of Sierra, as Chief Restructuring Officer of the Debtors and to provide additional Sierra personnel to support Mr. Perkins.  As contemplated by the Engagement Letter, Mr. Perkins was appointed as CRO of the Debtors effective as of September 19, 2022.

11.     Mr. Perkins has over 20 years of management consulting and advisory experience in restructuring matters.  Specifically, Mr. Perkins has extensive experience representing debtors in bankruptcy and out-of-court restructurings, providing due diligence on behalf of parties in interest, implementing operational changes, managing businesses, negotiating new and existing financing agreements, and performing estate wind-down and trustee-related services.   In connection with his in-court and out-of-court restructurings, Mr. Perkins has held positions such as Chief Restructuring Officer, Deputy Chief Restructuring Officer, Principal Investor, Turnaround Advisor, Strategic Consultant, Investment Banker, Financial Executive, Crisis Manager, Interim Chief Executive Officer, and Interim Chief Financial Officer to numerous middle market companies and is particularly skilled at assisting companies by providing crisis management services.

12.     Prior to founding Sierra in January 2013, Mr. Perkins was a Senior Managing Director and Regional Director of a national turnaround consulting firm where he was responsible for business development, marketing, staffing, and general management of the firm's presence in the region west of the Mississippi River.  Throughout his career, Mr. Perkins has served as Chief Restructuring Officer in numerous out-of-court restructurings as well as various chapter 11 cases,

including but not limited to the following: *In re Zosano Pharma Corp.*, Case No. 22-10506 (Bankr. D. Del. 2022); *In re Proteus Digital Health, Inc.,* Case No. 20-11580 (Bankr. D. Del. 2020) *In re CFO Mgmt. Holdings, LLC*, Case No. 19-40426 (Bankr. E.D. Tex. 2019); *In re Katy Indus., Inc.*, Case No. 17-11101 (Bankr. D. Del. 2017); *In re Liberty Asset Mgmt. Corp.*, Case No. 16-13575 (Bankr. C.D. Cal. 2016); *In re Bethel Healthcare, Inc. & Corinthian Sub-Acute & Rehab. Ctr., Inc.*, Case No. 13-12220 (Bankr. C.D. Cal. 2013); and *In re The Fuller Brush Co., Inc.*, Case No. 12-10714 (Bankr. S.D.N.Y. 2012).  In addition, Mr. Perkins has been involved in dozens of in-court and out-of-court restructurings in other roles, including serving as a Deputy Chief Restructuring Officer, Interim Chief Executive Officer, Interim Chief Financial Officer, and financial advisor.

13.     Since the time of their engagement, Mr. Perkins and additional Sierra personnel (the "SCP Personnel") have been providing services to the Debtors and they have become familiar with the Debtors' corporate and capital structures, operations and business. Accordingly, the Debtors believe that the SCP Personnel have developed significant relevant experience and expertise regarding the Debtors, and are uniquely qualified to provide CRO Support services to the Debtors.  The Debtors, therefore, submit that the retention of Sierra on the terms and conditions set forth in the Engagement Letter is necessary and appropriate, is in the best interest of the Debtors' estates and creditors, and all other parties in interest, and should be granted.

**B.    Services to be Provided**

14.     Subject to this Court's approval, the Debtors propose to retain Sierra to provide the Debtors with a CRO and support personnel on the terms and conditions set forth in the Engagement

Letter. Generally, the Engagement Letter[3] contemplates that Sierra will (i) provide restructuring and advisory services to the Debtors, and (ii) cause Mr. Perkins, who will report to the board of directors, managers or general partner of the Debtors (as the case may be) (collectively, the "Boards"), to serve as the CRO.  Mr. Perkins will be assisted in his tasks by additional Sierra personnel to support the CRO ("CRO Support" and together with the CRO, collectively, the "Sierra Personnel").  The professional services that Sierra will render to the Debtors, subject to the direction and instruction of the Boards, are anticipated to include, among other things, the following:

- o  Provide support to the CRO in the exercise of his duties;

- o  Provide oversight and assistance with the preparation of financial information for distribution to creditors and others, including, but not limited to, cash flow projections and budgets, cash receipts and disbursements analysis of various asset and liability accounts, and analysis of proposed transactions;

- o  Evaluate and make recommendations in connection with strategic alternatives as needed to maximize the value of the Debtors;

- o  Evaluate the cash flow generation capabilities of the Debtors for valuation maximization opportunities;

- o  Preparation of information for petitions, schedules and statements, reports and other bankruptcy court filings, as needed;

- o  Provide testimony and serve as responsible party for hearing and reporting requirements in these Chapter 11 Cases;

- o  Provide interim management support related to the operations and cash flow management during the bankruptcy process;

- o  Assist and support the Debtors in identifying, negotiating, and closing DIP financing, if any;

- o  Assist and support the Debtors in identifying, negotiating, and closing any asset sale;

- o  Provide management support in evaluating and responding to parties during

---

[3]    The summaries of certain terms of the Engagement Letter herein are qualified in their entirety by reference to the provisions of the Engagement Letter itself.  To the extent there is any discrepancy between the summaries contained in this Application and the terms of the Engagement Letter itself, the terms of the Engagement Letter shall control.  Unless otherwise defined, capitalized terms used in these summaries shall have the meanings ascribed to them in the Engagement Letter.

negotiation including landlords, vendors, potential buyers, and other key constituents;

o  Interact with the unsecured creditor or other committee(s), if any, and assist in the preparation of management reports;

o  Provide assistance related to drafting and confirming a plan of reorganization, if necessary; and

o  Perform such other services as necessary to fulfill its duties to the Debtors.

Sierra and Mr. Perkins will use reasonable efforts to coordinate with Debtors' other retained professionals to avoid the unnecessary duplication of services.

## C.    Professional Compensation

15.    The Debtors and Sierra have agreed to the proposed hourly fees set forth below (as set forth in the Engagement Letter):

| | |
|---|---|
| Lawrence Perkins as CRO: | $895/hr. |
| Partners: | $895/hr. to $1,005/hr. |
| Managing Directors: | $640/hr. to $720/hr. |
| Senior Directors: | $580/hr. to $640/hr. |
| Directors: | $445/hr. to $525/hr. |
| Senior Associates and Associates | $350/hr. |

16.    The standard billing rates reflect, among other things, geographical differentials, differences in experience levels within classifications, and differences between types of services. Sierra's hourly rates are adjusted periodically and may be increased by Sierra in accordance with its normal billing practices.

17.    The Debtors and Sierra have also agreed that Sierra will be reimbursed for reasonable, actual out-of-pocket expenses incurred in connection with its services, including, but

not limited to, airfare, hotel, car rental, photocopying charges, telephone calls, postage, shipping, meals, report preparation, delivery services and other costs.

18.     Pursuant to the Engagement Letter, prior to the Petition Date, the Debtors provided Sierra with an initial retainer in the amount of $25,000.00 and an additional retainer in the amount of $100,000.00 (collectively, the "Retainer").  Sierra has received payments from the Debtors during the year prior to the Petition Date in the total amount of $1,432,089.19, in connection with its prepetition representation of the Debtors.[4]

19.     Prior to the Petition Date, the Retainer was applied to all outstanding fees and expenses due Sierra, and, as a result, Sierra is not a creditor of the Debtors and the remaining sum in the Retainer is $58,928.75.  The Debtors understand that all fees and expenses incurred by Sierra prior to the Petition Date have been paid, and if not paid, waived.  The Debtors propose that the balance of the Retainer be held by Sierra as security throughout the Chapter 11 Cases until it is to be applied in accordance with any interim and final orders of this Court.

20.     The Debtors submit that the proposed terms of its engagement reflect normal business terms in the market-place, the parties are sophisticated business entities that have negotiated the terms of the engagement at arm's length, and approval of the engagement is in the best interests of the Debtors' estates.  Given the numerous issues which the SCP Personnel may be required to address in the performance of their services, Sierra's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for such services for engagements of this nature in an out-of-court context, as well as in chapter 11, the Debtors submit that the fee arrangements are reasonable.

---

[4] The $1,432,089.19 was comprised of the Retainer and $1,307,089.19 for payment of invoices.

21.     Further, the foregoing fee and expense structure is consistent with and typical of compensation arrangements entered into by Sierra and other comparable firms that render similar services under similar circumstances. The Debtors believe that the proposed structure is reasonable, market-based, and designed to compensate Sierra fairly for its work and to cover fixed and routine overhead expenses.

22.     Notwithstanding any provisions of the Engagement Letter to the contrary, the Debtors and Sierra propose that:

a.      Sierra and its affiliates shall not act as an investment banker, financial advisor, claims agent/claims administrator, or investor/acquirer in connection with the Chapter 11 Cases;

b.      In the event Debtors seek to have Sierra personnel assume officer positions that are different than the positions disclosed in this Application, or to materially change the terms of the engagement by either (i) broadening the functions of the SCP Personnel beyond those performed as of the Petition Date, or (ii) altering or expanding the scope of the engagement, a motion to modify the retention shall be filed;

c.      No principal, employee, or independent contractor of Sierra or any of its affiliates shall serve as a director of any of the Debtors during the pendency of the Chapter 11 Cases.

d.      As more fully set forth below, Sierra shall file a monthly report of staffing on the engagement for the previous month (the "Monthly Staffing Report") with the Court, with copies to the United States Trustee ("U.S. Trustee") and counsel to any official committees appointed in these cases (together, the "Notice Parties"), covering staffing, fees and expenses incurred during the prior month.  All staffing, fees and expenses shall be subject to review and adjudication by the Court in the event an objection is filed to a Monthly Staffing Report, as set forth herein.

e.      Any success fees or transaction fees other than the hourly fees not otherwise specifically set forth in the Engagement Letter or in this Application shall be approved by the Court at the conclusion of the Chapter 11 Cases on a reasonableness standard and are not being pre-approved by granting this Application.

f.      The Debtors will indemnify Mr. Perkins and any persons serving as officers on the same terms as provided to the Debtors' other officers and directors under the Debtors' bylaws and applicable state law. In addition, the Debtors

10

will add Mr. Perkins, in his capacity as CRO, to its existing director and officer liability insurance policy so that he shall be individually covered by the same liability insurance as is applicable to the other directors and officers of the Debtors.

g.    For a period of three years after the conclusion of the engagement, neither Sierra nor any of its affiliates shall make any investments in the Debtors or Reorganized Debtors, as applicable.

h.    Sierra shall disclose any and all facts that may have a bearing on whether the firm, its affiliates, and/or any individuals working on the engagement hold or represent any interest adverse to the Debtors, their creditors, or other parties-in-interest. This obligation to disclose is a continuing obligation.

**D.    Monthly Staffing Reports**

23.    By this Application, the Debtors are seeking to retain Sierra as a restructuring officer under section 363 of the Bankruptcy Code.  Because Sierra is not being employed as a professional under section 327 of the Bankruptcy Code, it should not be required to submit fee applications under sections 330 and 331 of the Bankruptcy Code.  Instead, the Debtors request that the fees and expenses incurred by Sierra in completion of its services under the Engagement Letter be treated as administrative expenses of the Debtors' estates and paid by the Debtors in the ordinary course of business upon submission by Sierra of an invoice.  To maintain transparency, Sierra shall file with the Court and provide copies to the Notice Parties (U.S. Trustee and counsel to any Committee), a Monthly Staffing Report for the previous month. Each Monthly Staffing Report shall: (i) be filed with the Court, and provided to the Notice Parties, within 14 days of the date the fees and expenses identified in such Monthly Staffing Reports are paid by the Debtors, (ii) include the names and functions of the individuals assigned, (iii) report compensation earned and expenses incurred by Sierra during the reported month, (iv) contain summary charts which describe the services provided, identify the compensation earned by each officer and staff employee provided, and itemize the expenses incurred, and (v) append time records containing detailed entries describing the task(s) performed on a daily basis, and organized by project category and for

11

services performed on an hourly basis, set forth hourly rates and identify the time spent completing each task in 0.10-hour increments, with the corresponding total charge for each task. The Notice Parties shall have fourteen (14) days after the date each Monthly Staffing Report is served on the Notice Parties to object in writing to such Monthly Staffing Report. In the event an objection is raised and not consensually resolved between the Debtors and the objecting party, all staffing and compensation shall be subject to review by the Court. Upon receipt of any objection, the Debtors shall deduct an amount equal to the amount objected to from the next payment to Sierra until such objection is resolved, either consensually or by Court order.

### E.   Lack of Adverse Interest in the Debtors

24.   Although the Debtors submit that the retention of Sierra is not governed by section 327 of the Bankruptcy Code, the Debtors nevertheless attach the Perkins Declaration. As set forth in greater detail in the Perkins Declaration, Sierra has undertaken a conflicts check for connections with certain potentially interested parties. To the best of the Debtors' knowledge based on the Perkins Declaration, and except as otherwise set forth therein, neither Sierra nor any employee of Sierra (i) holds or represents an interest adverse to Debtors' estates, their creditors, or other parties-in-interest in connection with the Chapter 11 Cases, and (b) is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code. Based upon their review of the Perkins Declaration, the Debtors believe that Sierra is eligible for retention in these cases.

25.   To the extent that Sierra discovers any new relevant facts or relationships bearing on the matters described herein during the period of Sierra's retention, Sierra will use reasonable efforts to file promptly a supplemental declaration.

### F.   Indemnification

26.   As a material part of the consideration for which  Sierra has agreed to provide the services described herein, and pursuant to the Engagement Letter, the Debtors have agreed to

DOCS_DE:240835.1 54622/001

indemnify Sierra, its principals, employees, and agents, including, without limitation, Mr. Perkins and the CRO Support that provide services to the Debtors during the Chapter 11 Cases, at a minimum, to the same extent as the most favorable indemnification the Debtors extend to their officers and directors, other than for claims, damages, liabilities, and expenses that resulted from fraud, willful misconduct, or gross negligence, provided, however, that any request for the payment of indemnity will be made by means of an application to, and shall be subject to review by, the Court to ensure that payment of such indemnity (a) conforms to the terms of the Engagement Letter and (b) is reasonable based upon the circumstances. In addition, Mr. Perkins, in his capacity as CRO, shall, at all times during the Chapter 11 Cases, be individually covered by the same indemnification and directors and officer's liability insurance as is applicable to the other directors and officers of the Debtors.

27.    Notwithstanding the foregoing, the Proposed Order modifies the indemnification provisions so that the Debtors are only permitted to indemnify those persons serving as officers on the same terms as provided to the Debtors' other officers and directors under the Debtors' bylaws and applicable state law, in addition to insurance coverage under the Debtors' director and officer insurance policies.   The Proposed Order further provides that there shall be no other indemnification of Sierra, its affiliates or subsidiaries, or the CRO Support.  The Debtors and Sierra believe that the indemnification provisions, as modified by the Proposed Order, are customary and reasonable for firms providing interim management services.

## BASIS FOR RELIEF REQUESTED

28.    Section 363(b) of the Bankruptcy Code provides, in part, that a debtor in possession "after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estates."  11 U.S.C. § 363(b).  Under applicable case law in this and other circuits, in determining whether to authorize a debtor's proposed use of their assets pursuant to Section

13

363(b) of the Bankruptcy Code, "courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 53 (Bankr. D. Del. 1999); *see also In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

29.     The retention of corporate officers is proper under section 363(b) of the Bankruptcy Code as an appropriate exercise of a debtor's business judgment.  Indeed, in many chapter 11 cases this Court has approved the retention of professionals to perform management services under section 363(b) of the Bankruptcy Code.  *See*, *e.g.*, *In re First Guaranty Mortgage Corporation*, No. 22-10584 (CTG) (Bankr. D. Del. Aug. 10, 2022) (authorizing debtors' retention of chief restructuring officer and other personnel); *In re JAB Energy Solutions II, LLC*, No. 21-11226 (CTG) (Bankr. D. Del. Nov. 15, 2021) (same); *In re High Ridge Brands Co.*, No. 19-12689 (BLS) (Bankr. D. Del. Jan. 15, 2020) (same); *In re J&M Sales, Inc.*, No. 18-11801 (LSS) (Bankr. D. Del. Aug. 27, 2018) (same); *In re Gibson Brands, Inc.*, No. 18-11025 (CSS) (Bankr. D. Del. June 11, 2018) (same); *In re Homer City Generation, L.P.*, Case No. 17-10086 (MFW) (Bankr. D. Del. Jan. 31, 2017) (same); *In re Constellation Enterprises LLC*, Case No. 16-11212 (CSS) (Bankr. D. Del. June 24, 2016) (same).

30.     Additionally, the Court's general equitable powers codified in section 105(a) of the Bankruptcy Code provide ample authority for the relief requested in the Application, as it empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." *See* 11 U.S.C. § 105(a); *see also In re Cont'l Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code.").

DOCS_DE:240835.1 54622/001

31.     The Debtors submit that the employment of Sierra, including Mr. Perkins, under the terms of the Engagement Letter and as provided for in the Proposed Order, would greatly benefit the Debtors' estates and creditors.  Sierra is already familiar with Debtors' operations and goals and is uniquely and well-qualified to serve in this role during the Chapter 11 Cases.

32.     Additionally, because the Debtors are seeking to retain Sierra pursuant to section 363(b), rather than section 327, of the Bankruptcy Code Sierra should not be subject to the compensation requirements of sections 330 and 331 of the Bankruptcy Code. Therefore, the Debtors request that the fees and expenses of Sierra incurred in the performance of the above-described services be treated as an administrative expense of the Debtors' estates be paid by the Debtors in the ordinary course of business, without the need for Sierra to file fee applications or otherwise seek Court approval for the compensation of its services and reimbursement of its expenses, other than the filing of the Monthly Staffing Reports and complying with related procedures, as described above.

33.     The Debtors further request that Sierra's retention and the employment of Mr. Perkins be made effective as of the Petition Date, in order to allow Sierra to be compensated for the work performed at the commencement of the Chapter 11 Cases, but prior to the Court's consideration of this Application.  The Debtors submit that under the circumstances, and to avoid irreparable harm to the Debtors' estates that may occur if Mr. Perkins is not immediately retained, retroactive approval to the Petition Date is necessary and warranted.  *See, e.g.*, *F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.)*, 844 F.2d 99, 103 (3d Cir. 1988), cert. denied, 488 U.S. 852 (1988); *Indian River Homes, Inc. v. Sussex Trust Co.*, 108 B.R. 46, 51 (D. Del. 1989) (approval of debtor's employment of attorney and real estate agent as of a prior date was not an abuse of

discretion); *In re Arkansas Co.*, 798 F.2d 645, 650 (3d Cir. 1986) (noting that time pressure and the absence of prejudice as factors favoring retroactive retention).

## NOTICE

34.     The Debtors have provided notice of this Application to the following parties or their respective counsel: (i) the U.S. Trustee; (ii) all parties on the Debtors' consolidated list of 30 largest unsecured creditors; and (iii) all parties entitled to notice pursuant to Local Rule 2002-1(b). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

35.     No previous application for the relief requested herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form of the Proposed Order attached hereto as **Exhibit A**, authorizing the Debtors to employ and retain Sierra, and designate Mr. Perkins to serve as CRO of the Debtors, on the terms set forth in the Engagement Letter, as amended by the Proposed Order, effective as of the Petition Date, and granting such other and further relief as is just and proper.

Dated: October 3, 2022  
      Wilmington, Delaware

/s/ *Laura Davis Jones*  
Laura Davis Jones (DE Bar No. 2436)  
Timothy P. Cairns (DE Bar No. 4228)  
Mary F. Caloway (DE Bar No. 3059)  
**PACHULSKI STANG ZIEHL & JONES LLP**  
919 North Market Street, 17th Floor  
P.O. Box 8705  
Wilmington, DE 19899-8705 (Courier 19801)  
Telephone:    (302) 652-4100  
Facsimile:    (302) 652-4400  
Email:    ljones@pszjlaw.com  
        tcairns@pszjlaw.com  
        mcaloway@pszjlaw.com

- and -

Hamid R. Rafatjoo (*pro hac vice*)  
Carollynn H.G. Callari (*pro hac vice*)  
David S. Forsh (*pro hac vice*)  
**RAINES FELDMAN LLP**  
1350 Avenue of the Americas, 22nd Floor  
New York, NY 10019-4801  
Telephone:    (917) 790-7100  
Email:    hrafatjoo@raineslaw.com  
        ccallari@raineslaw.com  
        dforsh@raineslaw.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

**EXHIBIT B**

**Perkins Declaration**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MARINER HEALTH CENTRAL, INC., *et al.*,[1] | Case No. Case No. 22-10877 |
| Debtors. | (Jointly Administered) |

### DECLARATION OF LAWRENCE R. PERKINS IN SUPPORT OF DEBTORS' APPLICATION TO (I) EMPLOY AND RETAIN SIERRACONSTELLATION PARTNERS, LLC TO PROVIDE THE DEBTORS WITH A CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL AND (II) DESIGNATE LAWRENCE R. PERKINS AS THE DEBTORS' CHIEF RESTRUCTURING OFFICER, EFFECTIVE AS OF THE PETITION DATE

I, Lawrence R. Perkins, being duly sworn according to law, depose and state that:

1.      I am the Founder and Chief Executive Officer of SierraConstellation Partners, LLC ("Sierra"), which has an office located at 355 S. Grand Ave., Suite 1450, Los Angeles, CA 90071. I make this declaration ("Declaration") in support of *Debtors' Application Pursuant to 11 U.S.C. §§105(a) and 363(b) to (I) Employ and Retain SierraConstellation Partners, LLC to Provide the Debtors with a Chief Restructuring Officer and Additional Personnel and (II) Designate Lawrence R. Perkins as Chief Executive Officer, Effective as of the Petition Date* (the "Application"),[2] pursuant to the terms and conditions set forth in the Engagement Letter between the Debtors and Sierra, a copy of which is annexed hereto as **Schedule 1**.

2.      I have read the statements set forth in the Application regarding Sierra's qualifications and services to be provided to the Debtors, as well as the statements regarding

---

[1]   The Debtors, along with the last four digits of each Debtors' tax identification number, are: Mariner Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating Company, LP (7273).  The Debtors' headquarters are located at 3060 Mercer University Drive, Suite 200, Atlanta, GA 30341.

[2]   Capitalized terms used but not defined in this Declaration shall have the meaning assigned to those terms in the Application.

disinterestedness, and believe them to be true.  The statements set forth in this declaration are based upon my personal knowledge, upon information and belief after reasonably inquiry, and upon client matter records kept in the ordinary course of business that were reviewed by me or other personnel of Sierra or its affiliates.

3.      Sierra is an interim management and advisory firm providing services to companies navigating their way through business challenges, including bankruptcy.  As the Founder and CEO of Sierra, I provide interim management and operational and financial advisory services to underperforming companies and companies in transition.  My experience includes challenging CRO roles, interim management, refinancings, distressed acquisitions and in-court and out-of-court restructurings.  I have held roles in various industries including retail, industrial manufacturing, real estate, financial services, and healthcare.

4.      The Sierra personnel that will work with me throughout the Chapter 11 Cases have substantial expertise in restructuring matters.  The Sierra team will work closely with the Debtors' management and other professionals throughout the Chapter 11 Cases.

5.      In connection with Sierra's proposed retention by the Debtors, Sierra received from the Debtors a list of potential parties in interest ("**Potentially Interested Parties List**") and searched or caused to be searched certain databases to determine whether Sierra has provided in the recent past or is currently providing services to such parties in interest.  A copy of the Potentially Interested Parties List is attached hereto as **Schedule 2.**  Sierra also performed its standard conflict inquiry and performed reasonable due diligence to determine whether it or its employees have or had any relationships with the Debtors or their affiliates, subsidiaries, directors or officers, or any of the Debtors' significant creditors, equity security holders, investors, professionals or other such entities with significant relationships with the Debtors.

2

6.      Except as set forth herein, to my knowledge based on reasonable inquiry, (i) Sierra and the principals and directors of Sierra that are anticipated to provide the services for which Sierra is to be retained in the Chapter 11 Cases do not hold or represent any interest adverse to Debtors and their estates and (ii) Sierra has no connection to Debtors, Debtors' significant creditors, other known significant parties-in-interest in the Chapter 11 Cases, or the other retained professionals and advisors that are known to us to be assisting the Debtors except as described below.  As such, I believe Sierra may be retained pursuant to the Application in the Chapter 11 Cases.

7.      To the best of my knowledge, information and belief, insofar as I have been able to ascertain after reasonable inquiry, except as disclosed herein, other than in connection with the Chapter 11 Cases, neither I, Sierra, nor any of its principals, employees, agents, or affiliates, have any connection with Debtors, its creditors, the U.S. Trustee, or any other party with an actual or potential interest in the Chapter 11 Cases, nor their respective attorneys or advisors, except as expressly set forth in the Application or this declaration.  In addition, I disclose that:

(a) Sierra provides services in connection with numerous cases, proceedings, and transactions unrelated to the Chapter 11 Cases.  These unrelated matters involve numerous attorneys, financial advisors, and creditors, some of which may be claimants or parties with actual or potential interests in the Chapter 11 Cases, or may represent such parties.

(b) Sierra's personnel may have business associations with certain creditors of the Debtors unrelated to the Chapter 11 Cases.

(c) In the ordinary course of its business, Sierra may engage counsel or other professionals in unrelated matters who now represent, or who may in the future represent, creditors or other interested parties in these cases.

(d) In 2019, in a matter unrelated to these cases, Sierra provided financial advisory services to Katten Muchin Rosenman LLP (the law firm Mr. Craig Barbarosh is affiliated with) who served as counsel to a bank that was administrative agent to a group of lenders to specific borrowers and guarantors.  Neither the bank, the lenders, the borrower, nor the guarantors in that former matter are creditors

3

of the Debtors, or a party in interest.  The services provided by Sierra to Katten are unrelated to the Debtors.  The aforementioned engagement has terminated.

(e) Sierra and Debtors' bankruptcy counsel, Raines Feldman, LLP ("Raines") have an existing and continuing working relationship and an attorney-client relationship.  Raines represents and has represented Sierra in matters unrelated to these cases or the Debtors.

8.     The efforts described above to identify and disclose Sierra's connections with the parties-in-interest notwithstanding, because Sierra's services are wide-spanning, Sierra is unable to state with absolute certainty that every client connection has been disclosed.  In this regard, if Sierra discovers additional information that it determines requires disclosure, it will file a supplemental disclosure with the Court promptly.

9.     The Debtors and Sierra have agreed to the proposed hourly fees set forth below (as set forth in the Engagement Letter):

| | |
|---|---|
| Lawrence Perkins as CRO: | $895/hr. |
| Partners: | $895/hr. to $1,005/hr. |
| Managing Directors: | $640/hr. to $720/hr. |
| Senior Directors: | $580/hr. to $640/hr. |
| Directors: | $445/hr. to $525/hr. |
| Senior Associates and Associates | $350/hr. |

10.     The standard billing rates reflect, among other things, geographical differentials, differences in experience levels within classifications, and differences between types of services. Sierra's hourly rates are adjusted periodically and may be increased by Sierra in accordance with its normal billing practices.

11.     The Debtors and Sierra have also agreed that Sierra will be reimbursed for reasonable, actual out-of-pocket expenses incurred in connection with its services, including, but

4

not limited to, airfare, hotel, car rental, photocopying charges, telephone calls, postage, shipping, meals, report preparation, delivery services and other costs.

12.     Pursuant to the Engagement Letter, prior to the Petition Date, the Debtors provided Sierra with an initial retainer in the amount of $25,000.00 and an additional retainer in the amount of $100,000.00 (collectively, the "Retainer"). Sierra has received payments from the Debtors during the year prior to the Petition Date in the total amount of $1,432,089.19, in connection with its prepetition representation of the Debtors, which is comprised of the Retainer and $1,307,089.19 for payment of invoices.

13.     Prior to the Petition Date, the Debtors paid all outstanding fees and expenses due Sierra, and, as a result, Sierra is not a creditor of the Debtors and the remaining sum in the Retainer is $58,928.75. As described in the Application, the Debtors propose that the Retainer be treated as an evergreen retainer to be held by Sierra as security throughout the Chapter 11 Cases until it is to be applied in accordance with any interim and final orders of this Court.

14.     In this district, I believe that evergreen retainer agreements reflect normal business terms in the marketplace. Moreover, Sierra and the Debtors are sophisticated business entities that have negotiated the amount of the Retainer at arm's length. The amount of the Retainer secures Sierra's fees and expenses for work performed in connection with the Debtors' Chapter 11 Cases. Thus, I believe the facts and circumstances of these cases support the approval of the security retainer requested herein.

15.     Given the extensive nature of the services that Sierra will provide to the Debtors, I believe that the retention of Sierra under an evergreen retainer is appropriate and necessary to enable the Debtors to faithfully execute their duties as debtors and debtors in possession and to implement the restructuring of the Debtors.

5

16.     Sierra has received no promises regarding compensation in the Chapter 11 Cases other than in accordance with the Bankruptcy Code and as set forth in this Declaration.  With respect to the services to be provided to the Debtors, except as set forth herein, Sierra has no agreement with any non-affiliated entity to share any revenues earned in the Chapter 11 Cases.

17.     I reserve the right to supplement this Declaration in the event that  Sierra discovers any facts bearing on matters described in this Declaration regarding Sierra's employment by the Debtors.

*[Remainder of Page Intentionally Left Blank]*

6

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: September 28, 2022

Lawrence R. Perkins
Founder and Chief Executive Officer
SierraConstellation Partners, LLC

# SCHEDULE 1 TO PERKINS DECLARATION

## Engagement Letter



As of September 16th, 2022

Via Email: cbarbarosh@gmail.com

Mariner Health Central, Inc.
Parkview Holding Company GP, LLC
Parkview Operating Company, LP
c/o Craig Barbarosh, Esq., Independent Manager
Katten
100 Spectrum Center Drive, Suite 1050
Irvine, California 92618-4960

  Re: Terms of Engagement of SierraConstellation Partners LLC to Provide Chief
    Restructuring Officer and CRO Support to Each of the Above Entities

Dear Mr. Barbarosh:

This letter sets forth the agreement between Mariner Health Central, Inc. ("Mariner"), Parkview
Holding Company GP, LLC ("Parkview Holding") and Parkview Operating Company LP
("Parkview Operating" and together with Mariner and Parkview Holding, collectively, the
"Company" or "you") and SierraConstellation Partners LLC ("SCP" and "we").[1] This letter (the
"Engagement Letter") together with the Standard Terms and Conditions (the "Standard Terms")
annexed hereto and incorporated by reference (collectively, the "Agreement") sets forth the terms of
our engagement.[2] This Agreement supersedes that certain engagement letter between Mariner and
SCP dated July 7, 2021 (the "Prior Engagement") and terminates the Prior Engagement.

We understand that each of Mariner, Parkview Holding and Parkview Operating may, if authorized
by its respective board of directors, general partner(s) or manager(s), as the case may be (collectively,
the "Boards"), file voluntary petitions (the "Bankruptcy Cases") for relief under Chapter 11 of 11
U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on or around Monday, September 19, 2022 in the
United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and, if the
Company does file Bankruptcy Cases, that the Company intends to continue to operate its business,
manage its financial affairs and operate its bankruptcy estate as a debtor in possession pursuant to
Sections 1107 and 1108 of the Bankruptcy Code.

You shall, by executing this letter, engage SCP for the purposes of providing Lawrence R. Perkins as
Chief Restructuring Officer ("CRO") to each of Mariner, Parkview Holding and Parkview Operating
and additional SCP personnel to support the CRO (collectively, the "CRO Support" and, together
with the CRO, collectively, the "SCP Personnel") with respect to business advice and consultation
regarding the Company's current challenges.  The CRO and CRO Support will also work with you

---

[1] Use of the term "Company" shall be interpreted to be singular or plural in context of any sentence, term
or provision of this Agreement suggests.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed in the Standard Terms.



toward the implementation of whatever strategies are most appropriate to achieve your objectives. SCP shall provide the following services ("Services") including, but not limited to, the following:

- SCP shall make the CRO available to the Company, to be named the Company's CRO by the Boards.

- SCP will also provide the CRO Support to provide assistance to the CRO, the Company and Boards from time to time.

- The CRO shall have such duties as the Boards, from time to time, determine.

- Provide oversight and assistance with the preparation of financial information for distribution to creditors and others, including, but not limited to, cash flow projections and budgets, cash receipts and disbursements analysis of various asset and liability accounts, and analysis of proposed transactions;

- Communicate with lenders directly regarding financial performance, strategy, and/or other topics relevant to the scope of this assignment;

- Evaluate and make recommendations in connection with strategic alternatives as needed to maximize the value of the Company;

- Evaluate the cash flow generation capabilities of the Company for valuation maximization opportunities;

- Provide oversight and assistance in connection with communications and negotiations with constituents including trade vendors, investors and other critical constituents to the successful execution of the Company's near-term business plan;

- Subject to the direction and instruction of the Boards, evaluate the possibility of the Company commencing the Bankruptcy Cases and emerge from bankruptcy as effectively and efficiently as possible under the circumstances, and as necessary:

  o Preparation and negotiation of any cash collateral and/or Debtor in Possession (DIP) cash flow forecast and resultant cash and/or financing requirements;

  o Assist and support the Company in identifying, negotiating, and closing DIP financing;

  o Assist and support the Company in identifying, negotiating, and closing an asset sale;

  o Preparation of petitions and schedules and statements for bankruptcy filing;

  o Provide assistance in the management of schedules and reporting for filing in a court-supervised proceedings;

  o Provide testimony and serve as responsible party for reporting requirements in Delaware;

  o Provide interim management support related to the operations and cash flow management during the bankruptcy process;



- o   Provide management support in evaluating and responding to parties during negotiation including landlords, vendors, potential buyers, and other key constituents;

- o   Provide analysis and services related to lease assumptions, rejections, modification or terminations;

- o   Interact with the unsecured creditor or other committee(s) (if any) and assist in the preparation of management reports; and

- o   Assistance related to drafting and confirming a plan of reorganization, if necessary; and

- •   Perform such other services as agreed by the CRO and the Company.

There will be a one-hundred thousand US dollars ($100,000.00) retainer paid or transferred to SCP at the execution of this Agreement (the "Retainer").  This Retainer will be held by SCP as an advance towards Services and Reimbursable Expenses and applied as set forth in the Standard Terms. SCP's fees for the Services will be billed at the rates set forth below

| Lawrence Perkins as CRO: | $895/hr. |
|---|---|
| Partners: | $895/hr. to $1,005/hr. |
| Managing Directors: | $640/hr. to $720/hr. |
| Senior Directors: | $580/hr. to $640/hr. |
| Directors: | $445/hr. to $525/hr. |
| Senior Associates: | $350/hr. |
| Associates: | $350/hr. |



If the foregoing represents your agreement, please sign the enclosed copy of this letter in the space provided and return it to me; or if you have any questions, please call me at (213) 289-9060. By signing this letter, you represent and warrant that the Company has the authority to enter into this Agreement. We appreciate the opportunity to work for you.

Very truly yours,

SierraConstellation Partners LLC

By: _____
Lawrence R. Perkins, CEO & Founder

**AGREED AND ACCEPTED BY:**

**Mariner Health Central Inc.**

By: _____

Name: _____

Title: _____

**Parkview Holding Company GP, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**Parkview Operating Company LP**

By: _____

Name: _____

Title: _____



If the foregoing represents your agreement, please sign the enclosed copy of this letter in the space provided and return it to me; or if you have any questions, please call me at (213) 289-9060. By signing this letter, you represent and warrant that the Company has the authority to enter into this Agreement. We appreciate the opportunity to work for you.

Very truly yours,

SierraConstellation Partners LLC

By: _____
    Lawrence R. Perkins, CEO & Founder

**AGREED AND ACCEPTED BY:**

**Mariner Health Central Inc.**

By: _____

Name: _____Craig A. Barbarosh_____

Title: _____Independent Director_____

**Parkview Holding Company GP, LLC**

By: _____

Name: _____Craig A. Barbarosh_____

Title: _____Independent Manager_____

Date: _____September 18, 2022_____

**Parkview Operating Company LP**

By: _____

Name: _____Craig A. Barbarosh_____

Title: _____Independent Manager of General Partner, Parkview Holding Company GP, LLC_____



Mariner Health Central, Inc.
Parkview Holding Company GP, LLC
Parkview Operating Company, LP

<u>Standard Terms & Conditions</u>

The terms and conditions set forth below (the "<u>Standard Terms</u>") are incorporated by reference into that certain Engagement Letter by and between SierraConstellation Partners, LLC ("<u>SCP</u>") and Mariner, Parkview Holding and Parkview Operating (collectively, the "<u>Company</u>") dated as of September 16, 2022 (the "<u>Engagement Letter</u>" and together with the Standard Terms, the "<u>Agreement</u>").

EFFECTIVE DATE, FEES AND EXPENSES

1.    <u>Effective Date</u>.  As used in the Agreement, the term "Effective Date" shall mean the date upon which: (a) SCP receives the Engagement Letter signed by a person at the Company with the authority to enter into the Agreement and bind the Company, including, as applicable, confirmation that the necessary resolutions of the Company's board of directors or officers appointing SCP to provide Company with the CRO and obligating the Company to indemnify and hold such CRO harmless have been obtained, (b) SCP receives the Retainer, and (c) either (i) the Company obtains the D&O policy naming the CRO as an insured or (ii) the Company adds the CRO to its existing D&O policy; whichever is acceptable to SCP.

2.    <u>Invoices</u>.  SCP will provide an invoice for Services to Company on a monthly basis (the "<u>Invoice</u>").  Each Invoice will provide sufficient details identifying the Services rendered and the Reimbursable Expenses incurred.

3.    <u>Payment of Invoices From Retainer</u>.  Payment of each Invoice is due upon receipt and shall be deducted from the Retainer as and when issued by SCP.  Company shall maintain the "evergreen" nature of the Retainer by replenishing the Retainer.  If the Retainer is not replenished in full when due, you agree that SCP has the rights and options, in its discretion until all outstanding Invoices are paid in full: (i) to suspend or terminate Services and/or (ii) withhold delivery of Services, testimony, Deliverables (as defined herein), reports or data (written or oral); in which event you agree that SCP will not be liable for any resulting losses, damages or expenses in connection with or resulting from such suspension, withholding or termination of Services or any delay in completion of or performance of the Services or compliance with any deadlines or timelines related to the Services.

4.    <u>Reimbursable Expenses</u>.  SCP will be reimbursed timely by you for any and all reasonable, actual out-of-pocket expenses incurred in connection with or related to the Services, including but not limited to the fees and expenses of counsel retained by SCP to advise SCP on Services that concern the Company, airfare, hotel, car rental, photocopying charges, telephone calls, postage, shipping, meals, report preparation, delivery services, and other costs (colletively, the "<u>Reimbursable Expenses</u>").

5.    <u>Taxes</u>.  Company shall be responsible for any taxes imposed on the Services or on the Engagement, other than taxes imposed by employment withholding for SCP Personnel or on SCP income or property.

INFORMATION, ASSISTANCE AND DELIVERABLES

6.    <u>Information, Access to Information</u>.  The Company shall use all reasonable efforts to: (i) provide SCP Personnel with access to Company management and other representatives of the Company; and (ii) furnish all data, material, and other information concerning the business, assets, liabities, operations, cash flows, properties, financial condition and prospects of the Company that SCP Personnel request in connection with and in furtherance of their performance of the Services.  SCP Personnel shall rely, without further independent verification, on the accuracy and completeness of all publicly available information and all information that is furnished to SCP and SCP Personnel by or on behalf of the Company and otherwise reviewed by SCP Personnel in connection with the Services.  Company acknowledges and agrees that SCP Personnel are not responsible for the accurary or completeness of such information and shall not be responsible to Company or any third party for any inaccuracies or omissions therein.  SCP is under no obligation to update data submitted to SCP or to review any other areas of the Company's business or operations unless specifically set forth in the Engagement Letter or as mutually agreed by and between Company and SCP in writing.  The source of such information, whether the Company management or other third party, as the case may be, shall be responsible for any and all financial information provided to SCP pursuant to this Agreement.  Furthermore, unless specifically retained to do so, SCP will not independently examine, compile or verify any financial information provided to SCP by the Company and/or Company management, as the case may be.  You shall use reasonable skill, care and attention to ensure that all information and documentation we may reasonably require is provided to us on a timely basis and is accurate and complete and relevant for the purpose for which it is required.  You shall also notify us promptly  if you subsequently learn that the information provide is outdated, incorrect or in accurate or otherwise should not be relied upon; and, in addition, you may not rely upon any Deliverable that contains outdated, incorrect or inaccurate information which you know or have reason to believe is outdated, incorrect or inaccurate.

7.    <u>Cooperation and Responsiblities</u>.  Company shall cooperate with SCP in the performance of the Services.  The Company shall be responsible for, among other things (a) the performance of its personnel and agents, (b) the accuracy and completeness of



all data and information provided to SCP for purposes of the performance of the Services, (c) designating a competent, responsible person to oversee the Services (d) evaluating the adequacy and results of the Services, (e) accepting responsibility for the results of the Services, and (f) establishing and maintaining internal controls, including monitoring ongoing activities. SCP's performance is dependent upon the timely and effective satisfaction of Company's responsibilities hereunder and timely decisions and approvals of Company in connection with the Services.

8.    Forward Looking Statements.  You understand that the Services may include the preparation of projections and other forward-looking statements, and numerous factors can affect the acutal results of the Company's operations, which may materially and adversely differ from those projections and statements.  Moreover, SCP will be relying upon information provided by the Company in the preparation of those projections and other forward-looking statements.

9.    Deliverables.  The tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") are complete only when presented in their entirety and only for the purpose stated therein.  Furthermore, (i) neither the Services nor any Deliverables, in whole or in part, shall constitute a fairness or solvency opinion; (ii) SCP will not provide any legal advice or address any questions of law; and (iii) the performance of the Services does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls, or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"), the Public Company Accounting Oversight Board (the "PCAOB"), or other state or federal professional or regulatory body.  Upon full payment to SCP hereunder, and subject to the terms and conditions contained herein, (i) the tangible items specified in the Deliverables shall become the property of Company..

LIMITATIONS ON SERVICES

10.    Use and Purpose of Advice and Deliverables.  Any advice given, communication (oral or written), report or Deliverable issued by SCP is provided solely for the use and benefit of Company and only in connection with the Services.  Unless required by law or with the prior consent of SCP, Company shall not share or disclose any advice given, communication, report or Deliverable to any third party (a "Third Party") or refer to the Services.  Neither the Services nor any Deliverables are intended for the express or implied benefit of any Third Party.  Unless otherwise agreed to in writing by SCP, no Third Party is entitled to rely in any manner or for any purpose on the Services or Deliverables.  Regardless of whether consent has been provided by SCP or disclosure is mandated as a matter of law or disclosure is made in violation of the Standard Terms, under no circumstances shall SCP assume any responsibility to any Third Party to whom any such advice, communication, report or Deliverable is disclosed or otherwise made available. The Services and this Engagement do not create privity between SCP and any Third Party.

11.    No Audit, Review or Compilation. Company acknowledges and agrees that SCP is not being retained to, and SCP Personnel are not being requested to, perform an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA, the SEC or other state or federal professional or regulatory body.

12.    No Assurances.  The Services will not result in the issuance of any written or oral communications by SCP to Company or any Third Party expressing any opinion, conclusion, or any other form of assurance with respect to, among other things, accounting policies, financial data, financial statements and related footnotes, appropriate application of generally accepted accounting principles, disclosure, operating or internal controls, compliance with the rules and regulations of the SEC or the PCAOB, compliance with the Sarbanes-Oxley Act of 2002 and related rules and regulations, or any other matters our services cannot be relied upon to disclose errors or fraud should they exist. The Services to be provided by SCP will **not** include any predictions or provide any opinions or other assurances concerning the outcomes of future events, including, without limitation, those that pertain to the operating results of any entity, the achievability of any business plan, the success of any investment, the recovery of any asset, or the ability to pay any debt.  Company expressly acknowledges that SCP does not guarantee, warrant, or otherwise provide any assurances regarding the outcome of any of Company's strategies or objectives as set forth in this Agreement

13.    No Assessment of Other Professionals Work.  The Services may include access to the work of other professional advisors or to financial statements or financial information or data reported on by such other professional advisors.  Company agrees that such access is not for the purpose of affirming or evaluating the procedures or professional standards used by such other professional advisors.  In this regard, we call your attention to the possibility that other professional advisors may perform procedures concerning the same information or data, and perhaps the same accounts and records, and reach different observations than SCP for a variety of reasons, including the possibilities that additional or different information or data might be provided to them that was not provided to SCP, or that, they might perform different procedures from SCP, or that professional judgments concerning, among others, complex, unusual, or poorly documented matters may differ.

14.    Strategic Decisions.  Neither SCP nor any SCP Personnel, assume any responsibity for the Company's decision to pursue, or not pursue any businss strategy, or to effect, or not to effect any transaction.  SCP and SCP Personnel shall be responsible for implementation only of the Services and only to the extent and in the manner directed and authorized by Company.

15.    Limitations on Warranties.  This is a services engagement.  SCP warrants that it shall perform the Services in good faith and with due professional care.  SCP DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.



16.   <u>Limitations on Damages</u>.  SCP, its subsidiaries and subcontractors, and their respective personnel shall not be liable to Company for any claims, liabilities, or expenses relating to this Engagement ("Company Claims") for an aggregate amount in excess of the fees paid to SCP pursuant to this Engagement, except to the extent resulting from the gross negligence, bad faith or intentional misconduct of SCP or its subcontractors.  In no event shall SCP, its subsidiaries or subcontractors, or their respective personnel be liable to Company for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct Company Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.  In circumstances where any limitation on damages or indemnification provision hereunder is unavailable, you agree that the aggregate liability of SCP, its subsidiaries and subcontractors, and their respective personnel for any Company Claim shall not exceed an amount that is proportional to the relative fault that the conduct of SCP and its subcontractors bears to all other conduct giving rise to such Company Claim.

**17.**   <u>Expert Witness Services</u>.  Unless specifically included in the description of Services contained in the Engagement Letter.  It is understood that the engagement of SCP and/or SCP Personnel to provide services as an expert witness, with respect to written reports, testimony or otherwise, in connection with or related to any administrative or judicial proceeding, or perform any level of related investigation (collectively, "<u>Expert Witness Services</u>"), is excluded from the definition of Services in this Agreement.

18.   <u>No Expert Advice on Securities Matters</u>.  SCP is not an expert under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, and will not consent to be a named expert in any Company filings with the SEC under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or otherwise.

19.   <u>No Improper Purposes</u>.  Under no circumstances will SCP or SCP Personnel abide by, assist or aid, directly or indirectly, any request by Company to violate or aid any violation of any state or federal statute, securities law, common law or regulatory rule or the terms and conditions of any loan agreement, security agreement or similar agreement to which the Company is a party. No person on behalf of the Company may take any action to impede SCP or SCP Personnel from communicating with Company or appropriate authorities regarding a possible violation of a state or federal statute, securities law, common law or regulatory rule or the terms and conditions of any loan agreement, security agreement or similar agreement, including enforcing, or threatening to enforce, any confidentiality agreement, the confidentiality provisions of the Standard Terms or termination of this Agreement with respect to such communications if SCP determines, in its discretion, that any such request exposes SCP to any potential liability or harm to its professional reputation..

INDEMNIFICATION

20.   <u>Indemnification, Generally</u>.  As part of the consideration for SCP's agreement to furnish the Services, Company agrees to indemnify and hold harmless CRO, all SCP Personnel and SCP and it's owners, partners, members, managers, officers, directors, agents, employees, consultants, attorneys and agents and any successors or assigns thereof (each, an "<u>SCP Indemnified Party</u>") to the fullest extent lawful from any and all claims, liabilities losses, damages, debts, judgments and/or expenses or actions (collectively, "<u>Indemnified Claims</u>") in respect thereof, incurred, related to or arising out of or in connection with the Services, the Engagement and/or this Agreement, including without limitation, any and all such SCP Indemnified Parties' reasonable costs, fees and expenses incurred in connection with investigating, preparing, defending, or settling any Indemnified Claim arising from or relating to such liabilities, including all of such SCP Indemnified Parties' reasonable legal fees and expenses; provided, however, that the Company shall not be responsible for any Indemnified Claim to the extent, and only to the extent, that it is finally and judicially determined by a final, non-appealable Court Order, that such Indemnified Claim was caused primarily due to such SCP Indemnified Party's bad faith, willful misconduct or gross negligence.  The indemnity and expense reimbursement obligations set forth herein (i) shall be in addition to any liability the Company may have to SCP at common law or otherwise, (ii) shall survive the completion of the Engagement, as amended, modified or extended, and/or the termination of this Agreement, (iii) shall apply to any modification of this Agreement or revisions to the Services, and (iv) shall be binding on any successor or assign of Company and its successors or assigns.

21.   <u>Indemnification of CRO and SCP Personnel Acting as Officers.</u>  To the extent that CRO and, as the case may be, any SCP Personnel is acting as an officer of the Company pursuant to the description of Services, in addition to any other indemnification provided in this Agreement, the Company further agrees to indemnify the CRO and the SCP Personnel acting as an officer(s) of the Company, to the same extent as the most favorable indemnification it extends to its officers or directors, whether under the Company's bylaws, its certificate of incorporation, by contract or otherwise, and no reduction or terminatin in any of the benefits provided under any such indemnities shall affect the benefits provided to the CRO and/or the SCP Personnel. The CRO and SCP Personnel shall be covered as an officer under the Compny's existing director and officer liability insurance policy and such policy shall have coverage and limits acceptable to SCP.  A certificate of insurance evidencing such coverage shall be furnished promptly to SCP and as a condition of the Effective Date occurring.  If no such policy exists prior to the Effective Date, the Company shall obtain such D&O policy prior to the Effective Date.   The Company shall give thirty (30) days' prior written notice to SCP and to CRO of cancellation, non-renewal, or material reduction in coverage, scope or amount of such director and office liability policy.  The Company shall purchase a "tail" on such directors and officers insurance policy upon the request of SCP.  Regardless, the Company shall also maintain such applicable insurance coverage for the CRO and SCP Personnel for a period of not less than six (6) years following the date of termination of the Services.  The provision of this Clause are in the nature of a contractuald obligation and no change in the applicable law or the Company's charter  by-laws or other organizational documents or policies shall affect the CRO's or SCP Personnel's rights hereunder.  This obligation shall be an administrative obligation and remain in effect regardless of the conditions upon which the Engagement concludes and/or this Agreement is terminated..



RELATIONSHIP OF THE PARTIES

22.    Independent Contractor.  SCP is an independent contractor under this Agreement .  This Agreement is not intended to create and does not create an employment agreement. No one on behalf of SCP, nor any members, managers, directors, employees, agents, independent consultants or contractors thereof, shall be considered to be a director, officer, member, manager, partner, control person, employee, representative, agent, or insider of Company unless expressly agreed to by SCP – it being understood that the CRO is, upon proper appointment by the Company, an officer of the Company.  As an independent contractor, SCP will have exclusive control over the management and operation of SCP, including hiring and paying the wages or other compensation of its personnel. Unless expressly provided otherwise in the Agreement, SCP and the SCP Personnel that provide services hereunder may also provide services to other past, present or future SCP clients in connection with unrelated matters. In addition, SCP may utilize the services of its own employees or services of qualified independent contractors to perform this Agreement in addition to the SCP Personnel.

23.    No Fiduciary Relationship with CRO Support.  Nothing in this Agreement is intended to create, or shall be deemed or construed to create a fiduciary relationship between the Company, including without limitation, the Company's directors, officers, members, managers, partners, control persons, shareholders, employees, representatives, agents, or creditors, on the one hand; and SCP, CRO Support, affiliated, consultants, members, control persons, shareholders, employees, representatives, attorneys, agents, successors or assigns, on the other hand.  The foregoing sentence does not apply to the CRO who will provide Services in a fiduciary capacity.

24.    No Agency Relationship.  Except as set forth in this Agreement, the Services are not intended to and do not create an agency relationship between Company and SCP.

25.    No Tenancy Created.  If SCP is provided with access to or use of Company's facilities for the purpose of performing the Services, such facilities may not be dedicated solely for SCP's use and SCP will not be deemed a tenant of Company with respect to such facilities.

26.    Non-Exclusivity.  SCP may (i) provide any services to any person or entity in matters or engagements unrelated to this Engagement, and (ii) develop for itself, or for others, any materials or processes, including those that may be similar to those produced as a result of the Services, provided that, SCP complies with its obligations of confidentiality set forth hereunder.

CONFLICTS

27.    Future Conflicts.  SCP is retained by new clients in the ordinary course of its business.  As a result, SCP cannot assure that, following the completion of our internal conflict search in connection with the Engagement, a new engagement for or involving one of the Company's creditors or other parties-in-interest or their respective attorneys and accountants will not be accepted by SCP or its affiliates.  Should any potential conflict come to the attention of SCP, we will endeavor to resolve such potential conflict and will determine what action needs to be taken.  You agree that you will inform us of the parties-in-interest to this matter or of additions to, or name changes for, those parties-in-interest whose names you provided.  SCP's determination of conflicts is based on the substance of the work to be performed on an engagement as opposed to the parties involved.  It is possible that some of SCP's past, present or future clients will have disputes with and other matters relating to Company, during the course of and subsequent to this Engagement.  As a condition of this Engagement, Company agrees that SCP may be engaged by parties with interests that are adverse to and may not be consistent with the interests of Company.  SCP reserves the right to accept engagement with other parties consistent with its internal, prior practices without objection by Company.

CONFIDENTIALITY

28.    Duty to Maintain Confidentiality.  SCP shall keep as confidential all non-public information received in conjunction with the Engagement, except: (i) as requested by subpoena or equivalent judicial process by the Company or its legal counsel or any successor in interest to the Company, including, but not limited to a chapter 11 trustee, a chapter 7 trustee, a liquidating trustee under a plan of reorganization or liquidation, a receiver, the assignee under an assignment for the benefit of creditors, the acquiror of the Company's assets, or a committee appointed in any bankruptcy case of the Company ; (ii) as required by legal proceedings or (iii) as reasonably required in the performance of this Engagement to the extent that such disclosure is (a) reasonably determined by the SCP to be in furtherance of its duties to Company and not otherwise in contravention of applicable disclosure rules and/or as express direction of the Company or (B) with a person that has agreed to be bound by confidentiality.  All obligations as to non-disclosure shall cease to any part of such information to the extent that such information is or becomes public other than as a result of a breach of this provision.  To the extent documents are requested pursuant to (i) or (ii) above, SCP shall produce any and all documents that are responsive to a subpoena or demand for production of documents without regard to any type of privilege or confidentiality.  It is the express duty of the Company, and not SCP, to object to a subpoena or demand for production of documents if the Company wishes to maintain any documents confidential or otherwise prevent the production of the same.

29.    Disclosure.  To the extent that, in connection with this Engagement, either party (each, the "receiving party") comes into possession of any confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent, using at least the same degree of care as it employs in maintaining in confidence its



own confidential information of a similar nature, but in no event less than a reasonable degree of care.  The disclosing party hereby consents to the receiving party disclosing such information: (i) to subcontractors, whether located within or outside of the United States, that are providing services in connection with this engagement and that have agreed to be bound by confidentiality obligations similar to those in this Clause; (ii) as may be required by law, regulation, judicial or administrative process, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; or (iii) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure in breach hereof, (b) becomes available to the receiving party on a non-confidential basis from a source that the receiving party believes is not prohibited from disclosing such information to the receiving party, (c) is already known by the receiving party without any obligation of confidentiality with respect thereto, or (d) is developed by the receiving party independently of any disclosures made to the receiving party hereunder.  Nothing in this Clause shall alter Company's obligations under any other Clause.  SCP, however, may use and disclose any knowledge and ideas acquired in connection with the Services, to the extent they are retained in the unaided memory of its personnel.  Further, SCP and its affiliates and related entities shall have the right to use Company's name as part of a general Company listing and as a specific citation in proposals or similar directed marketing efforts.

30.    <u>Subject Tax Planning Advice</u>.  No term of this Agreement is or is to be construed as a condition of confidentiality within the meaning of PCAOB Release 2005-014, Internal Revenue Code Sections 6011 and 6111 or the regulations thereunder, any related Internal Revenue Service guidance, or any other similar law, with respect to any Services, Deliverables or other materials of any kind provided hereunder relating to tax treatment or tax structure (collectively referred to as "<u>Subject Tax Planning Advice</u>"). Notwithstanding anything herein to the contrary, no provision of the Agreement shall place any limitation on Company's disclosure of any Subject Tax Planning Advice.  In the event of any unauthorized reliance on any Subject Tax Planning Advice by a Third Party, Company agrees to indemnify and hold harmless SCP, its subcontractors, and their respective personnel from any and all claims of a Third-Party, liabilities, costs, and expenses including attorneys' fees and expenses as provided for in the "Indemnification" Section of the Standard Terms.

TERMINATION

31.    <u>Termination with Notice</u>.  Any party to this Engagement may terminate the Engagement upon thirty (30) days' prior written notice to the other party(ies).  Upon receipt by the non-terminating party of such written notice, SCP will stop all work immediately.  Upon any termination of this Engagement, SCP shall be entitled to all incurred and unpaid fees for Services, other fees and expenses described in the Agreement .

32.    <u>Termination at Completion of Engagement</u>.  Unless terminated sooner as set forth herein, this Agreement shall terminate upon (i) the completion of the Services and the Engagement and (ii) the payment in full of all outstanding Invoices.

33.    <u>Return of Company Data/SCP Data Destruction Policy</u>.  Upon conclusion of the Engagement, Company may request to retrieve its confidential information, data, information and documents provided to, prepared by or otherwise in the possession of SCP (collectively, the "<u>Company Data</u>") from SCP at no additional charge to Company, Alternatively, Company Data can re returned in a mutually agreed format at a scope and price to be agreed.  Regardless, SCP will maintain a copy of Company Data for no more than six (6) months following termination of this Engagement, after which any Company Data not retrieved will be destroyed, subject to applicable law and SCP's internal data retention policy.

MISCELLANEOUS

34.    <u>Collection Costs/Enforcement Action</u>.  If an action or proceeding is commenced by SCP – whether during the Engaement or subsequent to termination – to collect or defend any objection to any Invoice, fee, Reimbursable Expense or cost or enforce any other obligation of Company under this Agreement whether commenced during or after termination of this Agreement (an "<u>Enforcement Action</u>"), Company agrees to pay and reimburse SCP for all reasonable SCP Personnel time, administration costs and expenses, including, attorneys' fees, costs and expenses incurred in connection with such Enforcement Action.

35.    <u>Misc. Fees, Expenses & Costs (Including Discovery Requests)</u>.  SCP will be compensated for any SCP Personnel time and expenses, including, attorneys' fees, costs and expenses, that SCP may incur in connection with the Services (whether during the Engagement or after termination of this Agreement) with respect to the responding to discovery requests, subpoenas or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, arbitration, or other proceedings (including, without limitation, those unrelated to the matters that are subject to this Engagement) as a result of, related to or in connection with the Services, the Engagement or this Agreement.

36.    <u>Survival and Interpretation</u>.  All provisions which are intended by their nature to survive performance of the Services and/or the termination of this Agreement, shall survive such performance, or the expiration or termination of this Agreement and remain an independent obligation of Company and of SCP.  Each of the provisions of these terms shall apply to the fullest extent of the law, whether in contract, statute, common law, or otherwise, notwithstanding the failure of the essential purpose of any remedy. Any references herein to the term "including" shall be deemed to be followed by "without limitation".

37.    <u>Assignment</u>.  Except as provided in this Agreement, neither party may assign any of its rights or obligations hereunder (including interests, Claims or Company Claims) without the prior written consent of the other party.



38.  Severability.  If any portion of this Agreement is held to be void, invalid, or otherwise unenforceable, in whole or in part, the remaining portions shall remain in effect.

39.  Successors and Assigns.  This Agreement shall be binding upon SCP and Company together with their respective heirs, successors, and assignees and any heir, successor, or assignee of a substantial portion of its businesses and/or assets.

40.  Entire Agreement; Bankruptcy Court Order.  Subject to the terms of any order entered by the Bankruptcy Court in the Bankruptcy Cases pertaining to SCP and/or the Services, this Agreement incorporates the entire understanding of the parties with respect to the subject matter hereof and may not be amended or modified except in writing executed by the parties.  This Agreement replaces and supersedes any previous proposal, draft letter of engagement, communication (oral or written), undertaking, representation, or correspondence – whether written or oral, regarding the Services.

41.  Limited Disclosure of Engagement.  Notwithstanding anything herein to the contrary, SCP may reference or list the Company's name and/or logo and /or a general description of the Services in SCP's marketing materials, media, social media , website or in any disclosure to a court of law as appropriate.

42.  Force Majeure.  No party shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

43.  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.  This Agreement may be executed by facsimile signatures or signatures forwarded by email.

44.  No Waiver.  No failure to delay in exercising any right, power or privilege related hereto, or any single or partial exercise thereof, shall operate as a direct or indirect waiver thereof.

45.  Waiver of Trial by Jury.  THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT AND THE SERVICES.

46.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California (without giving effect to the choice of law principles thereof).  Any action based upon or arising out of this Agreement shall be brought and maintained exclusively in any state or federal court, in each case located in Los Angeles County, the State of California.  Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum.

47.  In the Event of a Bankruptcy Filing.  In the event the Company determines to commence Chapter 11 proceedings, the Company shall apply promptly to the presiding Bankruptcy Court pursuant to the Bankruptcy Code, applicable rules and procedural orders of the Bankruptcy Court and procedural guidelines for approval of this Agreement, *nunc pro tunc* to the commencement date of such proceedings, and shall use its best efforts to obtain such Bankruptcy Court approval and authorization.  SCP acknowledges and accepts that in the event that the Bankruptcy Court approves its retention by the Company, payment of SCP's fees and expenses shall be subject to  (i) the jurisdiction and approval of the Bankruptcy Court and the Bankruptcy Code, (ii) any applicable fee and expense guidelines and/or order and (iii) any requirements governing interim and final fee applications imposed in the Bankruptcy Cases, if any.  In the context of a bankruptcy filing, "Reimbursable Expenses" shall include include any and all SCP Professional time, attorneys' fees, costs and expenses incurred by SCP in reviewing retention applications, interim and final fee applications and any related or appropriate bankruptcy court pleading of bankruptcy.

[Remainder of page left blank intentionally]

## **SCHEDULE 2 TO PERKINS DECLARATION**

**Potentially Interested Parties List**

**SCHEDULE 2 TO PERKINS DECLARATION**

**Potentially Interested Parties List**

<u>Schedule</u>  <u>Category</u>
  1(a)     <u>Known Affiliates</u>

National Senior Care, Inc.
Mariner Health Care Management Company
MHC Recruiting Company
Mariner Health Central, Inc.
MHC Holding Company
Bio-Pacific LLC
Mariner Insurance Company, LLC
MHC West Holding Company
GranCare, LLC
Sacramento Operating Company GP, LLC
Hayward Hills Operating Company GP LLC
Inglewood Operating Company GP LLC
San Rafael Operating Company GP LLC
Sacramento Operation Company LP
Hayward Hills Operating Company LP
Inglewood Operating Company LP
San Rafael Operating Company LP
GC Operating Company LLC
GC Holding Company 2, LLC
Driftwood Hayward Holding Company GP, LLC
Skyline San Jose Holding Company GP, LLC
Verdugo Vista Holding Company GP, LLC
Driftwood Santa Cruz Holding Company GP, LLC
Driftwood Hayward Operating Company, LP
Skyline San Jose Operating Company LP
Verdugo Vista Operating Company LP
Driftwood Santa Cruz Operating Company LP
Autumn Hills Holding Company GP, LLC
Monterey Palms Holding Company GP, LLC
Almaden Holding Company GP, LLC
Fruitvale Holding Company GP, LLC
Autumn Hills Operating Company, LP
Monterey Palms Operating Company, LP
Almaden Operating Company, LP
Fruitvale Operating Company, LP
Rehabilitation Center of Santa Monica Holding Company GP, LLC
Creekside Holding Company GP, LLC
Fremont Holding Company GP, LLC
Parkview Holding Company GP, LLC
Santa Monica Holding Company GP, LLC

Glendale Holding Company GP, LLC
San Marcos Holding Company GP, LLC
Rehabilitation Center of Santa Monica Operating Company, LP
Creekside Operating Company, LP
Fremont Healthcare Operating Company, LP
Santa Monica Operating Company, LP
Glendale Operating Company, LP
San Marcos Operating Company, LP
Palm Springs Holding Company GP, LLC
Vale Holding Company GP, LLC
Palm Springs Operating Company, LP
Vale Operating Company, LP

1(b)    Directors & Officers

Linda Taetz
Kenneth Tabler
Devin Ehrlich
Craig Barbarosh
Lawrence Perkins

1(c)    5% of More Equity Holders

Mariner Health Care Management Company
GC Holding Company 2, LLC

1(d)    Bankruptcy Judges

Chief Judge Laurie Selber Silverstein
Christopher S. Sontchi
John T. Dorsey
Craig T. Goldblatt
Karen B. Owens
Brendan L. Shannon
J. Kate Stickles
Mary F. Walrath
Ashley M. Chan

1(e)    Bankruptcy Professionals

Raines Feldman LLP
Pachulski Stang Ziehl & Jones, LLP
SierraConstellation Partners, LLC
Kurtzman Carson Consultants, LLC

1(f)    Banks/Lenders/UCC Lien Parties/Administrative Agents

Capital One, N.A.
Bank of America, N.A.
Citibank N.A.

National Datacare

1(g)        <u>Insurance</u>

Hamilton Insurance Agency
Risk Strategies Company
Willis Towers Watson Southeast, Inc.
Trion Group, Inc.
Ascot Underwriting Bermuda
Axis U.S. Insurance Company
Endurance American Insurance Company
Federal Insurance Company
Hudson Excess Insurance
Hudson Insurance Company
Ironshore Indemnity Inc.
Mt. Hawley Ins. Co.
National Union Fire Insurance Company of Pittsburg, PA
Philadelphia Ins. Co.
RSUI Indemnity Company
Scottsdale Indemnity Company
Scottsdale Ins. Co.
US Specialty Ins. Co.
Zurich American Insurance Company
Servarus Corporation
Allied World Specialty Insurance Company

1(h)        <u>Landlords</u>

Tampa Avenue Property LLC
Mason Family 1993 Trust
Hayward Area Historical Society
Sanders Legal Group LLC

1(i)        <u>Litigation</u>

Baustista, Jennifer
Bishop, Tiffany
Brown Ah-Hing, Feleai
Bunch, Alma
Cabrerra, Lisa
Chung, Brian Byung Hwa
Chung, Kyu
Contreras, Maria
Cook, Gregory
Cook Scott
Clearley, James Jr.
Davis, Robert
REDACTED, Alyssa
Ezra, Erza
Fillimon, Arzeta

Flores, Anna
Garret, Jessie Otis
Greene, Paula
Guerin, Carol
Holdsworth, Timothy
Horrobin, Janet
Huffman, Carlene
Hunter, Kathy
Hyo, Soon Choi
Hyo, Young Jung
Integra Med Analytics, LLC
Jackson, Tracy
Johnson, David
Jones, Azhya
Kazaryan, Jacqueline
Kapule, Rebecca
Kratz, Andrew
Ledesma, Refugio
Ledesma, Maricela
Ledesma, Esther
Ledesma, Alberto
Ledesma, Celina
Ledesma, David
Ledesma, Alejandro
Ledesma, Araceli
Ledesma, Esmeralda
Leong, Lai Fong
Lewis, Doloris
Light, Margo
Lofton, Melvin
Lofton, Yvonne
Lofton, Sylvia
Mangano, Philip
Martin, James
McCalope, Frances
McCalope, Robert
Meadors, Teresa
Merrill, Dorothy
Moore, Beatrice
Morris, Jean
Nazarians, Nora
People of The State of California
Powell, John
Rice, Jacqueline
Russell, Taylor
Sanchez, Jose
Seelig, John
Sira, Louie
Solis, Ana
Suarez, Irma
Suarez, Sophia
Tharp, Darriin
Tucker, Christopher
Tucker, Jason

Tucker, Casey
Tucker, Stephen
Umo, Ima
Valentine, Terry
Vassis, Christine
Vela- Alvarado, Julianna
Watson, Teola
Wilson, Bobby
Wilson, Chanova
Won, Susan Myung

1(j)          U.S. Trustee Office

T. Patrick Tinker
David Buchbinder
Linda Casey
Joseph Cudia
Timothy J. Fox, Jr.
Diane Giordano
Benjamin Hackman
Jane Leamy
Hannah M. McCollum
Joseph McMahon
Linda Richenderfer
Juliet Sarkessian
Richard Schepacarter
Rosa Sierra

1(k)          Utilities

8X8 Inc.
Ability Network Inc.
ABIS Inc.
Allbridge
AT&T - National
AT&T Teleconference Services
Biologic Environmental Services
Brask Enterprises Inc.
Efax Corporate
Glendale, City of
Hayward Area Historical Society
Hayward Water System
PG&E
SoCalGas - Southern California
Spectrotel
Start Meeting LLC
TPX Communications
Verizon Wireless
Waste Management Inc.

1(l)          30 Largest Unsecured Creditors
Ability Network
Bhupinder Bhandari MD Inc.
Boyd Gentry

5

Bio-Pacific, LLC
California, State of
Diagnostic Laboratories & Radiology
First Call Nursing Services
Fundamental Administrative Services
Harmony Healthcare International
Hayward Area Historical Society
Hayward Water System
Hooper Lundy & Bookman PC
Integra Med Analytics, LLC (Litigation above)
Iron Mountain Information Management, LLC
JJJ Health Care Staffing Agency LLC
Kingston 17
Ledesma (Litigation above)
Mason Family 1993 Trust
Medline Industries
Noridian Healthcare Solutions LLC
Nutrition Therapy Essentials
P G & E
People of the State of California (litigation above)
Pharmerica
Seyfarth Shaw
Sky Power Secure Solutions Inc.
Stone Mountain Medical Associates, Inc.
Sysco San Francisco
Tampa Avenue Property LLC
Vitawerks