## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 22-10877 (LSS) |
| MARINER HEALTH CENTRAL, INC., *et al*.,[1] | ) |  |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) |  |
|  | ) |  |

## DECLARATION OF SUSAN KANG GORDON

I, Susan Kang Gordon, Esq., hereby declare:

1.      I am an attorney in good standing and am licensed to practice law in the Courts of the State of California. I am the owner of the Law Office of Susan Kang Gordon located at 21C Orinda Way #162, Orinda, CA 94563.

2.      I am the attorney for the Ledesma Plaintiffs.  I have personal knowledge of these matters stated herein and could and would testify competently to them if called as a witness.

3.      I submit this declaration (the "Declaration") in connection with the **Ledesma Action Plaintiffs' Motion to Transfer Venue of Bankruptcy Cases to the United States Bankruptcy Court for the Northern District of California, Oakland Division**, filed contemporaneously herewith.

4.      Attached hereto as **Exhibit A** is a true and correct copy of the Second Amended Judgement in the *Ledesma* action entered on August 23, 2022.

5.      Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the Deposition of Kenneth Tabler, taken on February 15, 2022.

---

[1] The Debtors, along with the last four digits of each Debtor's tax identification number, are Mariner Health Central, Inc. (6203), Parkview Holding Company GP, LLC (1536), and Parkview Operating Company, LP (7273). The Debtors' headquarters are located at 3060 Mercer University Drive, Suite 200, Atlanta, GA 30341.

6.     Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the Deposition of Kristy Prince Owen, taken on February 15, 2022.

7.     Attached hereto as **Exhibit D** is a true and correct copy of excerpts from the Deposition of Linda Taetz, taken on February 15, 2022.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge. This Declaration was executed in Moraga, California on October 4, 2022.

**LAW OFFICE OF SUSAN KANG GORDON**

*Susan Kang Gordon*
_____
Susan Kang Gordon (Bar No. 273979)

# EXHIBIT "A"

Susan Y. Kang Gordon, Esq. (SBN: 273979)
**LAW OFFICE OF SUSAN KANG GORDON**
21C Orinda Way #162
Orinda, CA 94563
Telephone: (510) 400-6146
Facsimile: (510) 400-6148

Jennifer Fiore, Esq. (SBN: 203618)
Sophia Achermann, Esq. (SBN: 262712)
**FIORE ACHERMANN, A LAW CORP.**
340 Pine St., Ste. 503
San Francisco, CA 94104-3237
Telephone & Facsimile: (415) 550-0650

Jody C. Moore, Esq. (SBN: 192601)
**JOHNSON MOORE**
100 E. Thousand Oaks Blvd., Ste. 229
Thousand Oaks, CA 91360
Telephone: (805) 988-3661
Facsimile: (805) 494-4777

FILED
ALAMEDA COUNTY

AUG 2 3 2022

CLERK OF THE SUPERIOR COURT
By_____ Deputy

SUPERIOR COURT OF STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| MARICELA LEDESMA, et al. | Case No.: RG19025110 |
| Plaintiffs, | *[ASSIGNED FOR ALL PURPOSES TO DEPT. 21]* |
| vs. | **SECOND AMENDED JUDGMENT AFTER GRANTING OF PARTIAL JNOV AS TO PUNITIVE DAMAGES** |
| MARINER HEALTH CARE, INC.; MARINER HEALTH CENTRAL, INC.; MARINER HEALTH CARE MANAGEMENT COMPANY; MHC WEST HOLDING COMPANY; GRANCARE, LLC; PARKVIEW HEALTHCARE CENTER; JOHNSON OKERE; and DOES 1 Through 100, Inclusive, | Action Filed: 6/28/2019 Trial Date: 5/18/2021 |
| Defendants. | |

On September 16, 2021, and October 14, 2021, the Jury in the above-captioned case returned separate verdicts for monetary damages in favor of the plaintiffs and against defendants;

On December 30, 2021, the court granted plaintiffs' prayer for injunctive relief and entered judgment for monetary and injunctive relief;

On March 21, 2022, the court granted in part and denied in part defendants' motion JNOV;

On March 21, 2022, the court conditionally granted in part and denied in part the Motion for New Trial and issued a remittitur table;

On April 22, 2022, the court entered an amended judgment after granting JNOV, finding that the amended judgment entered on April 22, 2022, did not conform to JNOV entered on March 21, 2022, due to clerical and/or arithmetic errors;

On May 12, 2022, the court entered the First Amended Judgment After Granting of JNOV;

On May 16, 2022, the court re-issued the remittitur table by entering an Amended Remittitur ;

On June 14, 2022, Plaintiffs accepted the Amended Remittitur issued on May 16, 2022;

On July 25, 2022, the court issued an order granting in part and denying in part Defendants' motion to tax costs; and

On July 25, 2022, the court issued an order granting in part Plaintiffs' motion for award of attorney's fees and costs.

IT IS ORDERED, ADJUDGED AND DECREED.

**I. MONETARY RELIEF:**

Plaintiffs, and each of them, shall have judgment against Defendants Mariner Health Central, Inc, ("Mariner") and Parkview Operating Company, LP, ("Parkview") as follows:

**1.**    Plaintiff Feleai Brown Ah-Hing shall have and recover from Defendant Parkview $588,123.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

      a.   Statutory Damages: $500.00

      b.   Compensatory Damages: $88,000.00

      c.   Punitive Damages: $165,000.00

      d.  Attorney's Fees: $297,310.00

      e.  Costs: $37,313.00

        Total: $588,123.00

Plaintiff Feleai Brown Ah-Hing shall have and recover from Defendant Mariner $897,936.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

      a.  Compensatory Damages: $132,000.00

      b.  Punitive Damages: $264,000.00

      c.  Attorney's Fees: $445,966.00

      d.  Costs: $55,970.00

        Total: $897,936.00

2.     Plaintiff James Cearley, Jr., shall have and recover from Defendant Parkview $892,873.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

      a.  Statutory Damages: $500.00

      b.  Compensatory Damages: $194,000.00

      c.  Punitive Damages: $363,750.00

      d.  Attorney's Fees: $297,310.00

      e.  Costs: $37,313.00

        Total: $892,873.00

Plaintiff James Cearley, Jr., shall have and recover from Defendant Mariner $1,374,936.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

      a.  Compensatory Damages: $291,000.00

      b.  Punitive Damages: $582,000.00

      c.  Attorney's Fees: $445,966.00

      d.  Costs: $55,970.00

        Total: $1,374,936.00

SECOND AMENDED JUDGMENT AFTER GRANTING OF JNOV        CASE NO. RG19025110

**3.** Plaintiffs Maricela Ledesma, as Successor in Interest of J.R. Ledesma and Personal Representative of the Estate of J.R. Ledesma, and Esther Ledesma, Alberto Ledesma, Celina Ledesma, David Ledesma, Alejandro Ledesma, Araceli Ledesma and Esmeralda Ledesma, as Successors in Interest to J.R. Ledesma, and all as heirs of J.R. Ledesma, jointly, shall have and recover from Defendant Parkview $778,136.03, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

  a.  Statutory Damages: $500.00

  b.  Compensatory Damages: $243,013.03

  c.  Punitive Damages: $200,000.00

  d.  Attorney's Fees: $297,310.00

  e.  Costs: $37,313.00

  Total: $778,136.03

Plaintiffs Maricela Ledesma, as Successor in Interest of J.R. Ledesma and Personal Representative of the Estate of J.R. Ledesma, and Esther Ledesma, Alberto Ledesma, Celina Ledesma, David Ledesma, Alejandro Ledesma, Araceli Ledesma and Esmeralda Ledesma, as Successors in Interest to J.R. Ledesma, and all as heirs of J.R. Ledesma, jointly, shall have and recover from Defendant Mariner $1,166,455.55, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

  a. Compensatory Damages: $364,519.55

  b. Punitive Damages: $300,000

  c. Attorney's Fees: $445,966.00

  d. Costs: $55,970.00

  Total: $1,166,455.55

**4.** Plaintiff Frances McCalope shall have and recover from Defendant Parkview $838,248.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Statutory Damages: $500.00

    b.  Compensatory Damages: $175,000.00

    c.  Punitive Damages: $328,125.00

    d.  Attorney's Fees: $297,310.00

    e.  Costs: $37,313.00

        Total: $838,248.00

Plaintiff Frances McCalope shall have and recover from Defendant Mariner $1,289,436.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Compensatory Damages: $262,500.00

    b.  Punitive Damages: $525,000.00

    c.  Attorney's Fees: $445,966.00

    d.  Costs: $55,970.00

        Total: $1,289,436.00

**5.** Plaintiffs Henry Rice, as Successor in Interest to Jacqueline Rice and as Personal Representative of the Estate of Jaqueline Rice, and Marcus Moore, as Successor in Interest to Jaqueline Rice, jointly, shall have and recover from Defendant Parkview $635,123.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Statutory Damages: $500.00

    b.  Compensatory Damages: $100,000.00

    c.  Punitive Damages: $200,000.00

    d.  Attorney's Fees: $297,310.00

    e.  Costs: $37,313.00

        Total: $635,123.00

Plaintiffs Henry Rice, as Successor in Interest to Jacqueline Rice and as Personal Representative of the Estate of Jaqueline Rice, and Marcus Moore, as Successor in Interest to Jaqueline Rice, jointly, shall have and recover from Defendant Mariner $951,936.00, together with

interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Compensatory Damages: $150,000.00

    b.  Punitive Damages: $300,000.00

    c.  Attorney's Fees: $445,966.00

    d.  Costs: $55,970.00

      Total: $951,936.00

**6.** Plaintiffs Nancy Sanchez, as Successor in Interest to Jose Sanchez and as Personal Representative of the Estate of Jose Sanchez, and Joe Sanchez and Eduardo Sanchez, as Successors in Interest to Jose Sanchez, jointly, shall have and recover from Defendant Parkview $635,123.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Statutory Damages: $500.00

    b.  Compensatory Damages: $100,000.00

    c.  Punitive Damages: $200,000.00

    d.  Attorney's Fees: $297,310.00

    e.  Costs: $37,313.00

      Total: $635,123.00

Plaintiffs Nancy Sanchez, as Successor in Interest to Jose Sanchez and as Personal Representative of the Estate of Jose Sanchez, and Joe Sanchez and Eduardo Sanchez, as Successors in Interest to Jose Sanchez, jointly shall have and recover from Defendant Mariner $951,936.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Compensatory Damages: $150,000.00

    b.  Punitive Damages: $300,000.00

    c.  Attorney's Fees: $445,966.00

    d.  Costs: $55,970.00

      Total: $951,936.00

**7.** Plaintiff John Seelig shall have and recover from Defendant Parkview $579,498.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Statutory Damages: $500.00

    b.  Compensatory Damages: $85,000.00

    c.  Punitive Damages: $159,375.00

    d.  Attorney's Fees: $297,310.00

    e.  Costs: $37,313.00

       Total: $579,498.00

Plaintiff John Seelig shall have and recover from Defendant Mariner $884,436.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Compensatory Damages: $127,500.00

    b.  Punitive Damages: $255,000.00

    c.  Attorney's Fees: $445,966.00

    d.  Costs: $55,970.00

       Total: $884,436.00

**8.** Plaintiffs Lisa Cabrera, as Successor in Interest of Louie Sira and as Personal Representative of the Estate of Louie Sira, and Matthew Sira, as Successor in Interest to Louie Sira, jointly, shall have and recover from Defendant Parkview $776,354.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Statutory Damages: $500.00

    b.  Compensatory Damages: $241,231.00

    c.  Punitive Damages: $200,000.00

    d.  Attorney's Fees: $297,310.00

    e.  Costs: $37,313.00

       Total: $776,354.00

Plaintiffs Lisa Cabrera, as Successor in Interest of Louie Sira and as Personal Representative of the Estate of Louie Sira, and Matthew Sira, as Successor in Interest to Louie Sira, jointly, shall have and recover from Defendant Mariner $1,163,782.50, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Compensatory Damages: $361,846.50

    b.  Punitive Damages: $300,000.00

    c.  Attorney's Fees: $445,966.00

    d.  Costs: $55,970.00

       Total: $1,163,782.50

**9.** Plaintiffs Trinian Taylor, as Successor in Interest of Russell Taylor and as Personal Representative of the Estate of Russell Taylor, and Devon Taylor, as Successor in Interest Russell Taylor, jointly, shall have and recover from Defendant Parkview $73,791.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Statutory Damages: $500.00

    b.  Punitive Damages: $5,000.00

    c.  Attorney's Fees: $60,676.00

    d.  Costs: $7,615.00

       Total: $73,791.00

**10.** Plaintiff Chanova Wilson shall have and recover from Defendant Parkview $217,791.00, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid. The total amount consists of the following:

    a.  Statutory Damages: $500.00

    b.  Compensatory Damages: $144,000.00

    c.  Punitive Damages: $5,000.00

    d.  Attorney's Fees: $60,676.00

    e.  Costs: $7,615.00

Total: $217,791.00

Plaintiff Chanova Wilson shall have and recover from Defendant Mariner $216,000.00 in compensatory damages, together with interest thereon at the rate of ten percent (10%) per annum from the date of the entry of judgment until paid.

**II. INJUNCTIVE RELIEF:**

The court GRANTS injunctive relief and enjoins and restrains defendant Parkview as set forth in the Injunction filed and entered December 30, 2021.

**III. ATTORNEYS' FEES AND COSTS:**

Plaintiffs are the prevailing party in this litigation and shall recover attorneys' fees and costs in the amounts set forth herein.

The court sets forth its calculation of the damages amounts in this Second Amended Judgment after granting, in part, the Defendants' motion for JNOV, after Plaintiff's acceptance of Amended Remitter set forth as Exhibit A to this Second Amended Judgment, after granting in part Plaintiffs' motion for attorney's fees and costs and after granting in part Defendants' motion to tax costs. The injunctive relief provisions remain unchanged.

IT IS SO ORDERED.

AUG 2 3 2022

Dated: _____, 2022

_____
THE HONORABLE EVELIO M. GRILLO
JUDGE OF THE SUPERIOR COURT

SECOND AMENDED JUDGMENT AFTER GRANTING OF JNOV                    CASE NO. RG19025110

# EXHIBIT A

FILED
ALAMEDA COUNTY

MAY 1 6 2022

CLERK OF THE SUPERIOR COURT
By_____ Deputy

SUPERIOR COURT OF STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

| | |
|---|---|
| MARICELA LEDESMA, et al. | Case No.: RG19025110 |
| Plaintiffs, | |
| vs. | **AMENDED REMITTITUR** |
| | Action Filed: 6/28/2019 |
| MARINER HEALTH CARE, INC.; | Trial Date: 5/18/2021 |
| MARINER HEALTH CENTRAL, INC.; | |
| MARINER HEALTH CARE | |
| MANAGEMENT COMPANY; | |
| MHC WEST HOLDING COMPANY; | |
| GRANCARE, LLC; | |
| PARKVIEW HEALTHCARE CENTER; | |
| JOHNSON OKERE; | |
| and DOES 1 Through 100, Inclusive, | |
| Defendants. | |

The Jury in the above captioned case, on September 16, 2021, and October 14, 2021, returned separate verdicts for monetary damages in favor of the plaintiffs and against defendants. On December 30, 2021 the court granted plaintiffs' prayer for injunctive relief and entered judgment for monetary and injunctive relief. On March 21, 2022, the court entered its Order Conditionally Granting In Part and Denying In Part Defendants' Motion for New Trial and Order Re: Remittitur of Damages. The order granting the new trial was conditional on plaintiffs' acceptance or non-acceptance of the court's remittitur, *i.e.*, agreeing to accept the reduction of

1  punitive damages as specified in the order granting JNOV, also entered on March 21, 2022, but

2  not otherwise affecting compensatory damages, including wrongful death damages.  However, the

3  order and remittitur did not make this clear: the remittitur was directed to punitive damages only,

4  and was not intended to affect compensatory damages, which remained unchanged by the granting

5  of the JNOV.  In addition, the Amended Judgment entered April 22, 2022, contained mathematical

6  errors in the amount of the judgment, which were not corrected until the entry of the First

7  Amended Judgment on May 12, 2022. These mathematical errors were raised by the Plaintiffs and

8  discussed with the Defendants and the court, which ultimately resulted in the correction of the

9  judgment.

10          The court, accordingly, reissues the remittitur ("Amended Remittitur").  The remittitur

11  amounts are set forth on the Remittitur Tables attached as Exhibit A to this Amended Remittitur.

12          The deadline for acceptance or rejection of the reduction of damages as set forth in this

13  Amended Remittitur is 30 days from the date this Amended Remittitur is served by the clerk of the

14  court. Failure to respond to the to the Amended Remittitur order in accordance with this section

15  shall be deemed a rejection of the remittitur and a new trial limited to the issue of damages shall

16  be granted, as ordered in the Order Conditionally Granting In Part and Denying In Part

17  Defendants' Motion for New Trial and Order Re: Remittitur of Damages, filed March 21, 2022.

18          IT IS SO ORDERED.

19

20  Dated: _____, 2022          MAY 16 2022

21                                            EVELIO M. GRILLO
                                              JUDGE OF THE SUPERIOR COURT

22

23

24

25

26

27

28

2

AMENDED REMITTITUR                                              CASE NO. RG19025110

## DAMAGES PAYABLE BY MARINER

| Plaintiff | Past Non-Economic | Future Non-Economic Damages | Punitive Damages | Wrongful Death Non-Economic Damages | Wrongful Death Economic Damages |
|---|---|---|---|---|---|
| Ah-Hing | $120,000 | $12,000 | $264,000 | 0 | 0 |
| Cearley | $291,000 | 0 | $582,000 | 0 | 0 |
| McCalope | $250,500 | $12,000 | $525,000 | 0 | 0 |
| Ledesma | $150,000 | 0 | $300,000 | $210,000 | $4,519.55 |
| Rice | $150,000 | 0 | $300,000 | 0 | 0 |
| Sanchez | $150,000 | 0 | $300,000 | 0 | 0 |
| Seelig | $127,500 | 0 | $255,000 | 0 | 0 |
| Sira | $150,000 | 0 | $300,000 | $210,000 | $1,846.50 |
| Taylor | 0 | 0 | 0 | 0 | 0 |
| Wilson | $216,000 | 0 | 0 | 0 | 0 |

## DAMAGES PAYABLE BY PARKVIEW

| Plaintiff | Statutory Damages | Past Non-Economic | Future Non-Economic Damages | Punitive Damages | Wrongful Death Non-Economic Damages | Wrongful Death Economic Damages |
|---|---|---|---|---|---|---|
| Ah-Hing | $500 | $80,000 | $8,000 | $165,000 | 0 | 0 |
| Cearley | $500 | $194,000 | 0 | $363,750 | 0 | 0 |
| McCalope | $500 | $167,000 | $8,000 | $328,125 | 0 | 0 |
| Ledesma | $500 | $100,000 | 0 | $200,000 | $140,000 | $3,013.03 |
| Rice | $500 | $100,000 | 0 | $200,000 | 0 | 0 |
| Sanchez | $500 | $100,000 | 0 | $200,000 | 0 | 0 |
| Seelig | $500 | $85,000 | 0 | $159,375 | 0 | 0 |
| Sira | $500 | $100,000 | 0 | $200,000 | $140,000 | $1,231 |
| Taylor | $500 | 0 | 0 | $5,000 | 0 | 0 |
| Wilson | $500 | $144,000 | 0 | $5,000 | 0 | 0 |

# EXHIBIT A TO AMENDED REMITTITUR
# LEDESMA v. MARINER HEALTH CARE
# CASE NO. RG19025110

# EXHIBIT "B"

**Kenneth Tabler**
**February 15, 2022**

Page 1

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA


PEOPLE OF THE STATE OF CALIFORNIA,

      Plaintiff,

vs.                                         CASE NO:
                                            RG21095881

MARINER HEALTH CARE INC., A DELAWARE
CORPORATION; NATIONAL SENIOR CARE, INC.,
A DELAWARE CORPORATION; MARINER HEALTH CARE
MANAGEMENT CO., A DELAWARE CORPORATION;
MARINER HEALTH CENTRAL INC., A DELAWARE
CORPORATION; ET. AL.

      Defendants.

                                     /


REMOTE VIDEOCONFERENCE DEPOSITION OF:  KENNETH TABLER

DATE:  TUESDAY, FEBRUARY 15, 2022

TIME:  9:04 A.M.

PLACE:  REMOTE

REPORTER:  CONNIE WEBB, CSR NO. 10811

**Kenneth Tabler**
**February 15, 2022**

---

Page 2

```
 1                    APPEARANCES
 2
 3   For the plaintiff:
 4   District Attorney of Santa Cruz
     DOUG ALLEN, ESQUIRE
 5   Assistant District Attorney
     701 Ocean Street, Suite 200
 6   Santa Cruz, California 95060
     (831) 454-2930
 7   Douglas.Allen@santacruzcounty.us
 8   District Attorney of Marin
     ANDRES PEREZ, ESQUIRE
 9   Deputy District Attorney
     3501 Civic Center Drive, Suite 145
10   San Rafael, California 94903-4189
     (415) 473-6450
11   Aperez@marincounty.org
12   District Attorney of Alameda County
     LORI SCHNALL, ESQUIRE
13   Deputy District Attorney
     1225 Fallon Street, Suite 900
14   Oakland, California 94612-4208
     (510) 272-6222
15   Lori.Schnall@acgov.org
16   District Attorney of Los Angeles County
     SEZA MIKIKIAN, ESQUIRE
17   Deputy District Attorney
     211 West Temple Street, Suite 1000
18   Los Angeles, California 90012
     (213) 257-2450
19   Smikikian@da.lacounty.gov
20
     For the defendant:
21
     DARRYL A. ROSS, ESQUIRE
22   Mariner Health Central, Inc.
     5440 Trabuco Road
23   Irvine, California 92620-5704
     949-238-7775
24   daross@marinerhealthcare.com
25
```

Page 4

```
 1                    WITNESS INDEX
 2
 3   WITNESS                          PAGE
 4
 5   KENNETH TABLER
     By Mr. Allen:                      6
 6
 7
 8
 9                    EXHIBIT INDEX
10
11   NO.  DESCRIPTION                 MARKED
12
13    1  Second-amended Notice of Deposition    12
14    2  Deponent's declaration in support of   12
         motion to quash service
15
16    3  Organizational chart                   12
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    APPEARANCES
 2                    (continued)
 3
 4   Also present:
 5   Matt Clark
     Devin Ehrlich, general counsel
 6   Linda Taetz
     Kristy Prince Owen
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20     DEPOSITION OF KENNETH TABLER, taken on behalf of
21   the plaintiff in Eureka, California, on February 15,
22   2022, at 9:04 a.m., before Connie Webb, CSR No. 10811.
23
24
25
```

Page 5

```
 1             TUESDAY, FEBRUARY 15, 2022
 2                     • • •
 3                   9:04 A.M.
 4                     • • •
 5
 6        THE REPORTER:  Good morning, everyone.
 7   My name is Connie Webb, CSR 10811, and I'm
 8   located at my office in Eureka, California.  Today's date
 9   is Tuesday, February 15, 2022, and the time is 9:04 a.m.
10        This is the remote Zoom deposition of Kenneth
11   Tabler in the matter of People of the State of California
12   versus Mariner Health Care Inc., et al., case number
13   RG21095881, taken on behalf of the plaintiff.
14        This deposition and any transcript produced
15   therefrom will be handled pursuant to California CCP
16   2025.
17        Will counsel please state your appearances
18   starting with the noticing attorney?
19        MR. ALLEN:  Yes.  Good morning.  This is
20   Douglas Allen.  I'm an assistant district attorney with
21   the County of Santa Cruz.
22        MR. ROSS:  Good morning.  Darryl Ross and Matt
23   Clark via Zoom for the defendants and for the witness.
24        Also present in the room with me is Devin
25   Ehrlich, general counsel; Linda Taetz who is president of
```

**Kenneth Tabler**
**February 15, 2022**

### Page 18

1   I assume Emily Grunstein?
2       MR. ROSS:  Back in 2014?
3       MR. ALLEN:  In 2014, yes.
4       THE WITNESS:  In 2014, Mr. Grunstein was still
5   alive.
6       MR. ALLEN:  Ah, okay.
7       Q   (By Mr. Allen) When did he pass away?
8       A   I believe -- and my timeframe with COVID has
9   gotten very skewed.  I believe it's a 2017, 2018
10  timeframe.
11      Q   Okay.  And between 2014 and now, have there
12  been any other officers other than Mr. Ehrlich?
13      A   And myself, no.
14      Q   Okay.  In what state is Mr. Ehrlich's address?
15      A   He lives in Georgia.
16      Q   Is the law firm where the office down
17  there, is that a law firm that's associated with
18  Mr. Ehrlich?
19      MR. ROSS:  Object to the form.
20      THE WITNESS:  When you say "associated," I -- I
21  think it was a prior acquaintance.  But I don't believe
22  he worked there or has any other relationship with them.
23      Q   (By Mr. Allen) Okay.  He wasn't an associate, a
24  member or a partner or anything like that?
25      A   Correct.

### Page 19

1       Q   Okay.  Does the law firm where this nominal
2   office is, do they do corporate formation and other
3   corporate advice for the company?
4       A   To my knowledge, we've never used them.  I
5   don't know -- Mr. Ehrlich may have had a conversation,
6   but I've never been involved in any discussions with
7   them.  And -- and I don't believe I've ever seen an
8   invoice for services.
9       Q   So they just provide a -- a nominal location
10  for the company; is that correct?
11      A   I don't know nom -- I think they provide an
12  office.  I believe there's a lease.
13      Q   Do you know how much the lease costs?
14      A   No, I don't.
15      Q   National Senior Care doesn't have any
16  employees, correct?
17      A   That's correct.
18      Q   So the only two people other than -- the only
19  three people affiliated with National Senior Care, in
20  terms of its ownership and control, is you, Mr. Ehrlich
21  and then the sole shareholder?
22      MR. ROSS:  Object to the form of the question.
23  Calls for a legal conclusion.
24      But go ahead, Mr. Tabler.
25      THE WITNESS:  Could you repeat the question

### Page 20

1   just so I understand the exact language you used, sir?
2       Q   (By Mr. Allen) All we have for National Senior
3   Care is you and Mr. Ehrlich as officers and the sole
4   shareholder.  There are no other employees, no other
5   officers, directors, any other person that has anything
6   to do with ownership or control of the company.
7       A   That's correct.
8       Q   Okay.  Does the company have income?
9       A   When you say "company" at --
10      Q   Does National Senior Care have income?
11      A   No.  It does not have a -- a regular stream of
12  income.
13      Q   It doesn't have any source of revenue?
14      A   Correct.
15      Q   How does it pay a lease?
16      A   Those -- those funds are advanced and paid by
17  Mariner Health Central.
18      Q   Okay.  Is -- does Mariner Health Central do
19  centralized accounting for National Senior Care, Mariner
20  Health Care Management and Mariner Health Care, Inc.?
21      A   Yes.  That entity would be responsible for --
22  for those functions.
23      Q   Okay.  Does the Grunstein family have any
24  ownership in Mariner Health Central?
25      A   Only an indirect ownership through -- through

### Page 21

1   National Senior Care.  They do not have direct ownership
2   of -- of Mariner Health Central from the standpoint of
3   owning any -- you know, a percentage of that entity.
4       Q   Okay.  You get paid a salary at National Senior
5   Care?
6       A   No.
7       Q   Does Miss -- do you know if Mr. Ehrlich gets
8   paid a salary at National Senior Care?
9       A   Yes, I know.  And he does not.
10      Q   Okay.  And when I say "at," I should have said
11  "from" National Senior Care.
12      So National Senior Care doesn't have any
13  payroll.  It doesn't have any source of revenue other
14  than to get advances to pay its expenses from Mariner
15  Health Central; is that correct?
16      A   Correct.
17      Q   Does National Senior Care, other than owning
18  Mariner Health Care, Inc. have ownership in any other
19  subsidiary or entity?
20      A   I'm sorry.  That -- you're asking me what --
21  what National Senior Care -- it only owns Mariner Health
22  Care, Inc.
23      Q   Okay.  That's -- that's exactly what I was
24  getting at.
25      Okay.  And feel free to refer to Exhibit 3 if

6  (Pages 18 to 21)

**Kenneth Tabler**
**February 15, 2022**

Page 22

1  you want 'cause I'm doing that. So let's -- let's turn
2  to Mariner Health Care, Inc.
3       Are you an officer with Mariner Health Care,
4  Inc.? I think you said you were.
5    A   Yes, sir.
6    Q   And what officer are you?
7    A   My entitle and office is president.
8    Q   Are there any other officers?
9    A   Devin Ehrlich.
10   Q   Do either you or Mr. Ehrlich receive a salary
11 from Mariner Health Care, Inc.?
12   A   No.
13   Q   Does Mariner Health Care, Inc. have a stream of
14 revenue?
15   A   No.
16   Q   Does -- Mariner Health Care, Inc. does not have
17 any employees, correct?
18   A   That's correct, sir.
19   Q   And it's sole shareholder is National Senior
20 Care, inc.?
21   A   Correct.
22   Q   Does Mariner Health Care, Inc. have an office?
23   A   It uses that Georgia address as its office.
24   Q   And as Mariner Health Central advances the cost
25 of that office for National Senior Care, so does it also

Page 23

1  advance the cost of the office on behalf of Mariner
2  Health Care, Inc.?
3    A   Well, I just -- just want to be clear that I
4  think the lease is actually in the name of Mariner Health
5  Central, Inc.
6    Q   Okay.
7    A   And those other entities also use that address.
8  So they don't have separate leases for each of those
9  entities with that law firm.
10   Q   Okay. All right.
11      Now, on our organizational chart, there is a
12 line to a company called Mariner Health Care Management
13 Company. Do you see that?
14   A   I'm sorry. There was a little noise. So I
15 think you were telling me on the org chart, Mariner
16 Health Care, Inc. also has an ownership with -- to
17 Mariner Health Care Management Company. Is that the
18 question, sir?
19   Q   Well, there's a line drawn there. And I was
20 going to ask you, is that an ownership interest?
21   A   Yes.
22   Q   And what is Mariner Health Care Management
23 Company?
24   A   It is a holding company. At this point, it
25 doesn't have any activity, or it holds -- it has no

Page 24

1  employees.
2    Q   Does it have any property?
3    A   No.
4    Q   Does it share the same office in Georgia with
5  National Senior Care and Mariner Health Care, Inc.?
6    A   Yes, sir.
7    Q   At the law firm there?
8    A   Correct.
9       MR. ALLEN: I'm sorry. Gentleman, I'm going to
10 get a lozenge so I don't cough into the microphone all
11 the time. Pardon me.
12   Q   (By Mr. Allen) Now, there's -- there's another
13 entity called MHC Recruiting Company.
14      Do you see that? That's on Exhibit 3.
15   A   Yes.
16   Q   What is MAC Recruiting Company?
17   A   It's a entity that was established to provide
18 recruiting services, particularly oversees recruiting of
19 nurses to -- to help alleviate, you know, the -- the
20 employment shortage. So it -- it was formed to, as its
21 name suggests, to -- to facilitate recruiting on behalf
22 of Mariner.
23   Q   When was it formed?
24   A   I believe that is a new entity within two or
25 three years --

Page 25

1    Q   Okay.
2    A   -- is the timeframe.
3    Q   Does it have any officers?
4    A   It does. But -- but at this point, it's new.
5  And I don't do a lot with it. So I'm not sure exactly
6  who the officers are of that entity.
7    Q   Does it have a source of revenue?
8    A   I -- I believe it -- the way it's established
9  is that it would earn fees in terms of whatever costs or
10 it needed to recover on behalf of the various recruiting
11 expenses that -- that it would incur from the facilities.
12   Q   Do you have a contact with the company that you
13 work with?
14      MR. ROSS: I'm sorry. I apologize.
15      What was the question, Mr.Allen? Or could we
16 read it back?
17      MR. ALLEN: Do you have a contact with the
18 company that you work with?
19      MR. ROSS: Thank you.
20      THE WITNESS: I believe Devin Ehrlich is much
21 more involved with that. And I believe because of
22 the -- the nature of what they do, we -- we had some
23 assistance with outside law firms with the various
24 requirements and treaties and visas, that sort of thing.
25   Q   (By Mr. Allen) Okay. Now, they're recruiting

**CAL Reporting 925-425-9669**

**Kenneth Tabler**
**February 15, 2022**

| Page 26 | Page 28 |
|---|---|

**Page 26**

1  health care personnel, nurses in particular; is that
2  correct?
3      A   Yes.
4      Q   And for whom are they recruiting the nurses and
5  other health care personnel?
6      A   For the -- the various Mariner facilities.
7      Q   When you say the "various Mariner facilities,"
8  are you referring to 18 facilities in California?
9      A   I believe there's 20, but of those 18, yes.
10  Yes.
11      Q   Okay.  So they're -- in terms of the health
12  care facilities we're referring to for which this
13  recruiting would be done, there's 20 facilities in
14  California; is that correct?
15      A   Yes.
16      Q   Okay.  There's no facilities outside of
17  California; is that correct?
18      A   During -- there were at one point.  I don't
19  know your timeframe.  But since I've been involved with
20  this company, that is true.
21      Q   Okay.  Yes.  There was a lot of involvement
22  with a large number of facilities going back to the days
23  of SAVA and some of the formation of these companies, but
24  all that's been divested; is that correct?
25      A   That's -- that's correct.

**Page 28**

1      A   I believe in Oakland, we have a billing office,
2  which is -- you know, could -- could accommodate, you
3  know, 20, 25 people.  But if people need it, they can use
4  that location.
5      Q   And that's in Oakland, California?
6      A   Yes, sir.
7      Q   Can you give me the address of that office?
8      A   I -- I don't have that memorized.  I've been
9  there.  Usually I'm with someone.  And so I don't have to
10  navigate.  So I don't know the address.
11      Q   Do you remember what street it's on?
12      A   No.  I -- I think it's on the main street, but
13  that doesn't mean anything.
14      Q   All right.
15      A   There's a good restaurant down the street.  But
16  other than that, I don't know too much about it.
17      Q   Well, maybe we'll get to go there some day.
18          Okay.  Thank you.
19          So are you the president of Mariner Health
20  Central as well?
21      A   Yes, sir.
22      Q   Okay.  So how many officers does Mariner Health
23  Central have?
24      A   Mariner Health Central, I believe, has -- has
25  several, but Devin Ehrlich and myself are officers.

**Page 27**

1      Q   Okay.  So does Mariner Health Care Management
2  Company actually do anything other than just hold the
3  shares to Mariner Health Central and this recruiting
4  company?
5      A   At this point, yeah.  That's correct.  It's a
6  holding company.
7      Q   And that's all it does?
8      A   Correct.
9      Q   Okay.  Now, Mariner Health Central is now the
10  primary administrative, as you would say, back office
11  function company for the Mariner facilities in
12  California; is that right?
13      A   Yes.
14      Q   And, of course, they also do the work for
15  National Senior Care, Mariner Health Care, Inc. and
16  Mariner Health Care Management Company to the extent they
17  need it?
18      A   That's correct.
19      Q   Okay.  Where is Mariner Health Central, Inc.'s
20  office?
21      A   We -- we really don't have a physical location.
22  Our consultants -- we're like a sales force.  You put the
23  sales force out in the field.  And we want those people,
24  you know, serving the clients.
25      Q   Okay.  Does it have a nominal office somewhere?

**Page 29**

1      Q   Okay.  What's Mr. Ehrlich's position with
2  Mariner Health Central?
3      A   I think he's an executive vice president and
4  general counsel.
5      Q   Okay.  Is there -- is there a consolidated tax
6  return or tax accounting for National Senior Care,
7  Mariner Health Care, Inc., Mariner Health Care Management
8  Company with Mariner Health Central, Inc.?
9      A   Yes.
10      Q   Okay.  In other words, you don't file a
11  different return for each one?  They're all consolidated
12  and filed together to report to the various government
13  agencies.
14      A   That -- that's correct.
15      Q   Okay.  Does the Grunstein shareholder receive
16  income from -- passed on through the various accounting
17  ultimately out of National Senior Care?
18      A   She -- she receives a salary from -- from
19  Mariner Health Central.
20      Q   Okay.  Does Mariner Health Central pay
21  dividends to its shareholder?
22      A   I believe in 2012, we paid a dividend, but no
23  dividends have been paid since that date.
24      Q   Okay.  So if Mariner Health Central paid a
25  dividend, that would have to actually pass through the

**CAL Reporting 925-425-9669**

**Kenneth Tabler**
**February 15, 2022**

## Page 30

1  other three entities in order to actually get back to the
2  Grunstein family; is that right?
3      MR. ROSS: Object to the form. The question's
4  vague.
5      MR. ALLEN: Just trying to understand the
6  accounting here.
7      MR. ROSS: Sure.
8      THE WITNESS: Well, it -- it never -- it had,
9  you know, several years ago. But -- but we haven't paid
10 dividends in such a long time. I really can't -- that
11 would theoretically be the flow. And what all that would
12 involve, I haven't had to think about all that for a
13 while. But that would be the flow.
14     Q  (By Mr. Allen) Okay. So in terms of actual
15 income to the Grunstein family, Emily in particular, the
16 only way that that's paid in recent history, at least
17 since 2012, has been via salary from Mariner Health
18 Care -- excuse me, Mariner Health Central, Inc.?
19     A  That's correct.
20     Q  Okay. Let's turn to -- well, let me ask you
21 this question, is there a company that has an office in
22 Texas that's associated with the Mariner companies?
23     A  Not to my knowledge. We have some employees --
24 one who may work out of their home. But I'm not renting
25 or providing -- no -- an office building in Texas.

## Page 31

1      Q  Okay. There used to be an address at 5300 Sam
2  Houston Parkway in north Houston, but nobody holds that
3  office anymore?
4      A  I believe in 2011 -- nothing since 2011 or '12.
5      Q  Okay. So as we -- as we look at Exhibit 3, you
6  see below Mariner Health Care, Inc., that it has a
7  hundred percent ownership in MHC Holding Company.
8      Does that have any employees?
9      A  No, sir.
10     Q  And are you an officer of that company? Are
11 you the president of that company?
12     A  Yes, I am.
13     Q  And does it also only have two officers, you
14 and Mr. Ehrlich?
15     A  That's correct.
16     Q  And it's sole -- does it share an office
17 address in the same law firm as National Senior Care?
18     A  Yes.
19     Q  Okay. And does it have a stream of revenue?
20     A  No.
21     Q  Okay. And it holds -- MAC West Holding
22 Company, is it also another holding company with just the
23 same two officers and the nominal office at the law firm
24 in Georgia?
25     A  Correct.

## Page 32

1      Q  Okay. And it doesn't have a stream of revenue?
2      A  Correct.
3      Q  Okay. Then we get to GrandCare, LLC.
4      Does that have any employees?
5      A  No.
6      Q  Does grand -- are you and Mr. Ehrlich the
7  officers of GrandCare, LLC -- or should I say members?
8      A  Officers is the correct term.
9      Q  Officers is the correct term.
10     You're the managers of GrandCare, LLC?
11     A  Correct. Yes.
12     Q  Okay. And does it have any members other than
13 MAC West Holding Company?
14     MR. ROSS: So I'll just interpose an objection.
15 It's vague as to time.
16     MR. ALLEN: At this time?
17     THE WITNESS: To answer at this time, it has no
18 other members other than MAC West Holding Company.
19     Q  (By Mr. Allen) Okay. Now at one point, if I
20 understand correctly, GrandCare, LLC actually held a
21 number of the licenses for the skilled nursing
22 facilities. It was actually the licensee for the skilled
23 nursing facilities in California; is that correct?
24     A  That's correct.
25     Q  But that's no longer the case. They have

## Page 33

1  individual operating companies that are the licensees
2  now; is that correct?
3      A  That's correct.
4      Q  And does GrandCare, LLC own any real estate?
5      A  No.
6      Q  Okay. Does it have -- you have a GC Holding
7  Company 2, a GC Holding Company that it seems to have a
8  hundred percent membership, meaning that that would be
9  synonymous with ownership; is that correct?
10     A  That's correct.
11     Q  Those entities, do they own or operate real
12 estate at GC Holding Company and GC Holding Company 2?
13     A  They do not.
14     Q  Okay. So if we're to look a little -- first of
15 all, I want to go back to the -- the title of this chart.
16     It says, Mariner California Lease Hold Interest
17 as of 2021. Do you see that?
18     A  Yes, I do.
19     Q  And on the second page, it says the same thing
20 except it says, "Continued."
21     So other than the companies we see on this
22 chart -- and there's a little note here on the upper
23 left. We'll get to that in a moment. But are there --
24 does this chart show all the operating companies that
25 operate skilled nursing facilities in California?

**Kenneth Tabler**
**February 15, 2022**

Page 34

1     A   I believe it does. I believe just -- there is
2   a GC Holding Company 3 that's been established. But I
3   think all the operating entities are on these two pieces
4   of paper you have.
5     Q   What does the GC Holding Company 3 do?
6     A   It's a holding company without any -- at this
7   point, it has no interest. But it's been formed.
8     Q   Okay. Now, there has been developed real
9   estate operating companies to actually own the real
10  estate that is owned by the Mariner group of companies in
11  California; is that right?
12    A   What -- what is your -- Mariner, at this point,
13  does not have any real estate holdings in California.
14    Q   All the real estate holdings have been divested
15  into another company?
16    A   They've been divested, correct.
17    Q   Okay. Does Emily Grunstein have an interest in
18  any of those other real estate companies?
19    A   No.
20    Q   Okay. So when we look at the companies that
21  are on our chart here, we're looking at companies that
22  are all involved in the operation of the skilled nursing
23  facilities in California; is that correct?
24          MR. ROSS: Object to the form.
25          MR. ALLEN: I beg your pardon?

Page 35

1          MR. ROSS: Just objecting to the form.
2          MR. ALLEN: Oh.
3          MR. ROSS: It's -- question's --
4          MR. ALLEN: I'll point out, Counsel, that's not
5   an objection.
6          MR. ROSS: I can make the specific ones. But
7   some attorneys don't like speaking objections. So it's
8   vague.
9          MR. ALLEN: I don't -- vague is a specific
10  objection. That is a good one.
11         MR. ROSS: Okay.
12         MR. ALLEN: And I understand. And I --
13    Q   (By Mr. Allen) Mr. Tabler, I forgot my question
14  now.
15    A   Do you want to have the court reporter read it
16  or --
17         MR. ALLEN: Yeah.
18         MR. ROSS: And objecting to the form is, to my
19  knowledge, an appropriate objection. But maybe we can
20  talk about that some other time.
21         MR. ALLEN: Okay. Madam Court Reporter, what
22  was my question? Can you read it back?
23         THE REPORTER: Sure. One second.
24         "Q   So when we look at the companies
25  that are on our chart here, we're looking at

Page 36

1   companies that are all involved in the
2   operation of the skilled nursing facilities
3   in California; is that correct?"
4          MR. ALLEN: Feel free to explain what you don't
5   know about that question.
6     A   I guess where I have a little trouble, you use
7   the word "involved." And obviously, you know, we've gone
8   through a number of companies and entities, and some are
9   holding companies.
10         So I -- sometimes I -- and I don't want to be
11  misquoted, or I don't want to be misunderstood. When you
12  use the word "involved" -- you know, I'm not referring to
13  direct operations. I just want to -- there's nothing
14  hidden, is there? Or that's what I'm just trying to
15  grapple with is I --
16    Q   And that's a fair concern.
17         So I understand that some of the companies are
18  merely holding companies. They don't have any active
19  business. They don't even have a revenue stream. We've
20  talked about that.
21         But there's no other business out there in some
22  entity that is held, that is doing business other than
23  doing the skilled nursing business in California, except
24  we did talk about the recruiting company. But that's
25  recruiting people for the purposes of the California

Page 37

1   skilled nursing; is that correct?
2     A   Correct.
3     Q   Okay. And when I look at this chart, it's not
4   showing me the holding of any real estate in California
5   by any of these entities. That's all been divested into
6   something separate. That's not affiliated with this
7   group of companies?
8     A   That -- that's correct.
9     Q   Okay. There's two -- on page one, there's two
10  blanks that have been blacked out.
11         Do you know why that is?
12    A   I believe that it was a divested entity three
13  or four years ago. So it's really no longer operational.
14    Q   Do you remember what entity that was?
15    A   Double Tree in Sacramento. The lease ended.
16  And we -- we didn't renew the lease.
17    Q   Okay. Is that true -- on page two, there's
18  another couple of blanks. Is that because of another
19  entity that's been divested?
20    A   I -- I believe so. But I -- I'm a little less
21  clear on that blank out than the first blank out.
22    Q   Okay.
23    A   But I believe that's why.
24    Q   All right. The -- so the function of Mariner
25  Health Care -- Health Central, Inc. is to do the

10   (Pages 34 to 37)

Kenneth Tabler
February 15, 2022

Page 67

1                    CERTIFICATE OF REPORTER

2

3        I, CONNIE WEBB, CSR NO. 10811, hereby certify that

4    the witness in the foregoing deposition, KENNETH

5    TABLER, has duly affirmed, remotely via Zoom

6    videoconference, to tell the truth, the whole truth,

7    and nothing but the truth in the within-entitled cause;

8    that the testimony of said witness was taken down in

9    shorthand by me, a Certified Shorthand Reporter and a

10   disinterested person, at the time and place herein

11   stated, and that the testimony of the said witness was

12   thereafter reduced to typewriting, by computer, under

13   my direction and supervision;

14        I further certify that I am not of counsel or

15   attorney for either or any of the parties to the said

16   deposition nor in any way interested in the outcome of

17   this case, and that I am not related to any of the

18   parties thereto.

19        I hereto declare under penalty of perjury that the

20   foregoing is true and correct.  I have hereunto set my

21   hand on March 1, 2022.

22

23

24
                             CONNIE WEBB, CSR NO. 10811
25

# EXHIBIT "C"

**Kristy Prince Owen**
**February 15, 2022**

Page 1

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA


PEOPLE OF THE STATE OF CALIFORNIA,

       Plaintiff,

vs.                                              CASE NO:
                                                 RG21095881

MARINER HEALTH CARE INC., A DELAWARE
CORPORATION; NATIONAL SENIOR CARE, INC.,
A DELAWARE CORPORATION; MARINER HEALTH CARE
MANAGEMENT CO., A DELAWARE CORPORATION;
MARINER HEALTH CENTRAL INC., A DELAWARE
CORPORATION; ET. AL.

       Defendants.

                                                 /


REMOTE VIDEOCONFERENCE DEPOSITION OF:

    KRISTY PRINCE OWEN

DATE:  TUESDAY, FEBRUARY 15, 2022

TIME:  11:48 A.M.

PLACE:  REMOTE

REPORTER:  CONNIE WEBB, CSR NO. 10811

**Kristy Prince Owen**
**February 15, 2022**

Page 2

```
 1              APPEARANCES
 2
 3    For the plaintiff:
 4    District Attorney of Santa Cruz
      DOUG ALLEN, ESQUIRE
 5    Assistant District Attorney
      701 Ocean Street, Suite 200
 6    Santa Cruz, California 95060
      (831) 454-2930
 7    Douglas.Allen@santacruzcounty.us
 8    District Attorney of Marin
      ANDRES PEREZ, ESQUIRE
 9    Deputy District Attorney
      3501 Civic Center Drive, Suite 145
10    San Rafael, California 94903-4189
      (415) 473-6450
11    Aperez@marincounty.org
12    District Attorney of Alameda County
      LORI SCHNALL, ESQUIRE
13    Deputy District Attorney
      1225 Fallon Street, Suite 900
14    Oakland, California 94612-4208
      (510) 272-6222
15    Lori.Schnall@acgov.org
16    District Attorney of Los Angeles County
      SEZA MIKIKIAN, ESQUIRE
17    Deputy District Attorney
      211 West Temple Street, Suite 1000
18    Los Angeles, California 90012
      (213) 257-2450
19    Smikikian@da lacounty.gov
20
      For the defendant:
21
      DARRYL A. ROSS, ESQUIRE
22    Mariner Health Central, Inc.
      5440 Trabuco Road
23    Irvine, California 92620-5704
      949-238-7775
24    daross@marinerhealthcare.com
25
```

Page 4

```
 1              WITNESS INDEX
 2
 3    WITNESS                      PAGE
 4
 5    KRISTY PRINCE OWEN
      By Mr. Allen:              7
 6
 7
 8
 9              EXHIBIT INDEX
10
11    NO.  DESCRIPTION           MARKED
12            .
13    1  Second-amended notice of deposition    8
14    2  Deponent's declaration                 8
15    3  Organization chart                     8
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              APPEARANCES
 2              (continued)
 3
 4    Also present:
 5    Matt Clark
      Devin Ehrlich, general counsel
 6    Linda Taetz
      Kristy Prince Owen
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20    DEPOSITION OF KRISTY PRINCE OWEN, taken on behalf
21    of the plaintiff in Eureka, California, on February 15,
22    2022, at 11:48 a.m., before Connie Webb, CSR No. 10811.
23
24
25
```

Page 5

```
 1              TUESDAY, FEBRUARY 15, 2022
 2                    • • •
 3              11:48 A.M.
 4                    • • •
 5
 6        THE REPORTER:  Good morning, everyone.
 7    My name is Connie Webb, CSR 10811, and I'm
 8    located at my office in Eureka, California.  Today's date
 9    is Tuesday, February 15, 2022, and the time is 11:48 a.m.
10        This is the remote Zoom deposition of Kristy
11    Prince Owen in the matter of People of the State of
12    California versus Mariner Health Care Inc., et al., case
13    number RG21095881, taken on behalf of the plaintiff.
14        This deposition and any transcript produced
15    therefrom will be handled pursuant to California CCP
16    2025.
17        Will counsel please state your appearances
18    starting with the noticing attorney?
19        MR. ALLEN:  Yes.  Douglas Allen from the Santa
20    Cruz County District Attorney's Office for the People of
21    the State of California.
22        I'm also joined by Andy Perez from the Marin
23    County District Attorney's Office, Laurie Schnall from
24    the Alameda County District Attorney's Office and Seza
25    Mikikian from the Los Angeles County District Attorney's
```

**Kristy Prince Owen**
**February 15, 2022**

| Page 30 |
|---|
| 1   that's really the only correspondence I've had with her. |
| 2       Q   Okay. |
| 3       Are you aware of any plans to acquire other |
| 4   property in the Mariner system outside of California? |
| 5   For instance, there's these other entities that are still |
| 6   out there that are being kept current. |
| 7       Do you -- are you aware of if there's |
| 8   some -- some plan or intention to acquire other |
| 9   facilities or entities or operations elsewhere? |
| 10      A   I am not. |
| 11      Q   Okay.  Well, I think -- so with each of these |
| 12  operating companies, the operating companies are the |
| 13  license holder that you're referring to, correct? |
| 14      A   Correct.  With -- other than the Fruitvale, it |
| 15  doesn't -- Fruitvale Operating doesn't own the license. |
| 16      Q   Okay. |
| 17      A   It manages -- and Glendale. |
| 18      (Court reporter interruption.) |
| 19      THE WITNESS:  And Glendale.  And Glendale. |
| 20      Q   (By Mr. Allen)  Fruitvale and Glendale are just |
| 21  management companies. |
| 22      Who holds the license in those two? |
| 23      A   So for the Fruitvale one, it would be that |
| 24  Fruitvale Long-term Care, LLC.  And for Glendale, I |
| 25  believe it's -- I get it backwards sometimes -- Adventist |

| Page 31 |
|---|
| 1   Glendale or Glendale Adventist Hospital.  It's one of |
| 2   those two. |
| 3       Q   Okay.  These various holding companies we see, |
| 4   such as Driftwood Hayward, Skyline San Jose, Driftwood |
| 5   Santa Cruz, San Marcos Holding, Monterey Palms Holding, |
| 6   Almaden Holding, do they do anything other than just be |
| 7   the general partner in the operating companies? |
| 8       A   No.  They don't do anything else. |
| 9       Q   And with regard to the holding companies, is |
| 10  that -- the person that functions for the holding company |
| 11  in acting as a general partner, would that be Linda |
| 12  Taetz? |
| 13      A   She's the president of those entities as well, |
| 14  uh-huh. |
| 15      Q   Okay.  So if the -- if San Marcos Holding |
| 16  Company was going to do some function as a general |
| 17  partner of San Marcos Operating Company, that would -- |
| 18  the literal aspect of that would be Linda Taetz would do |
| 19  something; is that right? |
| 20      A   I don't -- I don't know the legalities of that, |
| 21  whether it's the entity or the president.  So I'm not |
| 22  sure how to answer that. |
| 23      Q   Well, I'm actually looking more for your |
| 24  understanding of the practical aspect of it.  Does the |
| 25  holding company really serve any function other than just |

| Page 32 |
|---|
| 1   being a holding company and a conduit of ownership |
| 2   between it and companies above, to your knowledge? |
| 3       MR. ROSS:  Object to the extent it calls for a |
| 4   legal conclusion.  But I believe he asked just for your |
| 5   knowledge.  So... |
| 6       THE WITNESS:  Correct.  It just serves as the |
| 7   holding company -- |
| 8       Q   (By Mr. Allen)  Okay. |
| 9       A   -- or the general partner, yes. |
| 10      Q   Do you know if the holding companies have |
| 11  separate insurance policies? |
| 12      A   They do not. |
| 13      Q   Do you know if National Senior Care has a |
| 14  separate insurance policy? |
| 15      A   It does not. |
| 16      Q   Is that true also of Mariner Health Care, Inc. |
| 17  and Mariner Health Care Management Company? |
| 18      A   That is true. |
| 19      MR. ALLEN:  Well, I -- I think, frankly, you're |
| 20  a wealth of knowledge.  But I don't really see that we |
| 21  need to continue this any further because I think we've |
| 22  discussed the companies and the -- in so far as it |
| 23  relates to jurisdictional matters. |
| 24      So unless one of my compatriots has another |
| 25  question, I think I should -- burning question I should |

| Page 33 |
|---|
| 1   have asked, I don't have any more questions. |
| 2       MR. ROSS:  None here, Doug.  Thank you. |
| 3       MS. SCHNALL:  No, thank you, Doug. |
| 4       MS. MIKIKIAN:  No, thank you, Doug.  You |
| 5   covered them.  Thank you. |
| 6       MR. ALLEN:  Well, I'm glad we got this out of |
| 7   the way.  And once again, I apologize for the |
| 8   inconvenience of -- of the arrangements.  But hopefully, |
| 9   this will assist you.  And with that -- |
| 10      MR. ROSS:  All right.  Thank you very much. |
| 11      MR. ALLEN:  Again, reading and signing handled |
| 12  through your counsel? |
| 13      THE WITNESS:  Yes, please.  Thank you. |
| 14      MR. ALLEN:  I do want a transcript and |
| 15  condensed copy. |
| 16      MR. ROSS:  Okay.  And I will send the exhibits |
| 17  as we discussed, and I'll copy you, Doug.  And I'd like |
| 18  the same order on this transcript, please, Madam |
| 19  Reporter. |
| 20      THE REPORTER:  Okay.  Thank you. |
| 21      MR. ROSS:  All right. |
| 22      MR. ALLEN:  Thank you.  Thank you. |
| 23      (Deposition concluded at 12:52 p.m.) |
| 24           • • • |
| 25 |

**CAL Reporting 925-425-9669**

**Kristy Prince Owen**
**February 15, 2022**

Page 34

1                    CERTIFICATE OF REPORTER

2

3        I, CONNIE WEBB, CSR NO. 10811, hereby certify that

4    the witness in the foregoing deposition, KENNETH

5    TABLER, has duly affirmed, remotely via Zoom

6    videoconference, to tell the truth, the whole truth,

7    and nothing but the truth in the within-entitled cause;

8    that the testimony of said witness was taken down in

9    shorthand by me, a Certified Shorthand Reporter and a

10   disinterested person, at the time and place herein

11   stated, and that the testimony of the said witness was

12   thereafter reduced to typewriting, by computer, under

13   my direction and supervision;

14       I further certify that I am not of counsel or

15   attorney for either or any of the parties to the said

16   deposition nor in any way interested in the outcome of

17   this case, and that I am not related to any of the

18   parties thereto.

19       I hereto declare under penalty of perjury that the

20   foregoing is true and correct.  I have hereunto set my

21   hand on March 1, 2022.

22

23

24
                         CONNIE WEBB, CSR NO. 10811
25

# EXHIBIT "D"

---

**Page 1**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF ALAMEDA

PEOPLE OF THE STATE OF          )
CALIFORNIA,                     )
                                )
          Plaintiff,            )
                                )
     -vs-                       ) Case No.: RG21095881
                                )
MARINER HEALTH CARE, INC.,      )
a Delaware corporation;         )
NATIONAL SENIOR CARE, INC.,     )
a Delaware corporation;         )
MARINER HEALTH CARE             )
MANAGEMENT CO., a Delaware      )
corporation; MARINER HEALTH     )
CENTRAL, INC., a Delaware       )
corporation; et al.             )
                                )
          Defendants.           )
_____)

VIDEOCONFERENCE DEPOSITION OF LINDA TAETZ
Wednesday, February 16, 2022

---

**Page 2**

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF ALAMEDA

PEOPLE OF THE STATE OF          )
CALIFORNIA,                     )
                                )
          Plaintiff,            )
                                )
     -vs-                       ) Case No.: RG21095881
                                )
MARINER HEALTH CARE, INC.,      )
a Delaware corporation;         )
NATIONAL SENIOR CARE, INC.,     )
a Delaware corporation;         )
MARINER HEALTH CARE             )
MANAGEMENT CO., a Delaware      )
corporation; MARINER HEALTH     )
CENTRAL, INC., a Delaware       )
corporation; et al,             )
                                )
          Defendants.           )
_____)

        Videoconference deposition of LINDA TAETZ, taken
on behalf of Plaintiff, before Viola Fedden, Certified
Shorthand Reporter No. 5586, for the State of California;
commencing at 9:08 a.m., Pacific time, on Wednesday,
February 16, 2022, taken remotely via Zoom.

---

**Page 3**

APPEARANCES OF COUNSEL:

FOR PLAINTIFF:
    DOUGLAS ALLEN
    Assistant District Attorney
    701 Ocean Street, Suite 200
    Santa Cruz,, California 95060
    (831) 454-2930
    Douglas.Allen@santacruzcounty.us

    ANDRES PEREZ
    Deputy District Attorney
    3501 Civic Center Drive, Suite 145
    San Rafael, California 94903-4189
    (415) 473-6450
    Aperez@marincounty.org
    LORI SCHNALL
    Deputy District Attorney
    1225 Fallon Street, Suite 900
    Oakland, California 94612-4208
    (510) 272-6222
    Lori.Schnall@acgov.org

    SEZA MIKIKIAN
    Deputy District Attorney
    211 West Temple Street, Suite 1000
    Los Angeles, California 90012
    (213) 257-2450
    Smikikian@da.lacounty.gov

---

**Page 4**

APPEARANCES (CONTINUED):

FOR DEFENDANTS:

    DARRYL ROSS
    Attorney at Law
    MARINER HEALTH CENTRAL, INC.
    5440 Trabuco Road
    Irvine, California 92620
    (949) 238-7775
    daross@marinerhealthcare.com

FOR SPECIALLY APPEARING DEFENDANTS MARINER HEALTH CARE,
INC., NATIONAL SENIOR CARE, INC., AND MARINER HEALTH CARE
MANAGEMENT COMPANY:

    HOOPER, LUNDY & BOOKMAN, P.C.
    Attorneys at Law
    101 Montgomery Street, 11th Floor
    San Francisco, California 94104
    (415) 875-8500
    Mclark@health-law.com
    BY:  MATTHEW CLARK

---

1 (Pages 1 to 4)

1  reorganization where SAVA was divested?
2      A.  Yes, I had.
3      Q.  And with whom did you meet?
4      A.  I met with Jane Moore, M-O-O-R-E -- and Jane is a
5  registered nurse -- and her team is in the Fundamental
6  Administrative Service IT Department.
7      Q.  Have you met with anyone else in traveling to a
8  different state besides Mr. Hussey, Ms. Moore and Ms. Owen
9  in Texas?
10     A.  At Fundamental, the offices that I just
11 mentioned, we also had Nancy Taylor who was a vice
12 president at the time of IT.  We were converting to our
13 new, at the time, electronic risk documentation system.
14     Q.  What is your electronic documentation system?
15     A.  MatrixCare.
16     Q.  And so when you say Ms. Moore is a VP of IT,
17 that's a VP of Fundamental Administrative Services?
18     A.  That's correct.
19     Q.  Okay.  They assisted you in transitioning to the
20 MatrixCare?
21     A.  They did.
22     Q.  Okay.  Is there anyone else that you have met
23 with outside of California regarding Mariner business
24 since the reorganization that we haven't discussed?
25     A.  Not that I can think of at the moment.

29

1      Q.  Fair enough.  When you sat through the
2  depositions of Mr. Tabler and Ms. Owen, did you hear them,
3  to your recollection, misstate anything or make a mistake
4  that you think ought to be corrected?
5      A.  Two things.  I believe -- and it wasn't a
6  mistake.  I believe that Mr. Tabler said he knew I was
7  president of "most" of the operating companies.  I don't
8  believe he said "all" of the operating companies.
9  Operating companies that we've just discussed.
10         And the only other thing I could think of is the
11 office in Northern California for Mariner Health Central,
12 Inc. is actually in Hayward, not in Oakland.
13     Q.  Okay.
14     A.  And I believe it's on Foothill Boulevard.  I know
15 it's Foothill Boulevard.  I'm not sure of the actual
16 address, but it is on Foothill Boulevard in Hayward.
17     Q.  Okay.  That's the only two things that you recall
18 that you would want to correct?
19     A.  Yes.  The only thing I could think of at the
20 moment, yes.
21     Q.  And when you would correct his answer about
22 "most," you mean to correct it that you're president of
23 all the operating companies?
24     A.  Correct.
25     Q.  Okay.  So going back to the various holding

30

1  companies that are one percent general partners in the 18
2  operating companies, do you know whether or not you hold a
3  position in those holding companies?
4      A.  The holding companies that you were referring to?
5      Q.  Right.  So for instance, starting on page 1 of
6  Exhibit 3, second row to the bottom.  We have Driftwood
7  Hayward Holding, Skyline San Jose Holding, Verdugo Vista
8  Holding.  That line there, all the way across to the
9  right, describes a number of holding companies.  Not the
10 ones above it.
11         Do you know if you have a position with any of
12 those companies?
13     A.  Yes.  I believe I'm president of those holding
14 companies.
15     Q.  Okay.  You also, to your knowledge, are president
16 of the bottom line which are the operating companies; is
17 that correct?
18     A.  That is correct.
19     Q.  Okay.  If we look at the next row above that, do
20 those rows also apply to Hayward Hills Operating
21 Company, LLC and Hayward Hills Operating Company, LP?  Are
22 you president of both those companies?
23     A.  I believe so, yes.
24     Q.  Is that also true of Autumn Hills Holding
25 Company, GP, LLC and Autumn Hills Operating Company, LP?

31

1      A.  That I don't recall.  I apologize.
2      Q.  So you don't know whether you're president or
3  not, one way or the other; is that correct?
4      A.  I believe I am, yes.
5      Q.  Okay.  You believe you are, but that would be
6  consistent with your understanding of the corporate
7  organization, but you don't have a specific recollection;
8  is that a fair statement?
9      A.  That is a fair statement.
10     Q.  Okay.  Do you have a position with GC Operating
11 Company, LLC?
12     A.  I don't recall at this moment.
13     Q.  Do you have a recollection as to who is the
14 manager of GC Operating Company, LLC?
15     Q.  Was the manager?
16     Q.  Well, it's an LLC, so typically we refer to the
17 person in charge as a manager, but they may have some
18 other title.  But who is the person that is the
19 decision-maker for GC Operating Company, LLC, if you
20 recall?
21     A.  I don't recall at this moment.
22     Q.  I'm going to ask the same question.  Who's the
23 person that's the decision-maker, the actual person, the
24 manager of GC Holding Company 2, LLC, if you know?
25     A.  I don't recall.

32

8  (Pages 29 to 32)

Taetz, Linda
**People of the State of California v. Mariner Health care, Inc.**

* * * *

I do solemnly declare under penalty of perjury that the foregoing is my deposition under oath; are the questions asked of me and my answers thereto; that I have read same and have made the necessary corrections, additions or changes to my answers that I deem necessary.

I witness thereof, I hereby subscribe my name this _____ day of _____, _____.

_____
LINDA TAETZ

41

CERTIFICATION
OF
CERTIFIED SHORTHAND REPORTER

The undersigned certified shorthand reporter of the state of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date February 17, 2022.

_____
Viola Fedden
Certifcate No.: 5586

42

CASE NAME: _____
WITNESS NAME: _____
DATE TAKEN: _____
    TRANSCRIPT ERRATA SHEET
The reasons for making changes are as follow:
    1. To Clarify the record;
    2. To conform to the facts;
    3. To correct major transcription errors.

_____

PAGE    LINE    CORRECTION & REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____
Signature of Deponent          Date

43

11  (Pages 41 to 43)